**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

RHONDA JONES *et al.*,

       Plaintiffs,

  v.

VICTOR HILL *et al.*,

       Defendants.

CIVIL ACTION

NO. 1:20-CV-2791-ELR-CCB

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

July 27, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ............................................................................. 1

FACTUAL BACKGROUND ................................................................. 5

    A.    COVID-19 Presents a Substantial Risk of Severe Illness and Death to People in Jails ................................................. 5

    B.    Defendants Have Failed to Take Reasonable Steps to Prevent and Mitigate COVID-19 Exposure in the Jail ........................ 7

LEGAL STANDARD ......................................................................... 13

ARGUMENT .................................................................................. 14

I.     Plaintiffs Are Likely to Prevail on the Merits ............................... 14

    A.    Defendants Are Punishing Pretrial Plaintiffs in Violation of the Fourteenth Amendment Due Process Clause ........................... 14

    B.    Defendants Are Deliberately Indifferent to Plaintiffs' Constitutional Rights ................................................... 17

        1.    The COVID-19 Pandemic Poses an Objective Risk of Serious Harm ....................................................... 18

        2.    Defendants Have Been Deliberately Indifferent ....................... 19

    C.    The Medically Vulnerable and Disability Subclasses Are Likely to Prevail on Their Habeas Claim ................................ 26

        1.    COVID-19 Makes Confinement Unlawful for the Medically Vulnerable and Disability Subclasses ................... 26

        2.    Habeas Relief May Take the Form of Release or Transfer ........................................................ 28

    D.    The Disability Subclasses Are Likely to Prevail on Their Claim That Defendants Are Violating the ADA and the RA ............................................................... 28

i

II.  Without Injunctive Relief, Plaintiffs Will Be Irreparably Harmed....................................................................................33

III. The Public Interest and Balance of Equities Favor Plaintiffs .......................33

CONCLUSION .................................................................................................35

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Alcantara v. Archambeault*,
    No. 3:20-CV-756, 2020 WL 2315777 (S.D. Cal. May 1, 2020) ........................35

*Alexander v. Choate*,
    469 U.S. 287 (1985) ........................................................................29

*Ancata v. Prison Health Servs. Inc.*,
    769 F.2d 700 (11th Cir. 1985) ..............................................................34

*Arias v. Decker*,
    No. 1:20-CV-2802, 2020 WL 2306565 (S.D.N.Y. May 8, 2020) ......................35

*Banks v. Booth*,
    No. 1:20-CV-849, 2020 WL 3303006 (D.D.C. June 18, 2020) ........................33

*Banks v. Booth*,
    No. 1:20-CV-849, 2020 WL 1914896 (D.D.C. Apr. 19, 2020) ........................35

*Basank v. Decker*,
    No. 1:20-CV-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ...................25

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ..........................................................14, 15, 16, 17

*BellSouth Telecomms, Inc. v. MCIMetro Access Transmission Svcs*, LLC,
    425 F.3d 964 (11th Cir. 2005) ..............................................................13

*Brown v. Plata*,
    563 U.S. 493 (2011) ........................................................................17

*Busby v. Bonner*,
    No. 2:20-CV-2359, 2020 WL 3108713 (W.D. Tenn. Jun. 10, 2020) ..........28, 32

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................. 33

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ...................................................................... 17, 33

*Farmer v. Brennan*,
    511 U.S. 825 (1994) .......................................................... 17, 18, 19, 24

*Farrow v. West*,
    320 F.3d 1235 (11th Cir. 2003) ............................................................ 19

*Fraihat v. U.S. Immigration & Customs Enf't*,
    No. 5:19-CV-1546, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020) ....... 30-31, 32

*Goebert v. Lee Cnty.*,
    510 F.3d 1312 (11th Cir. 2007) ............................................................ 18

*Hale v. Tallapoosa Cnty.*,
    50 F.3d 1579 (11th Cir. 1995) ........................................................ 19, 21

*Haskins v. City of Boaz*,
    822 F.2d 1014 (11th Cir. 1987) ............................................................ 27

*Helling v. McKinney*,
    509 U.S. 25 (1993) ............................................................................. 18

*Hispanic Interest Coal. of Ala. v. Governor of Ala.*,
    691 F.3d 1236 (11th Cir. 2012) ............................................................ 34

*Jimenez v. Aristiguieta*,
    314 F.2d 649 (5th Cir. 1963) ............................................................... 28

*Kingsley v. Hendrickson*,
    576 U.S. 389 (2015) ...................................................................... 15, 18

*LaMarca v. Turner*,
    995 F.2d 1526 (11th Cir. 1993) ............................................................ 19

*Lonergan v. Fla. Dep't of Corr.*,
623 F. App'x 990 (11th Cir. 2015) ....................................29

*Magluta v. Samples*,
375 F.3d 1269 (11th Cir. 2004) ......................................15

*Malam v. Adducci*,
No. 5:20-CV-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020) ...............27

*Martinez-Brooks v. Easter*,
No. 3:20-CV-569, 2020 WL 2405350 (D. Conn. May 12, 2020) .......................4

*McMillian v. Johnson*,
88 F.3d 1554 (11th Cir. 1996) ....................................15, 17

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ...............................34

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
715 F.3d 1268 (11th Cir. 2013) ........................................34

*Pierce v. District of Columbia*,
128 F. Supp. 3d 250 (D.D.C. 2015) .......................................29, 30, 32

*Pimentel-Estrada v. Barr*,
No. 2:20-CV-495, 2020 WL 2092430 (W.D. Wash. Apr. 28, 2020) ................25

*Plata v. Brown*,
427 F. Supp. 3d 1211 (N.D. Cal. 2013) ............................................27

*Preiser v. Rodriguez*,
411 U.S. 475 (1973) ........................................27

*R.W. v. Bd. of Regents of the Univ. Sys. of Ga.*,
114 F. Supp. 3d 1260 (N.D. Ga. 2015) .....................................29

*Reaves v. Dep't of Correction*,
404 F. Supp. 3d 520 (D. Mass. 2019) ................................................26

*Robenson v. Decker*,
No. 2:20-CV-5141, 2020 WL 2611544 (D.N.J. May 22, 2020) ........................35

*Swain v. Junior*,
961 F.3d 1276 (11th Cir. 2020) ...................................................................18, 19

*Taylor v. Hughes*,
920 F.3d 729 (11th Cir. 2019) ............................................................................24

*Thakker v. Doll*,
No. 1:20-CV-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020)......................25

*Thomas v. Bryant*,
614 F.3d 1288 (11th Cir. 2010) .........................................................................20

*Vazquez Barrera v. Wolf*,
No. 4:20-CV-1241, 2020 WL 1904497 (S.D. Tex. Apr. 17, 2020) ..................33

*Walker v. City of Calhoun*,
901 F.3d 1245 (11th Cir. 2018) .........................................................................19

*Wilson v. Gordon*,
822 F.3d 934 (6th Cir. 2016) .............................................................................33

*Zaya v. Adducci*,
No. 5:20-CV-10921, 2020 WL 2487490 (E.D. Mich. May 14, 2020)...............35

**STATUTES**

28 U.S.C. § 2241 ...................................................................................................14

42 U.S.C. § 1983 .............................................................................................14, 26

42 U.S.C. § 12101 .................................................................................................29

42 U.S.C. § 12102 .................................................................................................28

42 U.S.C. § 12131 ...........................................................................................29, 30

O.C.G.A. § 42-1-8...............................................................................28

O.C.G.A. § 42-4-7...............................................................................28

**RULES AND REGULATIONS**

28 C.F.R. § 35.102 .............................................................................29

28 C.F.R. § 35.104 .........................................................................29, 30

28 C.F.R. § 35.108 .............................................................................28

28 C.F.R. § 35.130 .........................................................................29, 30

**OTHER AUTHORITIES**

Clayton Cty. Sheriff's Office Advisory, May 30, 2020 .........................17

U.S. Ctrs. for Disease Control & Prevention, *Considerations for
    Wearing Cloth Face Coverings* (Jun. 28, 2020)................................24

U.S. Ctrs. for Disease Control & Prevention, *Interim Considerations
    for SARS-CoV-2 Testing in Correctional and Detention Facilities*
    (July 7, 2020) ......................................................................................6

U.S. Ctrs. for Disease Control and Prevention, *Interim Guidance on
    Management of Coronavirus Disease 2019 (COVID-19) in
    Correctional and Detention Facilities* (Mar. 23, 2020) ....................6, 21, 22, 23

U.S. Ctrs. for Disease Control & Prevention, *People Who Are at
    Increased Risk for Severe Illness* (June 25, 2020).............................5

**INTRODUCTION**

Plaintiffs seek preliminary injunctive relief to prevent imminent irreparable harm—including death and permanent physical injury—from the spreading COVID-19 outbreak in the Clayton County Jail and Defendants' failure to take reasonable steps to address the risks posed by the virus.

The COVID-19 pandemic is a life-and-death crisis of a magnitude unlike anything in living memory. Because the crisis presents immediate and severe problems for jails and prisons, federal courts around the country have had to confront the pandemic's unprecedented threat to incarcerated populations in order to preserve detainees' fundamental rights under the Eighth and Fourteenth Amendments. The specific conditions at issue in each lawsuit necessarily must be assessed on a case-by-case basis, with remedies tailored to the particular facts. In the present case, the evidence shows that there is a significant outbreak of COVID-19 at the Clayton County Jail, that the Jail's conditions are egregiously deficient, and that Defendants are callously indifferent to protecting detainees from a deadly virus. Judicial intervention is essential to save lives.

Despite the risks being evident for months, and an increasing number of positive cases in the Jail, Defendants have "taken little meaningful action to prevent the spread of COVID-19 and to protect the health and safety" of detainees.

(Rottnek Decl. ¶ 13.)[1]  Indeed, Defendants are taking actions that increase the

likelihood that detainees and staff will become infected:

- Defendants have failed to identify and isolate infected persons, instead leaving them inside crowded cells where they spread the virus to others.

- Defendants have no functioning system to ensure that infected people receive prompt medical attention, and instead instruct sick people to submit a medical request, a process that delays medical intervention for up to a week.

- Defendants have placed healthy persons into cells with people who are experiencing fevers, vomiting, diarrhea, and other COVID-19 symptoms.

- Defendants failed to provide facemasks to most detainees for a full three months, instead instructing detainees—including elderly and medically vulnerable people—to use a towel, t-shirt, sock, or underwear as a makeshift facemask.  There remains no system for replacing and cleaning masks, and not all detainees have been issued them.

- Defendants have failed to provide even minimally adequate hygiene and cleaning supplies, such that detainees resort to using scraps of toilet paper, socks, and their personal allotment of body soap to clean their cells.  The Defendants severely restrict soap distribution, providing detainees with only a small amount of liquid soap per week for hand-washing, showering, and in-cell cleaning.

- Defendants have failed to identify detainees who are medically vulnerable and take necessary precautions to protect them against infection.

- Defendants assign healthy detainees to beds vacated by detainees

---

[1] Plaintiffs submit the declarations of 12 present or former detainees and 3 experts: Nina Fefferman, Ph.D., an epidemiologist at the University of Tennessee, Knoxville; Fred Rottnek, M.D., a Professor of Medicine at Saint Louis University and the former Medical Director of the Saint Louis County Jail; and Emmitt L. Sparkman, a corrections consultant with more than 44 years of experience, including 11 years as Deputy Commissioner of Institutions for the Mississippi Department of Corrections.

exhibiting symptoms of COVID-19 without making any effort to sanitize the cell or bed.

- Defendants require detainees to line up a foot or two apart from one another during meal distribution, pill call, video court, and other activities.

- Defendants failed to provide any education or information about COVID-19 to detainees for a full three months of the pandemic, and to date have provided no information to detainees about COVID-19 symptoms, the Jail's outbreak, or the importance of reporting symptoms to jail staff.

- Defendants have made no discernable effort to reduce the Jail's population, continuing to house three detainees in most of the Jail's two-person cells.

Defendant Victor Hill and his subordinates, who operate the Jail and boast publicly of its harsh conditions, exhibit deliberate indifference to the risks of COVID-19 despite a surge of positive cases in the Jail. Public health agencies report 72 infected detainees as of July 9, plus at least 13 infected staff members. (Ex. G, Attach. 2, 3, 4, 9.) Instead of responding reasonably to this threat to people in their custody, Defendants contend that no outbreak exists. (Ex. K.) Defendants ignore warnings from public health agencies about COVID-19's heightened risk in jails and disregard basic precautionary steps such as social distancing, increased personal hygiene, sanitizing surfaces and cells, aggressive testing, and wearing personal protective equipment, such as clean masks. As a result of Defendants' conduct, conditions in the Jail pose an "unnecessary risk" to detainees and the public. (Fefferman Decl. ¶¶ 9, 12-14.)

To remedy Defendants' inaction and the resulting risk of harm to detainees, Plaintiffs brought this action on behalf of themselves and two classes—the Principal Pretrial Class, and the Principal Post-Adjudication Class—encompassing all detainees confined in the Jail, seeking relief from unconstitutional conditions of confinement. (Doc. 1 ¶¶ 181-88; *see id.* ¶¶ 207-14.) In addition, Plaintiffs seek to represent (1) Medically Vulnerable Subclasses of detainees whose age or medical condition makes them especially vulnerable to the most severe consequences of COVID-19, and (2) Disability Subclasses of detainees whose disabilities make them especially vulnerable to the most severe consequences of COVID-19 and entitle them to the protections of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA). (*Id.* ¶¶ 189-206; *see id.* ¶¶ 207-36.)

Plaintiffs now move for a preliminary injunction and writ of habeas corpus providing the relief set forth in the accompanying motion and proposed order, including a written plan to mitigate COVID-19 in the Jail and proper monitoring to ensure full implementation; preliminary steps toward releasing certain detainees, including identification of all members of the Medically Vulnerable and Disability Subclasses; and a plan for releasing medically vulnerable detainees.[2] Without

_____

[2] *See, e.g.*, *Martinez-Brooks v. Easter*, No. 3:20-CV-569, 2020 WL 2405350, at *32-33 (D. Conn. May 12, 2020) (ordering prison officials to identify "medically

preliminary injunctive relief, Plaintiffs will continue to be unnecessarily exposed to and infected by COVID-19 in violation of their constitutional and statutory rights. The Court should grant Plaintiffs' motion.

## FACTUAL BACKGROUND

### A. COVID-19 Presents a Substantial Risk of Severe Illness and Death to People in Jails.

COVID-19 is a highly contagious and deadly virus that presents an inherent risk in jails, which are "incubators for the virus." (Rottnek Decl. ¶ 15.) In Georgia alone, COVID-19 has infected at least 80,000 people and killed more than 2,800. (Doc. 1 ¶ 85.) Those 55 and older or with underlying health conditions are most susceptible.[3] COVID-19 spreads rapidly via "droplets in the air" and may also be transferred by "contaminated surfaces." (Fefferman Decl. ¶ 18.) Strictly following CDC guidelines regarding COVID-19—including reducing the number of detainees in congregate environments, promoting hygiene, providing face masks, and disinfecting surfaces often—is the best way to "mitigate the risk of infection and serious illness." (Rottnek Decl. 17-18; *see also* Sparkman Decl. ¶ 99.)

_____

vulnerable inmates" and implement process to review them for home confinement).

[3] U.S. Ctrs. for Disease Control & Prevention, *People Who Are at Increased Risk for Severe Illness* (June 25, 2020), https://bit.ly/3fVxXOb.

Congregate conditions in jails "foster[] easy transmission of COVID-19 infection." (Fefferman Decl. ¶ 19.) Daily staff ingress and egress as well as high population turnover also compound the risks of COVID-19 in jails, putting detainees, staff, and the public at "unnecessary risk." (*Id.* at ¶¶ 9-14; *see also* Sparkman Decl. ¶¶ 21, 95-97.)

The CDC has published guidance for detention facilities, which includes common-sense steps they can take to mitigate the risk of infection, including promoting intensified cleaning, educating staff and detainees, providing cloth face coverings, ensuring adequate amounts of hygiene supplies, and practicing social distancing.[4] CDC guidelines are considered an authoritative source by correctional administrators, and adherence to the guidelines is critical. (Sparkman Decl. ¶ 19-24.) These measures, however, "are designed to manage and mitigate—not completely eliminate—the increased risk to jail populations." (Rottnek Decl. ¶ 19.) Public health professionals widely agree that "[t]he best chance for medically vulnerable [detainees] to survive . . . is to release them." (*Id.* ¶ 43.)

---

[4] U.S. Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://bit.ly/2BX2gES (hereinafter, "*CDC Interim Guidance*"); *see also* U.S. Ctrs. for Disease Control & Prevention, *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities* (Jul. 7, 2020), https://bit.ly/2WDAvZv.

**B. Defendants Have Failed to Take Reasonable Steps to Prevent and Mitigate COVID-19 Exposure in the Jail.**

From the beginning of the pandemic, Defendants have been aware of the risks posed by COVID-19 and recommendations from public health experts about containing it.[5] Defendants have largely ignored this clear guidance (Sparkman Decl. ¶¶ 24-96), allowing for significant spread of COVID-19 within the Jail (Fefferman Decl. ¶¶ 16, 31).

The Georgia Department of Public Health confirmed 32 COVID-19 infections among Clayton County Jail detainees as of June 11, and 72 infections as of July 10. (Ex. G, Attach. 2 & 9.) The Clayton County Sheriff's Office nonetheless claims publicly that "[t]here is no outbreak of COVID-19 in our facility." (Ex. K.) Consistent with this denial, Defendants have no apparent system to track the outbreak, and they regularly leave symptomatic people in overcrowded cells, where sick people infect others. (Fefferman Decl. ¶¶ 24-31; Sparkman Decl. ¶¶ 83-95; F.S. Decl. ¶¶ 23-27.) Many detainees "have not been tested for COVID-19 . . . even though [they] had symptoms." (Singleton Decl. ¶

---

[5] For example, on March 13, 2020—the same day the President declared a national emergency—internal affairs Captain Eddie Cross emailed all five Defendants warning that prevention measures were needed to slow the spread of the virus and that people with chronic medical conditions were at higher than normal risk of serious illness if infected. (Ex. E; *see also* Ex. J.)

10.) Still others are refused medical care for even severe symptoms and are not separated from other detainees. (W.M. Decl. ¶¶ 28-33; D.H. Decl. ¶¶ 13-25.) Despite the spreading virus, people are directed to congregate in groups, with no distancing, for pill call, meal distribution, video court, and in the medical unit. (Sparkman Decl. ¶ 39-43.)

Numerous detainees have submitted declarations with this Court recounting their experiences in a jail in which Defendants failed to take reasonable steps in response to the known risks of the pandemic. (Ex. D.) The following are a few examples showing Defendants' unreasonable failure to act:

- W.L.M. is a 57-year-old man. (W.L.M. Decl. ¶ 2.) In May, he was placed in a small cell with a man experiencing fever, difficulty breathing, and diarrhea. (*Id.* ¶ 18.) The man was awaiting COVID-19 test results. (*Id.* ¶¶ 18-19.) W.L.M. had no mask. (*Id.*). Within days, W.L.M. had contracted COVID-19; he could not hold down food or water, had severe diarrhea, and "immense difficulty breathing." (*Id.* ¶¶ 21-28.) He repeatedly informed staff about his symptoms and was tested but was not isolated. (*Id.*) On a night when he could not breathe, "felt as if [his] lungs were going to collapse," and begged for help (*id.* ¶ 29), an officer told him to wait in his cell for six hours "until count," at which time another officer told him to wait hours longer "until free time" to submit a medical request. (Id. ¶¶ 30-32.) He was never called to the medical unit.

- M.B. is a 52-year-old woman who recently underwent chemotherapy for cancer. (M.B. Decl. ¶¶ 2, 12.) In late May, M.B. asked an officer for a mask, but none was provided. (*Id.* ¶ 13.) M.B. tied a scrap of old, ripped underwear around her face as a makeshift mask. (*Id.*) She became ill but could not submit a request to see a medical provider because her electronic kiosk access was "on restriction." (*Id.* ¶ 19.)

- F.S. is a 27-year-old woman whose cellmate, C.H., experienced fever, vomiting, and coughing up blood in April. (F.S. Decl. ¶¶ 2, 23-24.) When F.S. sought help, an officer told C.H. to submit a medical request, but C.H. was too sick to walk. (*Id.* ¶ 24.) When F.S. herself developed a fever, chills, sore throat, headaches, and vomiting, officers left both women in their housing unit, where they continued to line up with other detainees during meal and medication distribution. (*Id.* ¶¶ 23-27.) After submitting a medical request, F.S. waited a week to be seen by medical staff. (*Id.* ¶¶ 25-26.) She was never tested for COVID-19. (*Id.* ¶ 27.) During her illness, she used a cut-up sheet as a mask. (*Id.* ¶ 21.)

- D.H. is a 28-year-old man who works as a trustee, or inmate worker, in the Jail. (D.H. Decl. ¶¶ 2-4.) When other trustees in D.H.'s dorm began displaying symptoms consistent with COVID-19, jail officers did not immediately remove them from the dorm and instructed them to continue working around the Jail. (*Id.* ¶¶ 13-15.) D.H. became sick with similar symptoms shortly thereafter. (*Id.* ¶ 20.) He reported his symptoms to a nurse but was sent back to his dorm. (*Id.* ¶ 23.) For the next two weeks, despite being weak and actively symptomatic, D.H. was instructed to wrap a towel around his face and continue distributing meal trays to detainees in other housing units. (*Id.* ¶ 24.) He later tested positive for COVID-19. (*Id.* ¶ 26.)

- Similarly, detainees Mitchell and J.H. each placed medical requests seeking attention for symptoms consistent with COVID-19 and either waited over a week before being seen by medical staff or were never seen at all. (Mitchell Decl. ¶¶ 13-16; J.H. Decl. ¶¶ 30-31.)

Although the CDC urges jails to educate detainees about the risks of COVID-19, Defendants are not doing so. (Sparkman Decl. ¶ 70-75.) Detainees consistently report that Defendants have made no effort to advise detainees about coronavirus symptoms. (F.S. Decl. ¶ 19; A.W. Decl. ¶ 32; M.B. Decl. ¶ 16.) Defendants similarly disregard CDC recommendations to implement intensified

cleaning of the Jail.. (Sparkman Decl. ¶ 44-53.) The Jail's communal "showers [are] covered in black mold and rarely cleaned." (J.H. Decl. ¶ 13.) "Many people use the same telephones, showers, tables, and kiosks, without those items being sanitized between uses." (Jones Decl. ¶ 10; *see also* Singleton Decl. ¶ 4 (same).) Also, the Jail remains at nearly 100% capacity, and many detainees sleep on the floor with their head "two feet from the toilet." (F.S. Decl. ¶ 9.) Failing plumbing systems result in detainees sleeping where toilet water leaks onto the floor, soaking their bedding. (Watkins Decl. ¶ 20; Jones Decl. ¶ 6, 12; A.W. ¶ 10.).) Cells "smell of feces" (W.L.M. Decl. ¶ 11), have inoperable toilets (C.C. Decl. ¶ 17; A.W. Decl. ¶ 12), and are covered in mildew and mold. (A.W. Decl. ¶¶ 13-16.)

"Given the seriousness and prevalence of COVID-19, any jail administrator would understand the need for intensive sanitation measures during this time." (Sparkman Decl. ¶ 44.) But the Jail has not taken any coordinated effort to intensify cleaning. (Sparkman Decl. ¶ 51; Watkins Decl. ¶ 22; *see also* W.L.M. Decl. ¶ 13.) Prisoners who want to clean their own living areas lack supplies, and resort to using bits of toilet paper, socks, and body soap for in-cell sanitation. (*See, e.g.*, Sparkman Decl. ¶ 48; Jones Decl. ¶ 11.) While the provision of clean laundry is crucial to avoiding the spread of disease, laundering of personal items is not regular or timely at the Jail, and detainees often wait weeks or months before their

jumpsuits, towels, or sheets are laundered. (Sparkman Decl. ¶ 62-64; Mitchell Decl. ¶¶ 10-11; W.L.M. Decl. ¶ 15; J.H. Decl. ¶ 20; Watkins Decl. ¶ 17-19.) Although the CDC recommends making liquid soap readily available, soap at the Jail is strictly rationed, even as disease spreads. (Sparkman Decl. ¶ 56-58.) Detainees are only allotted four ounces per week—equivalent to a motel-sized bar of soap—and there are weeks when none is available. (J.H. Decl. ¶ 19; Watkins Decl. ¶ 15; A.W. Decl. ¶ 17; F.S. Decl. ¶ 14.) Many detainees must use their weekly soap allotment for in-cell cleaning and laundry, in addition to personal hygiene. (Singleton Decl. ¶ 6; Watkins Decl. ¶ 15.)[6]

The CDC also recommends the use of masks to stop the virus's spread, and "uniform mask use among detainees and staff would be an obvious and relatively inexpensive safeguard that any reasonable jail administrator would implement." (Sparkman Decl. ¶ 65.) But until this litigation was filed, most non-trustee detainees had no jail-issued masks. (*id.* ¶ 67.) Detainees were instead told to use makeshift masks of spare towels, ripped-up underwear, and pieces of sheets—if they have any—which are often unlaundered and potentially contaminated. (*Id.*)

---

[6] "At a jail where many people are testing positive for COVID-19 . . . any reasonable correctional administrator would know to modify the procedures, especially procedures pertaining to the rationing of soap." (Sparkman Decl. ¶ 54.)

Masks are not laundered, let alone laundered "routinely," as recommended by the CDC.  (*Id.* ¶ 66 (quoting *CDC Interim Guidance*).)

The CDC recommends jails promote social distancing and yet Defendants do just the opposite by compelling detainees every single day to line up one next to the other to obtain meals and medications, even packing "approximately twenty" people "side-by-side and back-to-back" for "video court."  (Watkins Decl. at ¶ 11; Singleton Decl. ¶ 4; J.H. Decl. ¶ 32; Sparkman Decl. ¶¶ 39-42.)  Defendants also refuse to release detainees who are eligible for home confinement or early release (*see* Ex. F) and routinely incarcerate people unable to purchase their release by payment of small bail sums.

The Jail's conditions are well known to each of the Defendants, all of whom have worked at the Jail for years and enter the Jail's housing units regularly.  In addition, multiple detainees have reported concerns about the Jail's systematic failure to ensure sanitary conditions, provide timely medical care, issue face coverings and cleaning supplies, provide information about COVID-19, or screen for COVID-19.  (Ex. I.)  As detainee A.B. aptly noted in a grievance submitted on May 31, "the staff here [are] not taking this pandemic serious[ly]."  (Ex. I.)

Defendants' failures to implement reasonable measures to mitigate the danger of COVID-19 are "medically and epidemiologically unsupportable."

(Fefferman Decl. ¶¶ 22, 26, 30.)  Further, they are contrary to "the standards on which reasonable correctional administrators would rely in addressing the pandemic."  (Sparkman Decl. ¶ 14.) These failures put all Plaintiffs—particularly those in the Medically Vulnerable and Disability Subclasses, who are "predispose[d] to severe COVID-19 outcomes"—at heightened and "unnecessary risk."  (*Id.* at ¶¶ 3, 12.)  Named Plaintiffs are among those at an increased risk of death or severe, permanent injury.  Plaintiff Jones is 58 years old with Chronic Obstructive Pulmonary Disorder.  (Jones Decl. ¶¶ 2-3.)  Plaintiff Watkins is a 60-year-old diabetic.  (Watkins Decl. ¶¶ 2-3.)  And Plaintiff Singleton is a 59-year-old man with hypertension.  (Singleton Decl. ¶¶ 2, 7.)[7]

## LEGAL STANDARD

A preliminary injunction should issue if the movants show: (1) a substantial likelihood of success on the merits; (2) irreparable harm absent an injunction; (3) a balance of harms in their favor; and (4) that the injunction would not be adverse to the public interest.  *BellSouth Telecomms, Inc. v. MCIMetro Access Transmission Svcs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005).

---

[7] Plaintiff Randolph Mitchell has been released from the Jail.

**ARGUMENT**

## I.     Plaintiffs Are Likely to Prevail on the Merits.

Plaintiffs are likely to prevail on each of their claims for relief.  First, the harmful conditions in the Jail fail to further any legitimate penological interest, amounting to unconstitutional punishment of pretrial detainees.  Second, Defendants have been deliberately indifferent to the threat of COVID-19 by failing to take reasonable steps to mitigate the risk.  Third, the continued detention of medically vulnerable detainees and detainees with disabilities constitutes unlawful confinement, requiring a writ of habeas corpus with respect to those detainees and release to protect their constitutional rights.[8]  Fourth, Defendants have unlawfully discriminated against detainees with disabilities who are at higher risk of serious illness or death from COVID-19.

### A.     Defendants Are Punishing Pretrial Plaintiffs in Violation of the Fourteenth Amendment Due Process Clause.

Because pretrial detainees have not been convicted of a crime, the Fourteenth Amendment Due Process Clause prohibits the government from punishing them.  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  Punishment occurs

---

[8] As discussed below, Plaintiffs seek the release of medically vulnerable detainees and detainees with disabilities under two separate statutes: 28 U.S.C. § 2241 and 42 U.S.C. § 1983.

"when a condition of pretrial detention is not reasonably related to a legitimate

governmental goal," such as when jail conditions are "excessive in relation to the

legitimate purpose assigned to [them]." *McMillian v. Johnson*, 88 F.3d 1554, 1564

(11th Cir. 1996); *see Magluta v. Samples*, 375 F.3d 1269, 1274 (11th Cir. 2004)

(holding complaint stated punishment claim where plaintiff alleged he was

"confined under extremely harsh conditions . . . for no legitimate reason").

Although *Bell* refers to an impermissible "purpose of punishment," *Bell*, 441 U.S.

at 538, "*Bell*'s focus on 'punishment' does not mean that proof of intent (or

motive) to punish is required for a pretrial detainee to prevail on a claim that his

due process rights were violated." *Kingsley v. Hendrickson*, 576 U.S. 389, 398

(2015). Instead, *Bell* announced an "objective standard." *Id.*

Here, Defendants' failure to take minimally adequate steps to prevent

COVID-19 infections lacks a connection to a "legitimate purpose." As reflected in

Plaintiffs' evidence, the Clayton County Jail is operating in a manner that risks

spreading infections among the thousands of detainees and staff cycling through

the Jail, who then take the disease back to the community. Defendants permit the

Jail's living areas to become hubs for the virus's spread, rarely if ever sanitizing

the surfaces of tables, telephones, kiosks, showers, and toilets used by numerous

detainees each day. (Sparkman Decl. ¶ 44-53.) Detainees lack basic supplies to

clean cells—even cells  housing sick detainees—and they resort to using toilet paper, clothing items, and body soap to wipe in-cell surfaces.  (*Id.* 48-49.) Defendants strictly ration hand soap in the midst of a global pandemic and a large outbreak at their own facility.  (*Id.* ¶ 54-61.)  Detainees are required to congregate for meal distribution, pill call, and sick call, and are not consistently issued functional face coverings to limit person-to-person spread of disease.  And detainees who report symptoms consistent with COVID-19 are often ignored. (W.L.M. Decl. ¶ 29 ("[I]t felt as if my lungs were going to collapse. I could not breathe. I began to bang on my cell door . . . no one was coming to help."); M.B. Decl. ¶ 18 ("My chest feels tight and my body aches. I am having chills, I feel sweaty, and I am having shortness of breath . . . But I have not been able to see anyone on the medical staff").)

Jail officials' "arbitrary and purposeless" decision to disregard experts' guidance and ignore reasonable steps to protect detainees is disconnected from any legitimate governmental interest and undermines the government's compelling interest in controlling the pandemic.  *Bell*, 441 U.S. at 520.  It cannot be justified by cost savings.  Certain steps—such as releasing eligible detainees, educating detainees remaining in the Jail, and providing prompt medical attention to symptomatic detainees—would involve little if any financial cost.  Other measures

would involve only modest expenditures that likely would be offset by reducing the costs of caring for detainees who become ill. At minimum, Defendants' inaction is "excessive in relation to" any interest in limiting financial outlays. *See McMillian*, 88 F.3d at 1564.

Indeed, Defendants' practices most plausibly project their desire to operate the facility as "Georgia's toughest para-military jail,"[9] and thus appear calculated to achieve retribution and deterrence, which "are not legitimate nonpunitive governmental objectives" with respect to pretrial detainees. *See Bell*, 441 U.S. at 539 n.20. Accordingly, Plaintiffs have a substantial likelihood of showing that, with respect to pretrial detainees, the Jail's conditions of confinement serve no "legitimate governmental purpose" and violate the Due Process Clause.

### B. Defendants Are Deliberately Indifferent to Plaintiffs' Constitutional Rights.

Governments have a constitutional duty to protect detainees from "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This right arises under the Eighth Amendment after conviction. *See Brown v. Plata*, 563 U.S. 493, 510 (2011); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). *A fortiori*, an Eighth Amendment violation also violates the rights of pretrial

---

[9] *See, e.g.*, Clayton Cty. Sheriff's Office Advisory, May 30, 2020, https://local.nixle.com/alert/8024208.

detainees under the Fourteenth Amendment's Due Process Clause. *See Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

To succeed on a claim of deliberate indifference, plaintiffs must show (1) a deprivation that is serious, and (2) that prison officials acted with deliberate indifference. *See Farmer*, 511 U.S. at 834.[10]

### 1. The COVID-19 Pandemic Poses an Objective Risk of Serious Harm.

Plaintiffs and other Clayton County Jail detainees face an objective risk of serious harm from COVID-19. A "condition of confinement that is sure or very likely to cause serious illness and needless suffering" to someone detained, which includes "exposure of inmates to a serious, communicable disease," is precisely the type of serious harm against which the Constitution protects. *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

COVID-19 is a serious, communicable disease that poses a threat to all detainees, especially those who are medically vulnerable. (*See, e.g.*, Fefferman Decl. ¶¶ 9-10; Rottnek Decl. ¶¶ 25-27, 43-44.) Thus, courts have recognized that COVID-19 poses an objective risk of serious harm. *See, e.g.*, *Swain v. Junior*, 961

---

[10] Plaintiffs preserve the argument that pretrial detainees need only make an objective showing under the deliberate indifference standard. *See Kingsley*, 135 S. Ct. at 2473-74. Plaintiffs acknowledge that the Eleventh Circuit has taken a contrary view. *See Swain v. Junior*, 961 F.3d 1276, 1285 n.4 (11th Cir. 2020).

F.3d 1276, 1285 (11th Cir. 2020).  Dozens of Clayton County Jail detainees have been infected with COVID-19 over the past four months, and the virus is still spreading through the Jail.  The conditions in the Jail thus pose an objectively serious risk of harm.

## 2.      Defendants Have Been Deliberately Indifferent.

Jailers are deliberately indifferent when they have "subjective awareness of an 'objectively serious need'" and their response is "objectively insufficient."  *See Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  A response is objectively insufficient where a jailer fails "to take reasonable measures to abate" the known risk of harm.  *Farmer*, 511 U.S. at 847.  In that regard, a jailer may be liable "for disregarding 'alternative means' or interim measures for reducing the risk" despite taking minimal responsive action.  *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1584 (11th Cir. 1995).  Where, as here, jailers are sued in their official capacities, a court may consider "the institution's historical indifference" to address the risk of harm.  *See LaMarca v. Turner*, 995 F.2d 1526, 1542 (11th Cir. 1993).[11]  A history of constitutional violations permits courts "to conclude that future violations of the

---

[11] *Cf. Walker v. City of Calhoun*, 901 F.3d 1245, 1270 (11th Cir. 2018) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case." (quoting *Flanigan's Enters., Inc. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc)).

same kind are likely." *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010)

(quoting *Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005)).

Defendants are unquestionably aware of the life-threatening risks presented

by COVID-19.  Government orders, public health guidance, and extensive news

coverage have repeatedly emphasized the risks of COVID-19 to incarcerated

people, as well as the heightened risk to the medically vulnerable.  (*See, e.g.*, Doc.

1 ¶¶ 97-98, 100 (citing public records concerning risks of COVID-19 and

prevention measures).)  Preventative measures like social distancing, the use of

masks, and proper hygiene have been widely publicized.  (*See* Doc. 1 ¶ 97.)  The

Jail's own records establish that written announcements and advice from multiple

public health authorities were distributed to Defendants.  (Ex. E; Ex. J.)

Defendants are likewise aware of the living conditions in the Jail, as the conditions

are obviously deficient and each Defendant is a senior official who has been

involved in operating the Jail for years.

Nevertheless, Defendants have ignored public health guidance and failed to

adopt measures that any reasonable correctional administrator would adopt in

addressing the pandemic.  (Sparkman Decl. ¶¶ 14, 26-96.)  Instead of taking steps

to reduce the Jail's population (*see* Ex. F), Defendants have continued to operate

the Jail at capacity, with most detainees housed three to a cell (*see* Ex. D).

Defendants have consistently failed to take reasonable steps to prevent and mitigate COVID-19 infections. Rather, they have declared there is no outbreak of COVID-19 in the Jail even though infections among detainees more than doubled between June 11 and July 9. Defendants continue to operate the Jail in a reckless manner. *See Hale*, 50 F.3d at 1579 (holding "atmosphere of deliberate indifference" at jail supported finding that defendant was liable).

Defendants' practices are so inherently risky and likely to spread COVID-19 that deliberate indifference is the only explanation for them. It is objectively unreasonable to place a healthy detainee in a cell with a symptomatic, infected person, yet Defendants do so.[12] (*See, e.g.*, Watkins Decl. ¶¶ 37-40; F.S. Decl. ¶¶ 23-27; J.H. Decl. ¶¶ 29-30.) Defendants' officers have also failed to isolate infected people, leading them to further spread the virus.[13] (*See, e.g.*, W.L.M. Decl. ¶¶ 18-21; Watkins Decl. ¶¶ 37-40; F.S. Decl. ¶¶ 23-27; J.H. Decl. ¶¶ 29-30.) Even when jailers remove symptomatic detainees from housing units, the cells are not sanitized before another detainee is assigned, and the cellmates of sick people

---

[12] The reasonable response when people display COVID-19 symptoms is to "immediately" place them "under medical isolation." *CDC Interim Guidance*, https://bit.ly/2BX2gES.

[13] Those who have been in close contact with a known COVID-19 case must promptly be quarantined. *CDC Interim Guidance*, https://bit.ly/2BX2gES.

are not tested for COVID-19.  (*See, e.g.*, A.W. Decl. ¶¶ 40-41; D.H. Decl. ¶¶ 16-18.)[14]  And Defendants place new admittees into general population without testing to ensure they do not have COVID-19.  (*See, e.g.*, W.L.M. Decl. ¶ 4; R.L. Decl. ¶¶ 9-12; Singleton Decl. ¶ 9.)

One critical way of preventing the spread of a contagious disease is by "implementing intensified cleaning and disinfecting procedures" to limit transmission of the virus through contaminated surfaces.[15]  Such measures are especially important in a jail, where dozens of detainees are forced to share the same telephones, showers, tables, and kiosks.  (*See, e.g.*, Jones Decl. ¶ 10.)  Nonetheless, Defendants continue to clean the common areas only "rarely" and fail to sanitize objects and surfaces between uses.  (*See, e.g.*, Watkins Decl. ¶ 25; Jones Decl. ¶ 10; Mitchell Decl. ¶ 6; Singleton Decl. ¶¶ 4, 6.)  Similarly, Defendants fail to provide detainees with chemicals necessary to sanitize their cells—issuing only a broom and dirty mop water most days—despite multiple complaints from

---

[14] When detainees complain of COVID-19 symptoms, jailers instead tell detainees to place a sick-call request on the kiosk, after which detainees wait several days to be seen by medical staff members, if they are seen at all.  (*See, e.g.*, J.H. Decl. ¶¶ 30.)  In the meantime, they remain in their assigned housing units with others, potentially spreading the disease.  (*See, e.g.*, Watkins Decl. ¶¶ 37-40; J.H. Decl. ¶¶ 30-32; F.S. Decl. ¶¶ 23-27.)

[15] *CDC Interim Guidance*, https://bit.ly/2BX2gES.

detainees about the lack of supplies. (*See, e.g.*, Watkins Decl. ¶¶ 23-24; Jones Decl. ¶ 11; Mitchell Decl. ¶¶ 9-10; Singleton Decl. ¶¶ 3, 6; J.H. Decl. ¶ 9.)

Another reasonable way of reducing the spread of the virus is to educate detainees about the virus's symptoms and the importance of good hygiene, and by issuing adequate supplies of soap for detainees to wash their hands frequently.[16] But Defendants have given detainees no information regarding COVID-19 symptoms (*see, e.g.*, Watkins Decl. ¶ 32; Jones Decl. ¶ 4; Mitchell Decl. ¶ 22; Singleton Decl. ¶ 11; J.H. Decl. ¶ 25), and detainees continue to receive, at most, the same four-ounce weekly allotment of soap that Defendants provided before the pandemic (*see, e.g.*, Watkins Decl. ¶ 15 ("Four ounces does not last any of us for the whole week.").[17]

Defendants have also failed to implement social distancing. They continue to require large groups of detainees to congregate during meal distribution, pill distribution, visits to the medical unit, and "video court" hearings, significantly

---

[16] *CDC Interim Guidance*, https://bit.ly/2BX2gES. (Sparkman Decl. ¶ 70-75.)

[17] "The amount of soap provided at the Clayton County Jail is woefully inadequate to ensure the kind of frequent hand washing needed to stop the spread of a contagious illness. If a person runs out of soap, more should be provided, and it should be provided immediately. This is not a time to maintain strict adherence to existing procedures about soap quantity. Soap, paper towels, and other hygiene items should be readily available upon request for detainees." (Sparkman Decl. ¶ 58.)

increasing the risk of contagion.  (*See, e.g.*, Watkins Decl. ¶¶ 13, 14, 26-27; A.W. Decl. ¶¶ 23-24; J.H. Decl. ¶ 32; R.L. Decl. ¶ 11.)

Until recently, Defendants had not issued most detainees facial coverings, "a critical preventive measure."[18]  Before this, only "inmate workers" were issued masks; all other detainees resorted to placing random clothing items like underwear or towels over their faces.  (*See, e.g.*, Watkins Decl. ¶ 35; Jones Decl. ¶ 14; Mitchell Decl. ¶¶ 19-20; Singleton Decl. ¶¶ 4, 8.)  Though Defendants may have recently issued masks to more detainees, it appears Defendants have still not issued every detainee a mask, and Defendants have not provided a way for those with masks to clean or replace them regularly.  (*See, e.g.*, Watkins Decl. ¶ 36 (noting in late June that he had been given a surgical mask at the end of May that had "not been cleaned or replaced" in the intervening three weeks).)

In sum, Defendants have failed to take "reasonable measures to abate" the serious harm of COVID-19.  *Farmer*, 511 U.S. at 837.[19]  The Clayton County Jail

---

[18] U.S. Ctrs. for Disease Control & Prevention, *Considerations for Wearing Cloth Face Coverings* (Jun. 28, 2020), https://bit.ly/32cUxh6.

[19] Defendants' response to date is so perfunctory that "even a lay person would easily recognize" the need for corrective action.  *See Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (citation omitted), *remanded*, No. 2:14-CV-1163, 2019 WL 5756057 (M.D. Ala. Nov. 4, 2019), *appeal filed*, (11th Cir. Dec. 5, 2019).  Many detainees have expressed concerns about the Jail's deficient prevention measures

is "not equipped to protect [detainees] from a potentially fatal exposure to COVID-19," and leaving Defendants' practices unchecked would invite "an unconscionable and possibly barbaric result." *Basank v. Decker*, 1:20-CV-2518, 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) (holding that several COVID-19 measures were "patently insufficient to protect [detainees]" where social distancing was not enforced); *Pimentel-Estrada v. Barr*, No. 2:20-CV-495, 2020 WL 2092430, at *16 (W.D. Wash. Apr. 28, 2020) (finding likelihood of deliberate indifference despite Defendants making numerous changes in response to the pandemic due to failure to reduce population, establish social distancing protocol, and implement widespread testing). *Cf. Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563, at *8-9 (M.D. Pa. Mar. 31, 2020) (ordering release of detainees housed with communal eating and sleeping space and bunks "often less than two feet apart"), *appeal docketed*, No. 20-1906 (3d Cir. Apr. 28, 2020).

By failing to take even rudimentary, let alone reasonable, steps necessary to

through the Jail's grievance system. For example, detainee C.S. complained on May 22 that he had not been given information regarding COVID-19. (Ex. I.) Detainee B.T. complained on May 16 that there was "no proper social distancing." (*Id.*) Multiple detainees have complained of being unable to obtain masks and cleaning supplies. (*Id.*) Several specifically referenced the Jail's failure to follow guidelines for preventing and mitigating COVID-19, and a number complained of being in fear for their lives. (*Id.*) One detainee, Q.T., complained on May 19 that he had been tested for COVID-19, was returned to his dorm, and learned two weeks later that his test was positive. (*Id.*)

address the virus, Defendants are recklessly exposing the Jail's detainees to a potentially lethal or permanently debilitating disease. The Eighth and Fourteenth Amendments prohibit this.

**C.    The Medically Vulnerable and Disability Subclasses Are Likely to Prevail on Their Habeas Claim.**

The Medically Vulnerable and Disability Subclasses are likely to prevail on their § 2241 claims, which are based on the same violations of federal law underlying Plaintiffs' § 1983, Americans with Disabilities Act, and Rehabilitation Act claims. "If medically vulnerable detainees are not released as soon as possible," they are at risk of "infection," "long-lasting and permanent organ damage," and "death." (Rottnek Decl. ¶ 43.)

**1.    COVID-19 Makes Confinement Unlawful for the Medically Vulnerable and Disability Subclasses.**

Members of the Medically Vulnerable and Disability Subclasses challenge the fact of their confinement, which by its very nature poses an unacceptably high risk of COVID-19 infection, long-term harm, and death. (Rottnek Decl. ¶ 43.) Given that "[t]here is no effective way to eliminate risk for medically vulnerable detainees in the jail" (*id.* ¶ 49), no conditions of confinement can protect these subclasses.[20]

---

[20] Plaintiffs pleaded this action as both a habeas petition and a civil action pursuant to 42 U.S.C. § 1983. (*See* Doc. 1 ¶¶ 24, 214.) Even if this Court concludes that it

As the Supreme Court explained, when the very fact of imprisonment is challenged as unlawful, a detainee's proper remedy is a writ of habeas corpus. *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). Therefore, where release is the only adequate remedy for a violation of federal rights, habeas relief is appropriate. *See Haskins v. City of Boaz*, 822 F.2d 1014, 1015 (11th Cir. 1987) ("When federal rights are violated, 'it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief'" (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946))).

Members of the Disability and Medically Vulnerable Subclasses' only adequate remedy is release, because the Jail is incapable of providing them with adequate care and protection from infection. (Rottnek Decl. ¶ 49.) "[E]ven the most stringent precautionary measures—short of limiting the detained population itself—simply cannot protect detainees from the extremely high risk of contracting this unique and deadly disease." *Malam v. Adducci*, 5:20-CV-10829, 2020 WL 1672662, at *8 (E.D. Mich. Apr. 5, 2020). Accordingly, those who are medically vulnerable "should be evaluated for release" (Fefferman Decl. ¶ 10), because absent release,

---

lacks habeas jurisdiction, it has the power to order release or transfer of detainees in a § 1983 action. *See, e.g., Reaves v. Dep't of Correction*, 404 F. Supp. 3d 520, 522-25 (D. Mass. 2019) (ordering transfer of prisoner with quadriplegia to outside treatment facility); *Plata v. Brown*, 427 F.Supp.3d 1211, 1222-24 (N.D. Cal. 2013) (ordering transfer of medically vulnerable prisoners due to risk of disease).

they "are at risk of infection . . . and even death" (Rottnek Decl. ¶ 43). "There is *no effective way to eliminate risk for medically vulnerable detainees*" and "[t]he best chance for medically vulnerable detainees to survive the pandemic is to release them from the jail so they can practice social distancing." (Rottnek Decl. ¶ 49 (emphasis added).)

### 2. Habeas Relief May Take the Form of Release or Transfer.

As an alternative to release, the Medically Vulnerable and Disability Subclasses require enlargement of their detention in the form of home confinement or transfer to facilities with adequate social distancing, sanitation practices, and other conditions sufficient to protect them from COVID-19, which Defendants have authority to grant. *See, e.g.*, O.C.G.A. §§ 42-4-7(b), 42-1-8; *see also, e.g.*, *Busby v. Bonner*, 2:20-CV-2359, 2020 WL 3108713, at *3 (W.D. Tenn. June 10, 2020) (enlargement claims may be brought under § 2241); *Jimenez v. Aristiguieta*, 314 F.2d 649, 652 (5th Cir. 1963) ("The District Court [has] inherent power as the habeas corpus court or judge to enter [an] order . . . respecting the custody or enlargement of [the petitioner]").

### D. The Disability Subclasses Are Likely to Prevail on Their Claim That Defendants Are Violating the ADA and the RA.

Members of the Disability Subclasses are protected persons with disabilities under Title II of the ADA and § 504 of the RA. 42 U.S.C. § 12102(1)(A), (2)(B),

28 C.F.R. § 35.108(d)(2)(iii).  By virtue of their detainee status, they are entitled to

equal access to the programs and services of the Jail, a public entity.  42 U.S.C. §

12131(2); 28 CFR § 35.104; *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990,

992 (11th Cir. 2015).

Title II of the ADA addresses "failure to make modifications to existing

facilities and practices."  42 U.S.C. § 12101(a)(5).  Public entities lack "the option

of being passive in their approach to disabled individuals as far as the provision of

accommodations is concerned."  *Pierce v. District of Columbia*, 128 F. Supp. 3d

250, 269 (D.D.C. 2015); *see also R.W. v. Bd. of Regents of the Univ. Sys. of Ga.*,

114 F. Supp. 3d 1260, 1282 (N.D. Ga. 2015) (recognizing proof of intentional

discrimination is unnecessary in ADA case seeking injunctive relief).  Similarly,

the RA requires public entities that receive federal funding to grant individuals

with disabilities access by making "reasonable accommodations," whether or not

exclusion was intentional.  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

The ADA and the RA require public entities to take *affirmative* steps and

make reasonable modifications to their policies, practices and procedures to ensure

the disabled have access to programs and services for which they would otherwise

be qualified.  28 C.F.R. §§ 35.102(a), 35.130(a), (b); *Alexander*, 469 U.S. at 295

(the RA entitles qualified disabled individuals to "meaningful access to the benefit

that the grantee offers" through "reasonable accommodations"); *Lonergan,* 623 F. App'x at 992 (Title II claims "may proceed on the theory that Defendant failed to reasonably accommodate the Plaintiff's disability"). The ADA expressly prohibits public entities from "utiliz[ing] criteria or methods of administration . . . [t]hat have the *effect* of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or "have the . . . *effect* of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i)-(ii) (emphasis added). The duty of a public entity to provide meaningful affirmative accommodations is at its apex when that entity is a jail, due to the "complete control [it has] over whether . . . inmates (disabled or not) receive any programs or services at all." *Pierce*, 128 F. Supp. 3d at 269.

Programs and services in detention include the safe adjudication of pretrial detainees' pending criminal cases, as well as adequate living conditions and access to medical care for all detainees. Keeping detainees alive and healthy to conclude their criminal proceedings and serve any sentences imposed are important components of a jail's program. *See generally* 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104. If members of the Disability Subclasses experience long-term illness or death from COVID-19, they will have been denied equal access to safe

adjudication of their cases, and thus will have suffered discrimination.  *See Fraihat*

*v. U.S. Immigration & Customs Enf't*, No. 5:19-CV-1546, 2020 WL 1932570, at

*26 (C.D. Cal. Apr. 20, 2020) (holding people with disabilities in ICE detention

entitled to reasonable accommodations in order to participate in the removal

process).  Disabled detainees also face discrimination in the form of unequal access

to the Jail's programs: they are facing impossible choices between accessing

essential medical care and risking potentially-deadly exposure to COVID, or

foregoing medical care to limit their exposure to the virus.

Defendants' practices potentially exclude the Disability Subclasses from

equal access to the Jail's services and access to courts, because of the heightened

risk that COVID-19 poses to them.  All of the Jail's services require being in close

quarters with other detainees, posing a disproportionate risk of severe illness and

death for the Disability Subclass.  (*See, e.g.*, J.H. Decl. ¶¶ 31-32.)  Defendants

nonetheless fail to provide essential basic resources, including hygiene products,

protective equipment, and social distancing, necessary for Disability Subclass

members to protect themselves from COVID-19 while engaging in these activities.

For example, Plaintiff Rhonda Jones is disabled as a result of chronic obstructive

pulmonary disease, has been hospitalized twice for pneumonia in recent months,

and must access the Jail's medical care program to manage her illness.  (Jones

Decl. ¶¶ 3, 9.)  But she can only participate in that program if she waits in a crowded cage in the Jail's medical unit, potentially exposing her to a virus that poses an acute threat to her health precisely because her disability makes her susceptible to serious illness or death.  (*Id.* ¶¶ 9, 22.)  The Jail has made no accommodations for Jones or other members of the Disability Subclasses to reduce their risk of exposure to the virus, meaning that these detainees are potentially excluded from Jail services.  *See Pierce*, 128 F. Supp. 3d. at 273 (ADA and RA violations where deaf prisoners were excluded from prison substance abuse and anger management programs because no interpreter was provided).

Defendants have disregarded their affirmative obligation under the ADA and RA to address these dangers for the Disability Subclasses.  The accommodations the Disability Subclasses require to address the harms they face—implementation of CDC guidelines to mitigate COVID-19 exposure and a process to facilitate the release of medically vulnerable detainees for whom mitigation will be insufficient—are reasonable and necessary.  *See Fraihat*, 2020 WL 1932570, at *29 (directing ICE to take mitigation measures in its detention facility, including timely release determinations, for detainees with risk factors); *Busby*, 2020 WL 3108713, at *9-10 (discussing plaintiffs' disabilities identified by the CDC as heightened COVID-19 risk factors).

## II. Without Injunctive Relief, Plaintiffs Will Be Irreparably Harmed.

"The deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, l429 U.S. 97, 104 (1976) (citation omitted). As does a "heightened risk of dying or suffering from serious illness and long-term health consequences" and "bodily injury and loss of life." *City of Los Angeles v. Lyons*, 461 U.S. 95, 98 (1983). "The risk of permanent harm to Plaintiffs applies with greater force to the medically vulnerable . . . , for whom continued detention is even more likely to cause injury and death." *Wilson v. Gordon*, 822 F.3d 934, 958 (6th Cir. 2016).

The dangers and lethality of COVID-19 are indisputable, and the risks to the Plaintiff classes of permanent physical injury or death are "prototypical irreparable harm." *Banks v. Booth*, 1:20-CV-849, 2020 WL 3303006, at *16 (D.D.C. June 18, 2020); *Vazquez Barrera v. Wolf*, 4:20-CV-1241, 2020 WL 1904497, at *6 (S.D. Tex. Apr. 17, 2020) (holding that the long-term health consequences of COVID-19 are irreparable harm). Plaintiffs thus meet the irreparable harm requirement.

## III. The Public Interest and Balance of Equities Favor Plaintiffs.

An injunction halting unconstitutional actions and unlawful discrimination against people with disabilities during a global pandemic disproportionately

affecting people in jails outweighs any harm to Defendants and is in the public interest. Injunctive relief is appropriate if the harm to plaintiffs in the absence of an injunction "would exceed the harm suffered by the State if the injunction is issued, and [the] injunction would not disserve the public interest." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1287 (11th Cir. 2013). "'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted); *see also Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012) (recognizing that a state "has no interest in enforcing a state law that is unconstitutional").

Although ordering Defendants to take steps to prevent and mitigate COVID-19 will entail some expenditures, any financial harm to Defendants does not outweigh the risk of severe illness, permanent organ damage, or death Plaintiffs face. Courts regularly find that the balance tips in favor of plaintiffs when detainees' health is at risk. *See, e.g.*, *Ancata v. Prison Health Servs. Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Lack of funds . . . cannot justify an unconstitutional lack of competent medical care"). Moreover, steps to control COVID-19 in the Jail will serve the public interest in controlling the pandemic by reducing the risk that an former detainee or staff member will carry the virus to the community.

(*See* Fefferman Decl. ¶¶ 9, 12-14 (noting Jail poses "unnecessary risk" to the "broader community").)

Similarly, release or enlargement is in the public interest because it "preserve[s] critical medical resources and prevent[s] further stress on the states' and country's already overburdened healthcare system." *Robenson v. Decker*, No. 2:20-CV-5141, 2020 WL 2611544, at *9 (D.N.J. May 22, 2020); *see Arias v. Decker*, No. 1:20-CV-2802, 2020 WL 2306565, at *11 (S.D.N.Y. May 8, 2020) (same), *appeal docketed*, No. 20-2139 (2d Cir. Jul. 7, 2020); *Alcantara v. Archambeault*, No. 3:20-CV-756, 2020 WL 2315777, at *10 (S.D. Cal. May 1, 2020) (same); *Zaya v. Adducci*, No. 5:20-CV-10921, 2020 WL 2487490, at *9 (E.D. Mich. May 14, 2020) (same), *appeal docketed*, No. 10-1667 (6th Cir. Jul. 14, 2020).

Finally, an injunction also serves the public interest because it will benefit the public health by mitigating COVID-19's spread in the community. *See Banks v. Booth*, No. 1:20-CV-849, 2020 WL 1914896, at *12 (D.D.C. Apr. 19, 2020) ("[I]njunctive relief . . . is in the public interest because it supports public health.").

## CONCLUSION

The Court should grant a preliminary injunction and writ of habeas corpus.

Respectfully submitted,

/s/ Jeremy Cutting

Kosha S. Tucker
Ga. Bar No. 214335
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA
P.O. Box 77208
Atlanta, GA 30357
(678) 981-5295
ktucker@acluga.org

Stephen L. Pevar
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
765 Asylum Avenue
Hartford, Connecticut 06105
(860) 570-9830
spevar@aclu.org

David C. Fathi
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 Fifteenth Street, N.W., Seventh Floor
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org

Sarah Geraghty
Ga. Bar No. 291393
Jeremy Cutting
Ga. Bar No. 947729
SOUTHERN CENTER
FOR HUMAN RIGHTS
60 Walton Street, N.W.
Atlanta, GA 30303
(404) 688-1202
sgeraghty@schr.org

Brandon Buskey
Robert W. Hunter
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
(212) 284-7364
bbuskey@aclu.org

*Counsel for Plaintiffs*

July 27, 2020

# CERTIFICATE OF COMPLIANCE

Pursuant to N.D. Ga. Local Civil Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with N.D. Ga. Local Civil Rule 5.1(C) in Times New Roman 14-point typeface.

/s/ Jeremy Cutting

July 27, 2020