IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RHONDA JONES, et al.,            :        PRISONER CIVIL RIGHTS
    Plaintiffs,                 :        42 U.S.C. § 1983
                          :
v.                               :
                          :
VICTOR HILL, et al.,             :        CIVIL ACTION NO.
    Defendants.                 :        1:20-CV-02791-JPB-CCB

**<u>NON-FINAL REPORT AND RECOMMENDATION</u>**

Plaintiffs Rhonda Jones, Randolph Mitchell,[1] Michael Singleton, and Barry Watkins, confined at the Clayton County Jail ("CCJ") in Jonesboro, Georgia, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 and petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 alleging violations of their rights as a result of Defendants' response—or lack thereof—to the COVID-19 pandemic currently affecting the country and the CCJ. (Doc. 1.)[2] As more fully discussed in a separate order, Plaintiffs have not fully paid the filing fee, but the Court will exercise its discretion to move forward with this case.

Defendants move to dismiss the complaint for numerous reasons, including lack of jurisdiction, failure to exhaust, and failure to state a claim. (Doc.

---

[1] Mitchell has since been released from the CCJ. (Doc. 23-1 at 14.)

[2] Plaintiffs seek a preliminary injunction and class-action certification; these matters will be considered separately.

23.) For the reasons stated below, it is **RECOMMENDED** that Defendants' motion to dismiss (Doc. 23) be **GRANTED IN PART and DENIED IN PART**, Plaintiff Randolph Mitchell's individual claims be **DISMISSED**, the remaining Plaintiffs' claims of deliberate indifference be **ALLOWED TO PROCEED**, and the remaining Plaintiffs' remaining claims be **DISMISSED**.

## I.   FACTUAL BACKGROUND

Plaintiffs are various inmates confined at the CCJ. Jones, a 58-year-old female with chronic obstructive pulmonary disease, is in pretrial detention at the CCJ. (Doc. 1 at 12.) Watkins, a 60-year-old male with diabetes, is also in pretrial detention at the CCJ. (*Id.* at 13.) Mitchell, a 72-year-old male with high blood pressure and a heart condition, was confined to the CCJ pursuant to a 12-month sentence for simple battery. (*Id.* at 12.) And Singleton, a 59-year-old male with high blood pressure, is confined to the CCJ pursuant to a one-year sentence for violating probation. (*Id.* at 13.) Plaintiffs seek class certification for two classes and four subclasses: a Principal Pretrial Class and Principal Post-Adjudication Class; and a Medically Vulnerable Pretrial Subclass, Medically Vulnerable Post-Adjudication Subclass, Disability Pretrial Subclass, and Disability Post-Adjudication Subclass. (*Id.* at 75-99.) They propose that Jones and Watkins will represent the Principal Pretrial Class, Medically Vulnerable Pretrial Subclass, and Disability Pretrial Subclass; and Mitchell and Singleton will represent the

Principal Post-Adjudication Class, Medically Vulnerable Post-Adjudication Subclass, and Disability Post-Adjudication Subclass. (*Id.* at 76, 84, 92; *id.* at 79, 88, 96.)

According to Plaintiffs' complaint, conditions at the CCJ are poor, and, since the development of the COVID-19 pandemic, Defendants have failed to take appropriate actions to ensure Plaintiffs' safety, such as implementing social distancing measures and providing adequate cleaning supplies and personal protective equipment. (*See generally id.* at 17-75.) Plaintiffs seek injunctive relief, including releasing or transferring inmates and improving measures to prevent the spread of COVID-19 at the CCJ. (*Id.* at 109.)

## II.   DISCUSSION

Pursuant to 28 U.S.C. § 1915A, a federal court is required to conduct an initial screening of a prisoner complaint to determine whether the action is (1) frivolous or malicious; (2) fails to state a claim on which relief may be granted; or (3) seeks monetary relief against a defendant who is immune from such relief.

"To avoid dismissal for failure to state a claim, a complaint must include factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017). A well-pleaded complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets and internal quotation marks omitted). Ultimately, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A complaint describing misconduct that is merely possible, as opposed to plausible, "has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (brackets and internal quotation marks omitted). Similarly, "an unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient to "nudge[]" a claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.

A.   *Standing*

The parties dispute whether Plaintiffs have standing to seek injunctive relief, and this Court is obligated to consider whether it has jurisdiction over this case. *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) ("Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting.").

Federal courts have the power to hear only live cases or controversies. U.S. Constitution art. III. As a result of this requirement, a plaintiff must have standing

to pursue an action in federal court. *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020). To show standing, a plaintiff must establish three elements: "the plaintiff must have suffered an injury in fact, the defendant must have caused that injury, and a favorable decision must be likely to redress it." *Id.*

### 1.   Injury in Fact

Of the three elements of standing, "[t]he foremost standing requirement is injury in fact." *Id.* (internal quotation marks omitted). This consists of "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks omitted). "When a plaintiff seeks prospective relief to prevent a future injury, it must establish that the threatened injury is certainly impending." *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1280 (11th Cir. 2020) (internal quotation marks omitted).

Defendants argue that Plaintiffs have failed to allege an injury in fact sufficient to establish standing because the risk of contracting COVID-19 is too speculative. (Doc. 23-1 at 17-19.) COVID-19 is a highly contagious virus that spreads quickly through closed environments like jails, and "[c]ourts have repeatedly held that the highly contagious nature of this dangerous and potentially fatal virus is sufficient to establish an alleged injury that is concrete and legally particularized." *Hango v. Adducci*, No. 1:19-CV-606, 2020 WL 3271061,

at *5 (N.D. Ohio June 17, 2020) (collecting cases); *Martinez Franco v. Jennings*, ___

F. Supp. 3d ___, ___, No. 20-CV-02474-CRB, 2020 WL 1976423, at *2 (N.D. Cal. Apr.

24, 2020) (noting that the argument that a plaintiff lacks standing because the risk

of contracting COVID-19 is too speculative "has been rejected by many, and

perhaps all, courts that have considered it"); *see also Matos v. Lopez Vega*, ___ F.

Supp. 3d ___, ___, No. 20-CIV-60784-RAR, 2020 WL 2298775, at *7 (S.D. Fla. May

6, 2020) ("Although they may never contract COVID-19, the alleged injury is

concrete enough to survive challenges to standing given the rapid spread and

highly contagious nature of the virus. Moreover, Petitioners need not wait to

contract COVID-19 to demonstrate an injury in fact."); *Helling v. McKinney*, 509

U.S. 25, 33 (1993) (explaining that "a remedy for unsafe conditions need not await

a tragic event"). Thus, Plaintiffs have sufficiently alleged an injury in fact.

  2.    *Traceability and Redressability*

  "[A] plaintiff's injury must be fairly traceable to the challenged action of the

defendant, and not the result of the independent action of some third party not

before the court." *Jacobson v. Fla. Sec'y of State*, ___ F.3d ___, ___, No. 19-14552,

2020 WL 5289377, at *11 (11th Cir. Sept. 3, 2020) (internal quotation marks

omitted). In evaluating redressability, a court must consider "whether a decision

in a plaintiff's favor would significantly increase the likelihood that she would

obtain relief that directly redresses the injury that she claims to have suffered."

*Lewis*, 944 F.3d at 1301 (brackets, ellipsis, and internal quotation marks omitted). With respect to any relief obtained, "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Id.* (emphasis and internal quotation marks omitted).

Defendants argue that Plaintiffs lack standing, at least with respect to their demand for a change in the CCJ's medical protocols and treatment, because their injury is not traceable to or redressable by any named Defendant. (Doc. 23-1 at 19-21.) In particular, they contend that CorrectHealth, LLC, is the medical provider for the CCJ and thus bears responsibility for the medical care provided at the CCJ. (*Id.* at 19.) And because CorrectHealth is a third party, they argue, it is not bound by any injunction that this Court might issue. (*Id.* at 20.) As a result, because Plaintiffs have failed to name CorrectHealth, a necessary party, as a defendant, they lack any redressable remedy from Defendants and consequently lack standing. (*Id.* at 20-21.)

Plaintiffs, however, have sufficiently shown that their alleged injuries are traceable to and redressable by Defendants. Plaintiffs allege that it is due to Defendants' failure to enact policies that they have been injured, for example:

> Although jailers have quarantined certain pods where detainees have exhibited COVID-19 symptoms (keeping both people who tested positive and people who tested negative in the same housing area and, in some cases, in the same cell), there is no

proactive effort to check detainees' temperatures in units where
COVID-19 cases are suspected by jailers.

. . . .

After a detainee exhibits symptoms of the virus, Defendants
have no procedure for determining which detainees have been in
close contact with the sick detainee and then testing them.

(Doc. 1 at 69, 70.) Whether CorrectHealth, in any failure to take appropriate steps

on its own initiative to prevent the spread of COVID-19, caused injury to Plaintiffs

is a separate question from whether Defendants injured Plaintiffs. *See Jacobson*,

2020 WL 5289377, at *11. Furthermore, although Defendants are correct that

CorrectHealth is a third party, CorrectHealth, as the medical provider for the CCJ

contractually acting under the authority of Defendant Hill, would be bound by

this Court's order because Defendants can legally direct CorrectHealth to

implement any steps ordered by the Court. *See Lewis*, 944 F.3d at 1301; (Doc. 1 at

14 (alleging that Defendant Hill is required to operate the CCJ, to maintain

custody of those in the CCJ, and to ensure safe and sanitary conditions of

confinement)). In essence, Defendants conflate standing with the merits of a claim

against CorrectHealth. Plaintiffs, however, sued Defendants, not CorrectHealth.

Because Defendants can redress Plaintiffs' alleged injuries by taking actions such

as releasing inmates or providing supplies or personal protective equipment,

Plaintiffs have sufficiently alleged that their injuries are traceable to and

redressable by Defendants.

B.    *Mootness*

"Mootness arises when an issue presented in a case is no longer live or the parties lack a legally cognizable interest in the outcome." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (internal quotation marks omitted). A case must be dismissed as moot "if events that occur subsequent to the filing of a lawsuit deprive the court of the ability to give the plaintiff meaningful relief," since the case no longer presents a live case or controversy as required by Article III of the Constitution. *Id.* (brackets, ellipsis, and internal quotation marks omitted). Mootness is jurisdictional. *Id.*

"The general rule . . . is that a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief." *Smith v. Allen*, 502 F.3d 1255, 1267 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277 (2011); *see also Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) ("Absent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred."). As the parties note, Plaintiff Mitchell has been released from the CCJ. (Doc. 37 at 19 n.8; Doc. 40 at 10.) *Smith* thus applies to moot Mitchell's claims. However, because Plaintiff Singleton also proposes to represent

the same classes as Mitchell, and Singleton's claims remain live, the claims of the proposed classes remain live.[3]

### C.      Exhaustion

Under the Prison Litigation Reform Act of 1996 (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA requires proper exhaustion, including compliance with deadlines and other procedural rules, before a prisoner can file

---

[3] Even if Mitchell were the only named plaintiff for the proposed classes, the classes' claims would not be moot because subsequent class certification will relate back to the date of the filing of the complaint. *See Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) ("That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction."). Application of the relation-back doctrine does not "turn[] on whether the named plaintiffs' individual claims become moot before or after the plaintiffs move to certify a class." *Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 707 (11th Cir. 2014). Instead, a named plaintiff simply must act diligently in pursuing class certification after filing a complaint. *Id.* Here, Plaintiffs did not fail to act diligently, filing their motion to certify class one day after they filed their complaint. (*See* Doc. 1; Doc. 7.) Thus, even though Mitchell's individual claims are moot, Mitchell may still proceed as a proposed class representative. *See, e.g.*, *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980) ("The proposed representative retains a 'personal stake' in obtaining class certification sufficient to assure that Art. III values are not undermined."); *McLaughlin*, 500 U.S. at 51 ("[T]he termination of a class representative's claim does not moot the claims of the unnamed members of the class." (internal quotation marks omitted)).

suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006); *see also Bryant v. Rich*, 530 F.3d 1368, 1378–79 (11th Cir. 2008) (affirming dismissal of prisoner's claims for failure to exhaust where prisoner did not timely appeal grievance or seek waiver of appeal deadline). The purpose of this requirement is "to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Woodford*, 548 U.S. at 93 (brackets and internal quotation marks omitted). As such, a prisoner must "provide as much relevant information as he reasonably can in the administrative grievance process." *Brown v. Sikes*, 212 F.3d 1205, 1207 (11th Cir. 2000).

The PLRA's exhaustion requirement is mandatory, and courts do not have the discretion to waive it. *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). "[T]he modifier 'available' in the PLRA means that inmates must exhaust administrative remedies so long as there is the possibility of at least some kind of relief." *Johnson v. Meadows*, 418 F.3d 1152, 1156 (11th Cir. 2005) (internal quotation marks omitted). Although the exhaustion requirement is not jurisdictional, it is a "matter in abatement" and thus "should be raised in a motion to dismiss." *Bryant*, 530 F.3d at 1374-75 (internal quotation marks omitted).

A court should apply a two-step process in deciding lack of exhaustion: first, a court should "look[] to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, take[] the

plaintiff's version of the facts as true." *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). "If the defendants can establish failure to exhaust based on the *plaintiff's* allegations, dismissal of the complaint is appropriate." *Whatley v. Smith*, 898 F.3d 1072, 1082 (11th Cir. 2018). Otherwise, the court should proceed to make "specific findings in order to resolve the disputed factual issues related to exhaustion." *Turner*, 541 F.3d at 1082. After making those findings, the court then should decide "whether under those findings the prisoner has exhausted his available administrative remedies." *Id.* at 1083.

A court may properly "consider facts outside of the pleadings" and "resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." *Bryant*, 530 F.3d at 1376 (footnote omitted). "Failure to exhaust administrative remedies is an affirmative defense. The burden therefore is on the defendant to show that the plaintiff has not exhausted properly his administrative remedies." *Whatley*, 898 F.3d at 1082.

According to Defendants, Plaintiffs have failed to exhaust their administrative remedies. In particular, Defendants point to a declaration from Terrance Gibson, Lieutenant over Support Operations at the Clayton County Sheriff's Office, who states, "Inmates are informed about the Grievance Procedure during inmate orientation." (Doc. 23-2 at 3.) Defendants also include a copy of the

12

Clayton County Sheriff's Office Standard Operating Procedures ("Paper-Based Grievance Procedure") detailing the grievance process. (*Id.* at 4-6.) According to the Paper-Based Grievance Procedure, "Inmates shall be provided a Grievance Form upon request. No inmate shall be denied a Grievance Form." (*Id.* at 4.). The Paper-Based Grievance Procedure also states that inmates shall place the completed grievance form in a grievance box mounted in the inmate's housing unit, and an official will collect the forms. (*Id.*) The Paper-Based Grievance Procedure provides that a response will be given within ten calendar days, with a final decision within 30 days of the inmate's grievance. (*Id.* at 5.) An inmate must appeal within two days, and a CCJ official must respond to the appeal within ten days. (*Id.*)

With respect to Plaintiffs, Defendants argue that each Plaintiff was aware of the grievance procedure at the CCJ and failed to exhaust his or her administrative remedies. For example, Defendants contend that, according to the CCJ's records, Plaintiff Jones never submitted a grievance regarding COVID-19 before filing suit. (Doc. 23-1 at 12.) Instead, Jones complained about the CCJ's inadequate response to COVID-19 in an appeal to a previous grievance regarding the refund of money. (*Id.* at 12-13; Doc. 23-2 at 8.) Because Jones never submitted a standalone grievance regarding COVID-19 or sought to appeal the response in which she complained about COVID-19, Defendants argue, Jones failed to

exhaust her administrative remedies. (Doc. 23-1 at 13.) With respect to Plaintiff Mitchell, Defendants note that Mitchell's request for a COVID-19 test and mask was marked as resolved with a note of "scheduled for sick call. Refer to security for mask." (Doc. 23-1 at 14; Doc. 23-2 at 13.) Because Mitchell never appealed this grievance, Defendants argue that he failed to exhaust his administrative remedies. (Doc. 23-1 at 14.) As for Plaintiff Singleton, Defendants note that Singleton submitted a grievance on May 15, 2020, for masks and cleaning supplies, and an official subsequently explained, "All issues have been addressed." (Doc. 23-1 at 14-15; Doc. 23-2 at 18.)[4] Singleton never appealed this grievance, and Defendants contend that he thus failed to exhaust his administrative remedies. (Doc. 23-1 at 15.) Finally, with regard to Plaintiff Watkins, Defendants explain that CCJ records do not show Watkins as having ever submitted any grievance related to COVID-19. (*Id.* at 12.) As a result, they argue, Watkins failed to exhaust his administrative remedies. (*Id.*)

In contrast, Plaintiffs paint a very different picture. According to Plaintiffs' complaint:

> A purported grievance procedure is available on the kiosk only, not through paper forms. Grievances are rarely answered, and detainees cannot have more than two grievances pending at a time. People who

---

[4] Confusingly, the status of this grievance, as of July 9, 2020, is noted as "In Progress." (*See* Doc. 23-2 at 18.) Notably, this grievance was apparently resolved after Plaintiffs' complaint was filed on July 1, 2020.

> have two grievances pending cannot file grievances about new problems. Many detainees have had two grievances pending for months without a response. There is no way to withdraw a pending grievance via the kiosk, and detainees are given no guidance about how to appeal a grievance decision. No information about the grievance procedure is given to detainees when they enter the jail; detainees do not receive inmate handbooks explaining the grievance procedure and other jail rules.

(Doc. 1 at 24-25.) More specifically, each of the named Plaintiffs have submitted declarations regarding their inability to pursue their administrative remedies. For example, Jones stated that she tried to submit a grievance regarding the Jail's failure to adequately protect her from COVID-19, but was unable to do so because she was at her grievance limit. (Doc. 6-1 at 7-8.) Furthermore, she stated that, although she knew she could submit a grievance at the kiosk, "[t]he grievance procedure was not explained to me at orientation. No one gave me an inmate handbook or other document explaining the grievance procedure." (*Id.* at 7.) She also stated that a prison official told her that she could not submit a paper grievance because "[t]he jail does not accept paper grievances from inmates. Grievances must be submitted in the kiosk, the officer told me." (*Id.* at 8.)

Other Plaintiffs report similar difficulties in pursuing their administrative remedies. Mitchell stated:

> No one on the jail staff has ever given me any information that I can recall about how to file a grievance. I never received a copy of the jail's inmate handbook. I do not know for sure the correct way to use the grievance system. In the past, when I need to file a grievance, I asked another detainee for help with the kiosk machine in my dorm.

I don't think I have ever received a response to any grievance that was put into the kiosk on my behalf.

I recently asked another detainee for help in submitting a grievance about how the jail is not doing what it should to stop the outbreak of coronavirus. The kiosk screen showed that I had "used up" all my grievances and could not file any more.

(*Id.* at 15.)[5]

Singleton stated:

I filed a grievance on or around May 15 about the jail's lack of disinfectant and cleaning supplies, as well as their failure to provide detainees with masks, and I referenced the virus. I also filed a grievance on or around May 8 about a different subject. I have not received a response to either grievance. At the end of May, I submitted an appeal on the kiosk, asking why the two grievances from May 8 and May 15 were not answered. I did not get a response to my appeal, but I saw on the kiosk that this appeal had been closed out on June 4. I don't know what that means. Sometimes, officers block detainees from using the kiosk, which means they cannot submit medical requests.

(*Id.* at 20-21.)

Watkins stated:

I submitted a grievance around May asking the jail for information about Covid-19 and how I can protect myself. I haven't received a response [as of June 21, 2020]. That does not surprise me. When I have filed other grievances in the past, they were left pending for months without a response. I do not know of any way to withdraw one of my grievances so I can file another.

---

[5] Although Mitchell's individual claims are moot, his experiences with the CCJ's grievance procedure are relevant in showing whether the grievance procedure is generally available to Plaintiffs.

(*Id.* at 31-32.)

In their reply brief, Defendants maintain that the grievance procedure was available to Plaintiffs and that each Plaintiff failed to exhaust his or her administrative remedies. (Doc. 40 at 6-11.) In particular, with respect to the availability of the grievance process, Defendants point to a second declaration from Lieutenant Gibson, as well as a declaration from Demarco May, an inmate at CCJ, supporting their argument that the grievance procedure was available to Plaintiffs. (*Id.* at 6; Doc. 41-1 at 7-8; Doc. 41-2 at 3-5.)

However, Defendants present this new evidence in their reply brief, not in their original motion to dismiss. "When faced with a reply brief that offers new evidence, . . . the district court has two permissible courses of action. It can either (1) permit the nonmoving party to file a surreply or (2) refrain from relying on any new material contained in the reply brief." *Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc.*, 793 F. App'x 896, 901-02 (11th Cir. 2019). Although the Court has the discretion to permit Plaintiffs to file a surreply addressing Defendants' new evidence, it is more appropriate here to exclude Defendants' new evidence for several reasons. First, Defendants attach these declarations only to their response in opposition to Plaintiffs' motion for a preliminary injunction, not to their reply brief in support of their motion to dismiss. A review of these declarations show that they are tailored to the issues raised by Plaintiffs' motion for a preliminary

17

injunction, not to the specific question of whether, before and at the time the complaint was filed, the grievance process available to Plaintiffs. Relatedly, the observations of an inmate at the CCJ who appears to have no connection to Plaintiffs regarding his own personal experiences about the grievance procedure has little, if any, relevance to whether the grievance procedure was available to Plaintiffs. Furthermore, Lieutenant Gibson's second declaration contradicts the evidence presented by Defendants with their motion to dismiss: Defendants attached to their motion to dismiss a copy of a grievance procedure based on paper forms, but Lieutenant Gibson's second declaration implies that the CCJ's grievance procedure uses electronic forms. (*See* Doc. 23-2 at 4-6; Doc. 41-1 at 7-8.) Finally, Lieutenant Gibson's first declaration—which was included with Defendants' motion to dismiss—is striking in the lack of detail compared to his second declaration, yet Defendants provide no explanation why Lieutenant Gibson could not have provided his statements earlier. (*Compare* Doc. 23-2 at 3, *with* Doc. 41-1 at 7-8.) As a result, the Court will not consider Defendants' newly proffered evidence.

Based on the evidence presented in Defendants' motion to dismiss and Plaintiffs' response in opposition and declarations accompanying the complaint, Defendants have failed to show that Plaintiffs' claims should be dismissed for failure to exhaust. As noted previously, Defendants presented evidence of a

paper-based grievance procedure. (Doc. 23-2 at 4-6.) Yet Plaintiffs uniformly state that the CCJ uses electronic grievance forms that are filed through kiosks located in various parts of the CCJ, and Defendants' own exhibits of copies of Plaintiffs' grievances show that the CCJ uses electronic grievances. *See Gardner v. County of Baldwin*, No. 12-0281-CG-C, 2014 WL 171839, at *17 (S.D. Ala. Jan. 15, 2014) (holding that defendants failed to show that plaintiff failed to exhaust where "[t]he grievance procedure that was in effect at the time of the complained of incidents [was] not before the Court"); (Doc. 1 at 24-25; Doc. 6-1; Doc. 23-2 at 7-28.) Defendants assert that "[w]hile the written Grievance Procedure technically does not refer to the Kiosk, this is immaterial because the process is the same." (Doc. 40 at 7.) Defendants, however, provide no evidence in support of this assertion. Indeed, while the Paper-Based Grievance Procedure states that "[n]o inmate shall be denied a Grievance Form," (Doc. 23-2 at 4), Plaintiffs state that there is a two-grievance limit and that there is no way to withdraw an outstanding grievance, (Doc. 1 at 24; Doc. 6-1 at 7-8, 15; *see also* Doc. 6-1 at 21 ("Sometimes, officers block detainees from using the kiosk, which means they cannot submit medical requests.").) [6] Other than arguing that the Paper-Based Grievance

---

[6] Notably, Lieutenant Gibson's second declaration, which the Court will not otherwise consider, also states that inmates are limited to only two outstanding grievances at a time. (Doc. 41-1 at 7.)

Procedure—which, according to the document, has not been updated since September 2011—is the procedure in effect at the CCJ, Defendants do not otherwise dispute Plaintiff's evidence that grievances are limited. In any event, even if the Paper-Based Grievance Procedure accurately describes the CCJ's current grievance procedure, Defendants have not shown that Plaintiffs were properly informed of the CCJ's grievance procedure. Lieutenant Gibson's first declaration states, with no elaboration: "Inmates are informed about the Grievance Procedure during inmate orientation." (Doc. 23-2 at 3.) Such a wholly conclusory statement is simply insufficient to establish that Plaintiffs were informed about the CCJ's grievance procedure. *See Rogers v. Evans*, 792 F.2d 1052, 1062 n.9 (11th Cir. 1986) ("The affidavit is phrased in conclusory terms without citing facts. . . . The affidavit is defective to create a factual dispute.").[7]

Moreover, not only have Defendants failed to show what the current grievance procedure at the CCJ actually is, but the presence of a two-grievance limit, with no ability to withdraw an outstanding grievance, coupled with evidence that grievances are routinely unanswered or untimely answered, (Doc.

---

[7] Curiously, Defendants undermine their own argument on this point: "While the factual statement is brief, it is not a conclusory statement, *as a conclusory statement would be simply stating inmates know of the Grievance Procedure*." (Doc. 40 at 6 n.2 (emphasis added).) That is exactly what Lieutenant Gibson's statement says.

6-1 at 20-21; *id.* at 31 ("When I have filed other grievances in the past, they were left pending for months without a response.")), strongly weighs against requiring full exhaustion from Plaintiffs. Even assuming that the current grievance procedure, whatever it may be, follows the same deadlines listed in the Paper-Based Grievance Procedure, Defendants' own evidence shows that prison officials at the CCJ frequently fail to timely respond to Plaintiffs' grievances. For example, Plaintiff Singleton filed his grievance requesting supplies to protect against COVID-19 on May 15, 2020. (Doc. 23-2 at 18.) The Paper-Based Grievance Procedure states that prison officials must respond within ten days and provide a final decision within 30 days of the date the grievance was filed. (*Id.* at 5.) Yet Singleton's grievance did not receive any response until July 9, 2020, several weeks after the paper-based Grievance Procedure's 30-day deadline. (*Id.* at 18.) Two of Plaintiff Watkin's grievances, and at least two of Plaintiff Jones's grievances, unrelated to COVID-19, were also untimely answered. (*See id.* at 10-11, 19, 25.)[8]

The Supreme Court has given examples of when an administrative procedure is unavailable, including when it operates as a simple dead end, when it is so opaque that no ordinary prisoner could discern or navigate it, and when

---

[8] Notably, Jones's grievances received responses shortly after Plaintiffs' complaint was filed—over a month after responses were due.

prison officials thwart inmates from taking advantage of the process through machination, misrepresentation, or intimidation. *See Ross*, 136 S. Ct. at 1859–60.  A two-grievance limit, standing alone, does not render a grievance procedure unavailable. *Pearson v. Taylor*, 665 F. App'x 858, 868 (11th Cir. 2016) ("[W]hile Pearson was limited to two active grievances at any one time, the defendants' evidence reflected that [the prison's] policy allowed him to withdraw a pending grievance and file a new one. Thus, Pearson had an available route to exhaust his claims regarding the denial of medical treatment according to the applicable procedural rules, even if it would have required him to prioritize his grievances."). But here, the totality of the circumstances regarding the two-grievance limit, the inability to withdraw grievances, and CCJ officials' frequent tardiness in responding to grievances is sufficient to show that the grievance procedure was unavailable for purposes of exhausting administrative remedies. *See Jackson v. Griffin*, 762 F. App'x 744, 746 (11th Cir. 2019) (holding that prison officials' failure to comply with grievance procedural rules meant that grievance process was unavailable to prisoner); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006) ("Prison officials may not take unfair advantage of the exhaustion requirement, and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." (brackets and internal quotation marks omitted)); *Gibson v.*

*Weber*, 431 F.3d 339, 341 (8th Cir. 2005) (explaining that prison officials' failure to comply with grievance procedure may excuse inmate's noncompliance).

### D.    *Eleventh Amendment Immunity*

It is "well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an arm of the State is sued." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc) (internal quotation marks omitted). A Georgia county sheriff acts as an arm of the State of Georgia "when promulgating policies and procedures governing conditions of confinement" for a county jail. *Purcell ex rel. Estate of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1325 (11th Cir. 2005). As a result, the county sheriff is entitled to Eleventh Amendment immunity from suit in his official capacity. *Id.* However, some[9] suits "requesting injunctive or declaratory relief against state officials are not considered suits against the state and thus are not barred by sovereign immunity." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1204 (11th Cir. 2019) (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908) (injunctive relief) and *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002) (declaratory relief)).

---

[9] The Supreme Court has recognized an exception to *Ex Parte Young* "that prohibits a plaintiff from seeking injunctive relief when he alleges merely that a state official has violated *state* law." *Nat'l Ass'n of the Deaf v. Florida*, 945 F.3d 1339, 1351 (11th Cir. 2020) (internal quotation marks omitted and emphasis in original).

Defendants argue that, although "Plaintiffs' claims for prospective injunctive relief against the Sheriff in his official capacity are not barred by the Eleventh Amendment under the *Ex parte Young* exception, all other claims are barred." (Doc. 23-1 at 6.) As Plaintiffs point out, however, Plaintiffs "are not seeking any relief other than prospective relief against the Defendants, the very relief permissible." (Doc. 37 at 25; *see* Doc. 1 at 109.) To the extent Defendants argue that Plaintiffs cannot seek declaratory relief specifically, "[i]nsofar as the exposure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction." *Verizon Md.*, 535 U.S. at 646. As a result, Defendants are not entitled to dismissal based on Eleventh Amendment immunity.

E.    *Duplicative Parties*

Defendants argue that the claims against Defendants Boehrer, Gibson, Thomas, and Johnson are duplicative of those against Hill, and that all Defendants except Hill should be dismissed. (Doc. 23-1 at 7.) As noted earlier, suits "requesting injunctive or declaratory relief against state officials are not considered suits against the state." *S&M Brands*, 925 F.3d at 1204; *see also Nat'l Ass'n of the Deaf*, 945 F.3d at 1345, 1351–52 (noting that lawsuit was brought against numerous Florida state officials); *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1288 (N.D. Ga. 2019) (explaining that each defendant, as a Georgia state election official, had some connection with alleged misconduct).

24

"Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity. All that is required is that the official be responsible for the challenged action." *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988); *see Ex parte Young*, 209 U.S. at 157 (explaining that a state official may be sued so long as the official has "some connection" with alleged violation); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) (clarifying that, to establish liability in suits against state officials in their official capacity, "[b]ecause the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law" (internal quotation marks omitted)). In contrast, "[t]here is no longer a need to bring official-capacity actions against local government officials" because "local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985); *see also id.* ("Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, however, a State cannot be sued directly in its own name regardless of the relief sought. Thus, implementation of state policy or custom may be reached in federal court only because official-capacity actions for prospective relief are not treated as actions against the State." (citation omitted)).

Here, Plaintiffs allege that Defendant Hill, as Sheriff, is responsible for managing the CCJ and has delegated aspects of his authority to the other Defendants. (Doc. 1 at 14-16.) Because these Defendants have some connection with the alleged misconduct, Plaintiffs' claims may proceed against each of the named Defendants. *See Luckey*, 860 F.2d at 1015; *Fair Fight Action*, 413 F. Supp. 3d at 1288 ("[T]hese Defendants have some connection with the asserted misconduct at issue in this case. Said connection is sufficient for this case to proceed against the named State Defendants. . . .")

F.   *Claim 1 (Unconstitutional punishment in violation of the Due Process Clause of the 14th Amendment)*

While the conditions under which a convicted inmate are held are scrutinized under the Eighth Amendment's prohibition on cruel and unusual punishment, the conditions under which a pretrial detainee are held are reviewed under the Due Process Clause of the Fourteenth Amendment. *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016). Plaintiffs Jones and Watkins, as pretrial detainees, allege that they are being unconstitutionally punished by being held at the CCJ and suffering from a risk of contracting COVID-19. (Doc. 1 at 100-01.) According to Jones and Watkins, "No legitimate government purpose is served by unnecessarily subjecting pretrial detainees to an excessive risk of exposure to and contracting COVID-19." (*Id.* at 100.) Furthermore, they claim, "Detention inherently increases the chance of exposure to COVID-19." (Doc. 37 at 39.)

26

Defendants argue that this claim should be dismissed because it is "an improper carve out of a conditions of confinement claim, which Plaintiffs already assert in Count II." (Doc. 23-1 at 27); *see County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." (internal quotation marks omitted)); *Henry v. Hulett*, 969 F.3d 769, 780–81 (7th Cir. 2020) (en banc) ("[T]he Supreme Court has held unenumerated rights—such as those arising from the due process clause—do not afford a prisoner greater protection than the Eighth Amendment. . . . [T]his conclusion is specific to the Court's substantive due process jurisprudence . . . ." (emphasis, citation, and internal quotation marks omitted)). Defendants maintain that Plaintiffs are attempting to impose a rational basis test under the 14th Amendment, when in fact they have to show that the deprivation suffered was objectively serious and that prison officials were deliberately indifferent to the violation of the constitutional rights. (Doc. 23-1 at 26–27.) In response, Plaintiffs point to *Jacoby v. Baldwin County*, 835 F.3d 1338, 1344-46 (11th Cir. 2016), in which the Eleventh Circuit evaluated a pretrial detainee's claims under the substantive due process test established by *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979), and they argue that the Court must determine whether the continued detention of the

pretrial detainees is reasonably related to a legitimate, non-punitive government purpose or is excessive in relation to that purpose. (Doc. 37 at 38.)

Defendants make a strong argument, and *Jacoby* appears to be at some tension with *Lewis* and with numerous Eleventh Circuit cases that consider pretrial detainees' claims under the deliberate indifference standard. *See, e.g.*, *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (observing that "a pre-trial detainee's rights exist under the due process clause of the Fourteenth Amendment but are subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment" (internal quotation marks omitted)); *Dang ex rel. Dang v. Sheriff*, 871 F.3d 1272, 1279 (11th Cir. 2017) ("As a pretrial detainee, Dang alleges inadequate medical care under the Fourteenth Amendment rather than the Eighth Amendment. Nevertheless, Dang's claims are evaluated under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment." (citations omitted)); *Melton*, 841 F.3d at 1220 ("As a pretrial detainee at Pickens County Jail, Melton's rights arose under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment. Nonetheless, Melton's claims are subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment." (citation and internal quotation marks omitted)); *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013) ("Where, as here, the plaintiff is a pretrial detainee such

as Goodman, the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment's prohibition against cruel and unusual punishment, governs our analysis. Regardless of the particular taxonomy under which we analyze the case, however, the result is the same, because the standards under the Fourteenth Amendment are identical to those under the Eighth." (citation and internal quotation marks omitted)); *cf. Jacoby*, 835 F.3d at 1345 n.3 (noting that "we need not decide Mr. Jacoby's claim that the Eighth Amendment's subjective deliberate indifference standard conflicts with *Bell*'s objective 'punishment' standard" because appellant could not prevail under either standard). However, much of the tension can be resolved by observing that a claim that a "condition of pretrial detention amounts to punishment," *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004), is not identical to a claim that deliberate indifference to a serious medical need amounts to punishment. A discussion of the *Bell* standard is instructive, which the Circuit discussed at length in *Jacoby*.

A pretrial detainee may not be punished prior to an adjudication of guilt, but "the government 'may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.'" *Jacoby*, 835 F.3d at 1344-45 (quoting *Bell*, 441 U.S. at 536-37). "Whether a condition of pretrial detention amounts to punishment turns on

whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." *Id.* (brackets and internal quotation marks omitted); *see Bell*, 441 U.S. at 561 ("[T]he determination whether these restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose."). A court must consider whether (1) any "legitimate goal" is served by the prison conditions and (2) whether those conditions are "reasonably related" to that goal. *Jacoby*, 835 F.3d at 1345 (internal quotation marks omitted).[10]

In delineating the "condition" that leads to unconstitutional "punishment," a careful reading of *Bell*, *Jacoby*, and *Magluta* shows that the focus is on intentional conduct by a defendant designed to punish a plaintiff, as opposed to a reckless act or omission with regard to a medical need: *Bell* concerned the policy of "double bunking" in cells designed for only one person, and *Jacoby* and *Magluta* concerned administrative segregation as a disciplinary measure. For example, the plaintiff in *Jacoby* alleged that he was forced into administrative segregation after testing positive for cocaine, and "he had to sleep on the floor next to a toilet while

---

[10] To the extent Defendants could be read only as challenging Plaintiffs' claim as not cognizable, the Court is independently required under 28 U.S.C. § 1915A to fully evaluate the merits of Plaintiffs' claim.

in administrative segregation because he was the third inmate in an 8-by-10-foot cell meant for two." *Jacoby*, 835 F.3d at 1343. He further alleged that "his cellmates urinated and defecated over him as he tried to sleep, and that other inmates in the segregation unit threw feces and urine at him," causing him to develop "a foot rash due to these unsanitary conditions and the lack of hygiene products available to him." *Id.* (brackets and internal quotation marks omitted). The Eleventh Circuit, however, ruled that, "[t]aken in the light most favorable to him, Mr. Jacoby's allegations establish that he was temporarily forced to sleep on a mattress on the floor near the toilet" and that this was insufficient to show that this condition amounted to punishment. *Id.* at 1346. In other words, the court focused on the intentional placement of the plaintiff as a third person in administrative segregation in a cell meant for two rather than on the consequences by third parties following that decision.

Here, not only do Jones and Watkins simply allege that Defendants' *failed* to address COVID-19, as opposed to affirmative conduct, but they also have not alleged that Defendants *intentionally* exposed them to a greater risk of contracting COVID-19. Ultimately, Plaintiffs are attempting to shoehorn a run-of-the-mill deliberate indifference claim into a substantive due process claim without any allegation that Defendants are intentionally punishing Plaintiffs. The fact that COVID-19 may be spreading at the CCJ is not the result of a policy by Defendants

to spread COVID-19. At most, Jones and Watkins have only alleged that Defendants are intentionally detaining them and that "[d]etention inherently increases the chance of exposure to COVID-19." (Doc. 37 at 39; Doc. 1 at 38.) *But see Cureno Hernandez v. Mora*, ___ F. Supp. 3d ___, ___, No. 1:20-CV-00104-H, 2020 WL 3246753, at *8 (N.D. Tex. June 15, 2020) ("The incidence of diseases or infections, standing alone, cannot imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks." (brackets and internal quotation marks omitted)). As the Third Circuit recently ruled in a COVID-19 case involving immigration detainees, however:

> The District Court could see no rational relationship between a legitimate government objective and keeping Petitioners detained in unsanitary, tightly-packed environments—because doing so would constitute a punishment to Petitioners. But Petitioners' confinement implicates multiple legitimate governmental objectives, including: (1) ensuring Petitioners' appearances at . . . proceedings; (2) protecting the public; and (3) managing the detention facilities.

*Hope v. Warden York Cnty. Prison*, ___, F.3d ___, ___, No. 20-1784, 2020 WL 5001785, at *9 (3d Cir. Aug. 25, 2020) (brackets and internal quotation marks omitted); *see also id.* at *15 n.7 (noting that "[s]ome detainees released on their own recognizance in [the case below] absconded"); *cf. Hoffer v. Sec'y, Fla. Dep't of Corr.*, ___ F.3d, ___, ___, No. 19-11921, 2020 WL 5105013, at *10 (11th Cir. Aug. 31, 2020) (explaining that cost considerations may permissibly factor into officials' decisions to provide care to inmates). Given Jones and Watkins's failure to allege

any intentional conduct besides detention by Defendants that amounts to punishment, and given the strong legitimate interests by the State in detaining Jones and Watkins, Defendants are entitled to dismissal of this claim.[11]

      G.    *Claims 3 and 4 (Violations of the ADA and Rehabilitation Act)*

Under Title II of the Americans with Disabilities Act ("ADA"), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under section 504 of the Rehabilitation Act ("RA"), "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be

---

[11] Defendants do not explicitly move to dismiss Count II, but as noted earlier, the Court is independently required under 28 U.S.C. § 1915A to fully evaluate the merits of Plaintiffs' claims. This evaluation need not be lengthy, however, as Plaintiffs—who propose to represent all classes for this claim—have stated a claim of deliberate indifference. *See Swain v. Junior*, 958 F.3d 1081, 1088-89 (11th Cir. 2020) (stating standard for deliberate indifference and noting that standard is same whether based on Fourteenth Amendment for pretrial detainees or Eighth Amendment for convicted prisoners). COVID-19 is a serious disease. In addition, although Plaintiffs could have provided more detail to support their allegations, Plaintiffs have shown that Defendants are aware of the risk of COVID-19 generally and the risk that it poses to the CCJ. (Doc. 1 at 47-48.) Furthermore, Plaintiffs have sufficiently alleged that, despite this knowledge, Defendants' failure to adequately respond to COVID-19 amounts to reckless conduct. *See Swain*, 958 F.3d at 1089; *Hoffer*, 2020 WL 5105013, at *4 n.2; (Doc. 1 at 52-75.)

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Claims under either act are governed by the same standard, and courts "rely on cases construing Title II and § 504 interchangeably." *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019) (internal quotation marks omitted).

> To state a claim under either Title II or § 504, a plaintiff must establish (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*Id.* at 1134 (internal quotation marks omitted). "A physical impairment, standing alone, . . . is not necessarily a disability as contemplated by the ADA." *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). Instead, to qualify as disabled, a plaintiff must show that "he has '(A) a physical or mental impairment that substantially limits one or more of the major life activities; (B) a record of such an impairment; or (C) is regarded as having such an impairment.'" *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1264 (11th Cir. 2007) (quoting 42 U.S.C. § 12102(2)) (brackets and ellipsis omitted); *see Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Greenberg*, 498 F.3d at 1264 (internal quotation

marks omitted); *see also* 42 U.S.C. § 12102(2)(A). When alleging a failure to provide a reasonable accommodation, the "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) (internal quotation marks omitted) (considering a claim under Title I of the ADA).

Plaintiffs, as proposed representatives of the disability subclasses, allege that Defendants have denied them "important services, programs, and activities that would mitigate the risk of COVID-19" solely because of their disabilities and that Defendants have failed to provide reasonable accommodations. (Doc. 1 at 105.) Defendants contend that Plaintiffs have not shown that they are disabled as defined by the ADA and RA. (Doc. 40 at 12.) Although Defendants' argument may have some merit, any pleading deficiency on this point likely could be cured with more detailed allegations.

However, even assuming that Plaintiffs are disabled, Plaintiffs have not sufficiently alleged that they were discriminated against because of their disabilities. A reading of Plaintiffs' complaint shows that Defendants have allegedly failed to adequately respond to COVID-19 with respect to all inmates, not simply those with disabilities, and thus Defendants did not discriminate against Plaintiffs by reason of their disabilities. *See Silberman*, 927 F.3d at 1133; *see also Money v. Pritzker*, ___ F. Supp. 3d ___, ___, No. 20-CV-2093, 2020 WL 1820660,

at *18-19 & n.14 (N.D. Ill. Apr. 10, 2020) (ruling that inmates failed to show they were likely to succeed on ADA claim where prison officials' COVID-19 release policies treated all inmates equally and may even have disproportionally benefited disabled inmates); *Frazier v. Kelley*, ___ F. Supp. 3d ___, ___, No. 4:20-CV-00434-KGB, 2020 WL 2561956, at *35 (E.D. Ark. May 19, 2020) (ruling that inmates failed to show they were likely to succeed on ADA claim because there was no evidence that prison officials' failure to combat COVID-19 and provide accommodations was because of inmates' alleged disabilities). Moreover, to the extent Plaintiffs allege that Defendants have failed to provide reasonable accommodations, Plaintiffs have not alleged that they ever made a specific demand for an accommodation.[12] *See D'Onofrio*, 964 F.3d at 1022.[13] Accordingly, Defendants are entitled to dismissal of these claims.

---

[12] That Plaintiffs have been excused from exhaustion under the PLRA does not excuse their failure to request an accommodation under the ADA and RA.

[13] Furthermore, the only "reasonable accommodation" Plaintiffs allege in their complaint is release from custody. (Doc. 1 at 66 ("[N]o set of conditions can adequately protect members of this class. Public health experts recommend rapidly releasing people most vulnerable to COVID-19 from custody. Release not only protects the most vulnerable people from being infected with the virus, but also eases crowding, thereby allowing for greater risk mitigation for people held or working in a jail, and the broader community."); *see* Doc. 37 at 36 ("The complaint outlines the steps necessary to protect members of the Disability Subclasses: release or transfer from the Clayton County Jail.").) However, release from custody is not a "reasonable accommodation," and the PLRA prohibits such release without a prior "order for less intrusive relief that has failed to remedy the

H.     *Claim 5 (Petition for a Writ of Habeas Corpus)*

Finally, Plaintiffs, as proposed representatives of the medically vulnerable and disability subclasses, seek a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 directing their release or transfer from the CCJ. (Doc. 1 at 107-08.) However, this Court has regularly held that litigants like Plaintiffs may not proceed under both habeas and § 1983 in the same action. *See Boyd v. Warden*, 856 F.3d 853, 865 (11th Cir. 2017) (explaining that "habeas and § 1983 are mutually exclusive avenues for relief" (internal quotation marks omitted)). "Simply put, if the relief sought by the inmate would either invalidate his conviction or sentence or change the nature or duration of his sentence, the inmate's claim must be raised

---

deprivation of the Federal right sought to be remedied through the prisoner release order." 18 U.S.C. § 3626(a)(3)(A)(i). In addition, only a three-judge court can enter such a release order, and such order can only be entered "if the court finds by clear and convincing evidence that . . . crowding is the primary cause of the violation of a Federal right; and . . . no other relief will remedy the violation of the Federal right." *Id.* § 3626(a)(3)(E). Insofar as Plaintiffs contend that the PLRA's restrictions on release do not apply because "it is Defendants' gross mismanagement of the outbreak, not overcrowding, that is the primary cause of the constitutional violations in this case," (Doc. 37 at 44), "[t]he appropriate Eleventh Circuit relief from prison conditions that violate the Eighth Amendment during legal incarceration is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment. . . . [R]elief of an Eighth Amendment violation does not include release from confinement." *Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990).

in a § 2254 habeas petition, not a § 1983 civil rights action." [14] *Id.* (internal quotation marks omitted); *see also Bryant v. Warden, FCC Coleman-Medium*, 738 F.3d 1253, 1288 (11th Cir. 2013) (explaining that "§ 2241 habeas petitions, which must be filed in the incarceration district, are generally reserved for challenges to execution of a sentence or the nature of confinement, not the validity of the sentence itself or the *fact* of confinement"), *overruled on other grounds by McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076 (11th Cir. 2017); *Vaz v. Skinner*, 634 F. App'x 778, 781 (11th Cir. 2015) (ruling that a "§ 2241 petition is not the appropriate vehicle for raising an inadequate medical care claim, as such a claim challenges the conditions of confinement, not the fact or duration of that confinement").

Plaintiffs attempt to dance around this problem by arguing that they are not challenging the conditions of their confinement, but rather are challenging the "fact" of their confinement because confinement itself is unconstitutional in light of COVID-19. (Doc. 37 at 40.) This argument fails. The only reason Plaintiffs claim the "fact" of their incarceration is unconstitutional is because of the conditions in

---

[14] Jones and Watkins, as pretrial detainees, cannot file 28 U.S.C. § 2254 petitions because they have not been sentenced pursuant to a conviction. However, even if they were to file a separate 28 U.S.C. § 2241 action, it is likely that they would be unable to obtain any relief, both because this Court would likely be required to abstain under *Younger v. Harris*, 401 U.S. 37 (1971), and because they have not shown that they have exhausted their state-court remedies.

the jail related to COVID-19. Plaintiffs can try to twist the description of their claim as they wish, but at the end of the day it is a conditions-of-confinement claim that cannot exist under § 2241. *See A.S.M. v. Warden*, __F.Supp.3d__, __, No. 7:20-CV-62 (CDL), 2020 WL 2988307, at *4 (M.D. Ga. June 3, 2020) (finding that the court lacked jurisdiction to consider petitioners' habeas corpus remedy and that petitioners were not otherwise entitled to release from confinement and holding that "[r]elease from detention is not available as a remedy for unconstitutional conditions of confinement claims"). Accordingly, Defendants are entitled to dismissal of this claim.[15]

---

[15] Because this claim is one challenging conditions of confinement, the Court declines to address Defendants' argument that Plaintiffs have failed to exhaust their administrative remedies. (Doc. 23-1 at 23–24).

## III.   CONCLUSION

For the reasons stated above, it is **RECOMMENDED** that Defendants' motion to dismiss (Doc. 23) be **GRANTED IN PART and DENIED IN PART**, Plaintiff Randolph Mitchell's individual claims be **DISMISSED**, the remaining Plaintiffs' claims of deliberate indifference be **ALLOWED TO PROCEED**, and the remaining Plaintiffs' remaining claims be **DISMISSED**.

**IT IS SO RECOMMENDED**, this 16th day of September, 2020.

_____

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE