## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RHONDA JONES *et al.*,

        Plaintiffs,

  v.

VICTOR HILL *et al.*,

        Defendants.

CIVIL ACTION

NO. 1:20-CV-2791-JPB-CCB

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

The jail described in Defendants' brief (Doc. 41) bears little resemblance to the one in which Plaintiffs are held. Defendants claim to have implemented comprehensive COVID-19 prevention measures, but their assertions are contradicted by detainees who describe deplorable conditions and harrowing accounts of illness and neglect. Neither do Defendants acknowledge that most of their minimal mitigation measures occurred after this lawsuit was filed.

Plaintiffs attach to this brief thirteen additional declarations from detainees who would not recognize the jail described in Defendant Terrance Gibson's declaration (Doc. 41-1) as the one in which they are incarcerated. The declarations show that Defendants and their officers ignore people who report COVID-19

symptoms; fail to isolate infected persons; fail to test many people, against their own medical provider's advice; fail to provide detainees with useable facemasks; fail to provide sufficient quantities of soap and cleaning supplies; and fail to enforce social distancing measures.

As for Defendants' claim that "statistically speaking," there is "no COVID-19 outbreak at the CCJ" (Doc. 41 at 4), that assertion crosses the line from partisan wordsmithing to misrepresentation of fact.  (Ex. A, Supp. Fefferman Decl. ¶ 7.) Defendants' description of the number of positive COVID-19 cases at the jail as "low" is not supported by Defendants' own data, which shows consistently high COVID-19 positivity rates over several months.  (*Id*. ¶¶ 7-10.)

Plaintiffs are likely to succeed on the merits of their claims.   Given Defendants' insufficient response to the pandemic, members of the putative class face an imminent risk of irreparable injury absent an injunction. The balance of harms favors Plaintiffs because the risk of serious illness is substantial and the proposed injunction is carefully crafted to give Defendants the responsibility in the first instance for formulating and implementing "reasonably specific and detailed written plans" to address deficient conditions.  (Doc. 19-15 ¶ 1.)  An injunction will serve the public interest by protecting the rights and lives of people in the Jail.

## STATEMENT OF FACTS

**A.  Many of the Prevention Measures Described in Defendants' Brief Are Not Actually in Practice in the Jail.**

> **1.  Defendants Have Failed to Identify, Isolate, and Treat Infected Persons, Instead Leaving Them Inside Crowded Cells Where They Spread the Virus to Others.**

According to Defendants, "[i]f any inmate shows symptoms of COVID-19 after intake," the person is "separated from other inmates, medically evaluated in the medical infirmary, and tested for COVID-19."  (Doc. 41 at 12.)  Defendants are silent regarding the testimony of numerous detainees who had precisely the opposite experience.  (Doc. 19-1 at 8-9, 21.)  To give just a few examples:

- In April 2020, F.S., who had no mask, was locked in a cell with a woman who experienced fever, vomiting, and coughing up blood.  (F.S. Decl. ¶¶ 21-24.)  F.S. became infected.  (*Id.* ¶ 25.)  She submitted a sick call request but did not see a nurse for a week.  (*Id.* ¶¶ 25-26.)  Although she reported her symptoms, she was left in her housing unit where she continued to congregate with others for food service.  (*Id.* ¶ 25-27.)  F.S. and her cellmate were symptomatic for two weeks, during which they were neither tested nor isolated.  (*Id.* ¶ 27.)

- In April 2020, D.H. experienced symptoms of COVID-19.  (D.H. Decl. ¶ 20.)  He reported his symptoms to a nurse but was not isolated or given a mask.  (*Id.* ¶ 23.)  For the next two weeks, he followed orders to perform his trustee functions while symptomatic.  (*Id.* ¶ 24.)  He spent twelve hours per day passing out meals in other housing units without a mask.  (*Id.*)

- In May 2020, W.L.M was placed in a cell, without a mask, with a man who had just been tested for COVID-19 and was symptomatic.  (W.L.M. Decl. ¶ 18-19.)  W.L.M. developed symptoms of COVID-19.  (*Id.* ¶ 21.)  He told a nurse about his symptoms but was not given a mask or isolated.  (*Id.* ¶ 23.)

He experienced vomiting, diarrhea, and "immense difficulty breathing." (*Id*. ¶ 28.)  One night, he "felt as if [his] lungs were going to collapse" (*id*. ¶ 29), and "begged [an officer] for medical attention" (*id*. ¶ 32) but received none. (*Id*. ¶ 33.)

More recent declarations show that Defendants still fail to isolate and treat people with COVID-19 symptoms.

- In July 2020, S.T. developed a fever, diarrhea, shortness of breath, and loss of the ability to taste.  (S.T. Decl. ¶ 11.)  Her cellmates experienced similar symptoms.  (*Id*. ¶ 10.)  S.T. reported their symptoms to officers "at each count within the first day of the onset of symptoms."  (*Id*. ¶ 12.)  When one of S.T.'s cellmates became dangerously short of breath, S.T. banged on the cell door for assistance, but no one responded.  (*Id*.)  After three days of asking for help, S.T. saw a nurse.  (*Id*. ¶ 13.)  The nurse found that all three women had fevers, but S.T. and her cellmates remained in the housing unit.  (*Id*. ¶ 14.)  S.T. was not tested or isolated.  (*Id*. ¶ 15-16.)

- In July 2020, a man showing symptoms of COVID-19, including "severe coughing fits," was moved into a cell shared by G.R. and R.C.  (G.R. Decl. ¶ 7.)  G.R. and R.C. repeatedly told officers that the new cellmate could infect them with COVID-19, but the symptomatic man was not moved for a week. (*Id*. ¶ 7-8.)  R.C. then developed symptoms of COVID-19.  (*Id*. ¶ 9.)  R.C. reported these symptoms to officers and submitted sick call requests but was not moved.  (*Id*.)  G.R. then developed COVID-19 symptoms.  (*Id*. ¶ 10.)  He submitted sick call requests asking to be tested and evaluated but "never received any response" and was not tested.  (*Id*.)

- In July 2020, P.B. developed COVID-19 symptoms, including difficulty breathing and inability to taste or smell.  (P.B. Decl. ¶¶ 6-7.)  He told an officer but was not isolated or tested.  (*Id*.)  He then told a nurse about his symptoms and requested a test, but the nurse only took his temperature, gave him Tylenol, and sent him back to his cell.  (*Id*.)  Worried he would infect others, P.B. asked an officer to move him out of the housing unit.  (*Id*. ¶ 7.)  Instead, P.B. was moved within the same unit into a cell with two other men.  (*Id*.)  He was not tested.  (*Id*.)

- In June 2020, J.J.L.'s cellmate developed COVID-19 symptoms. (J.J.L. Decl. ¶¶ 6-7.) After reporting his symptoms and asking officers for care for three days, the cellmate finally lay on the dorm floor for hours in protest until a nurse was called. (*Id*. ¶ 7.) Soon thereafter, J.J.L. experienced vomiting, fever, and other symptoms. (*Id*. ¶ 9.) He too sought medical care for days but was not taken to medical until an officer found him passed out on his cell floor. (*Id*. ¶¶ 9-11.) J.J.L. was returned to the dorm without being tested. (*Id*. ¶ 12.)

## 2. Many Detainees with Active COVID-19 Symptoms and Recent Exposure to Infected People Do Not Receive Tests.

Defendants claim that "[n]o inmates at the CCJ are denied a COVID-19 test." (Doc. 41 at 11.)[1] Detainees report otherwise. C.B. developed a fever and lost his senses of taste and smell in late July. (C.B. Decl. ¶ 6.) He asked to be tested by grievance, medical request, and verbal request. (*Id*.) C.B. states:

> A nurse came to my cell and took my temperature. She told me my temperature wasn't high enough to bring me to the medical wing. I had no further contact from her or anyone else about my symptoms, which I continued to experience for weeks. I was not quarantined or provided with any medical care whatsoever. . . I have still never been tested for COVID-19. (C.B. Decl. ¶ 6.)[2]

R.J. experienced COVID-19 symptoms in July 2020. (R.J. Decl. ¶ 7.) He submitted

---

[1] Defendants claim to provide testing to "any inmate who requests same, any inmate with signs or symptoms consistent with COVID-19, and asymptomatic inmates with recent known or suspected exposure to COVID-19." (*Id*.)

[2] C.B. submitted a grievance asking for COVID-19 testing. (C.B. Decl. ¶ 19.) The grievance was "pending" for a month, during which time C.B. submitted a request, asking for a response to the grievance. (*Id*.) C.B. received no response, and the grievance later "disappeared from the kiosk." (*Id*.)

three sick call requests but did not see a nurse for almost a month.  (*Id.*)  Regarding

testing, R.J. states:

> When I was called up to the medical wing, I told the nurse about my
> symptoms, which were causing me a lot of discomfort and fear. The
> nurse took my temperature and blood pressure and told me that I was
> "good." I asked her if I could be tested for COVID-19, but she told me
> I had to have a fever to be tested. She then sent me back to my cell. I
> have never been tested for COVID-19.  (R.J. Decl. ¶ 7.)

Plaintiff Singleton, F.S., A.W., J.H., L.P., P.B., and A.B. were also denied tests,

despite symptoms and/or exposure to infected people.[3]   Indeed, Defendants are

failing to follow the advice of their own medical director, who recommended testing

"all new inmate[s] that are admitted to the jail."[4]

### 3.   Detained People Still Lack Access to Useable Masks, Minimally Adequate Quantities of Soap, and Cleaning Supplies.

#### a.   Masks

Defendants do not deny that they failed to issue most detainees facial

coverings, a critical prevention measure, for at least three months into the pandemic.

---

[3] *See* Singleton Decl. ¶ 10; F.S. Decl. ¶ 27; A.W. Decl. ¶¶ 40-44; J.H. Decl. ¶ 5; L.P. Decl. ¶ 7; P.B. Decl. ¶ 6; *cf.* A.B. Decl. ¶¶ 7-14 (describing unsuccessful efforts over the course of four months to get COVID-19 test, without success as of September 24, 2020).

[4] *See* Exhibit C, Email from E. Smith, July 20, 2020 (stating that "[a]s an intervention to fight COVID-19, our medical director Dr. Clopton is recommending that we test all new inmate[s] that are admitted to the jail.").

(Doc. 19-1 at 32; C.C. Decl. ¶ 22 (stating on June 25 that "[a]lmost no one has face masks"); J.H. Decl. ¶ 26 (stating "many men in my dorm still did not have masks" as of June 19); G.R. Decl. ¶ 5 ("I received one cloth mask in mid-July.").)  They are silent on the fact that, from March through early July, elderly and medically vulnerable people in their jail resorted to tying bits of torn underwear and ripped sheets over their faces to protect themselves from a deadly virus. (*See, e.g.*, Watkins Decl. ¶ 35; Jones Decl. ¶ 14; Mitchell Decl. ¶¶ 19-20; Singleton Decl. ¶¶ 4, 8.)

Defendants ignore all of that and claim (with no reference to the date of alleged implementation) that "every inmate" is provided with two facemasks at intake, a washable mask and a disposable mask.  (Doc. 41 at 7-8.)  They state that if a detainee loses her mask, another "will be provided for free."  (*Id*. at 8.)

It is true that more detainees have masks than did when this lawsuit was filed, such that elderly people and cancer patients are no longer walking around the jail with underwear tied over their faces.  However, many detainees, such as J.J.L., still have no mask.  (*See* J.J.L. Decl. ¶ 5; L.P. Decl. ¶¶ 4-6.)  Detainees do not receive two masks and replacements are not available.  (*See id*.)[5]

---

[5] *See also, e.g.*, R.J. Decl. ¶¶ 6, 15 (stating that he received one mask at intake in July, his mask is now soiled, he has asked for a replacement, "officers told me that they don't have any more masks," and his grievance asking for a new mask "disappeared" from the kiosk); C.B. Decl. ¶ 7 (stating that he received a mask in

By way of further example, S.T. did not receive *any* mask when she entered the jail in June and had none for weeks thereafter.  (S.T. Decl. ¶ 7.)  When F.B. entered the jail on August 7, he received a previously used, "threadbare," cloth mask, on which "the straps were loose and stretched out."  (F.B. Decl. ¶ 4.)  F.B. asked several officers for a replacement without success.  (*Id.*)  W.G. is a 78-year-old man arrested for a traffic offense, who spent four days in the jail in August and lacked a functional mask until the last day of his incarceration.  (W.G. Decl. ¶¶ 5-6.)  And P.B. states that as of September 17, three new arrivals in his dorm have no masks. (P.B. Decl. ¶ 14.)

### b.    Soap for Handwashing

According to Defendants' "protocol," all incarcerated persons "are provided multiple bars of soap for personal use and additional soap is available for replacement" free of charge.  (Doc. 41 at 7.)  In practice, detainees are allotted four ounces of liquid soap (not "bars") per week, which is an insufficient quantity for handwashing, showering, and in-cell cleaning.  (J.H. Decl. ¶ 19; Watkins Decl. ¶ 15; A.W. Decl. ¶ 17; F.S. Decl. ¶ 14.)[6]  Contrary to Defendants' claims, moreover (Doc.

---

June, has asked officers for a new mask multiple times, but has never received one).

[6] Many detainees must use their weekly soap allotment for in-cell cleaning and laundry, in addition to personal hygiene. (Singleton Decl. ¶ 6; Watkins Decl. ¶ 15.)

41 at 7), detainees are not able to get additional soap when needed.[7]  Liquid soap at
the jail is strictly rationed, even as disease spreads.  (Sparkman Decl. ¶¶ 56-58.)

### c.      Cleaning Supplies and Sanitation

Defendants claim that "each cell is cleaned and sanitized twice a day by the
inmates in the cell."  (Doc. 41 at 9.)  For this purpose, detainees allegedly receive "a
broom, a mop, and a bucket that contains OPTIM 1 and/or bleach."  (*Id.*)  Trustees
allegedly spray the toilet and sink twice a day with disinfectant solution.  (*See id.*)
Here again, the purported protocol does not operate in practice.

- C.B. cannot sanitize his cell twice a day because he lacks the supplies.  (C.B.
  Decl. ¶¶ 12-13.)  He has access once a day to a bucket of "black" water and a
  broom.  (*Id.*)  He usually does not have enough personal soap for cell cleaning
  since he must conserve it for showering and washing hands.  (*Id.* ("I have only
  seen a trustee spray my sink and toilet once in the past month.").)

- R.J. has "[a]t no time" been provided twice a day with a broom, mop, and
  bucket with cleaning solution.  (R.J. Decl. ¶¶ 10-11.) Once per day, he
  receives a bucket of dirty water.  (*Id.* ¶ 10.)  Despite his requests for additional
  cleaning solution, the last time a trustee sprayed the toilet or sink was "at least
  six weeks ago."  (*Id.* ¶ 10-11)

- S.T. receives a mop, broom, and bucket of dirty water about three times per
  week, not twice a day.  (S.T. Decl. ¶ 8.)   Cell toilets are sprayed
  "infrequently."  (*Id.*)

- F.B. has access once a day to a mop and bucket filled with water that "quickly

---

[7] *See also* C.B. Decl. ¶ 15 (stating that the only way to get more than the allotted
amount of soap per week is to barter with a trustee or purchase it); R.J. Decl. ¶ 8
(stating that "detainees . . . certainly don't get free replacement soap").

becomes filthy and unusable." (F.B. Decl. ¶ 11.)  F.B. does not have access to cleaning chemicals. (*Id.*)  He states: "I have asked officers for cleaning supplies. The officers have told me to talk to the trustees, and the trustees have told me that they are not allowed to share cleaning materials with us." (*Id.*)

### 4. Several of Defendants' Purported Social Distancing Protocols Are Not Implemented in Practice.

Defendants claim that they now enforce social distancing, including by distributing meals to each cell and requiring people to come out of cells for pill call "one by one and separate six feet apart." (Doc. 41 at 10.)  As for court appearances, Defendants claim that detainees remain in their pods until their case is called, and then move to a holding area for a Zoom hearing. (*Id.* at 10-11.)

Here again, Defendants' alleged protocols are not implemented.  In a declaration dated September 17, 2020, F.B. reports that detained people still must congregate in crowds of people to receive food and medication.

> At mealtime, everyone in my tier necessarily lines up close to one another in order to get their food. If we don't congregate in line to wait for our food, the officers will wait until we are in line before they start to distribute food trays. At pill call, people who get medications have to line up again. Jail staff do not encourage us to maintain social distancing at all. (F.B. Decl. ¶ 8.)

Similarly, in a declaration dated September 18, 2020, R.J. states that "[i]t is not the case that all meals are delivered to each detainee's cell." (R.J. Decl. ¶ 13.)  Rather, "we all line up close together" to wait in line for food. (*Id.*)  "There is no mention of social distancing from the officers or the trustee workers." (*Id.*)  The jail "does

not require, nor has it really attempted to implement social distancing at mealtimes or pill call." (S.T. Decl. ¶ 9.)  Instead, people must line up or crowd around at mealtimes and pill call.  (*Id.*)

Regarding court hearings, video stills from a recent date in magistrate court (September 17) show twelve women (two of whom are in wheelchairs) crammed together in a hallway awaiting court.  (Ex. D, Screenshots from Court Appearances.) A large crowd of men is visible in the background.  (*Id.*)  Consistent with Exhibit D, P.B., described recently being crowded into a small cell with nine other people and made to wait three hours for his case to be called.

> When we have a court appearance, we do not stay in our cells until our case is called. I went to court last Friday, September 11, 2020. I was taken to a single holding cell that is about 12 ft by 8 ft and was left there for over 3 hours with about nine other people while we waited for our court appearances. During this time, I had no ability to maintain distance from the other people in the small cell. There were no efforts to allow for social distancing while we waited to see the judge.  (P.B. Decl. ¶ 11.)

**B.    The Jail's Undisputed COVID-19 Data Shows an Alarming COVID-19 Positivity Rate at the Jail.**

There is a COVID-19 outbreak at the Jail.[8]  Defendants cite data from May,

---

[8] *See* Supp. Fefferman Decl. ¶¶ 5-7 ("[T]he infections at the Jail clearly meet the definition of an ongoing outbreak"); *see also* Exhibit E, Email from O. Adewale, District Epidemiologist, Clayton County Health District, Georgia Department of Public Health, Sept. 23, 2020 ("A confirmed case of COVID-19 in one or more inmates or staff is counted as an outbreak.").

June, and July and conclude that "the number of positive cases in the CCJ has remained low and stable." (Doc. 41 at 15-16.) Far from showing a "low" number of cases, the Defendants' data shows a COVID-19 positivity rate of 27.1% in May, 18.75% in June, and 27.2% in July. (*Id.*) In the medical community, such positivity rates "would not be reasonably characterized as 'low.'" (Supp. Fefferman Decl. ¶ 8.) Instead, they show that "mitigation efforts have demonstrably failed to prevent ongoing spread." (*Id.* ¶ 7.)[9]

---

[9] With their response brief, Defendants submitted the declaration of Edward Sweeney, a purported corrections expert. (Doc. 41-4.) Though the declaration is cumulative of Defendants' other evidence and plays a minimal role in Defendants' response, Plaintiffs object to Sweeney's declaration for two principal reasons. First, the declaration does not contain proper expert opinions based on his expertise and experience, but instead consists largely of factual recitations (*see, e.g.*, *id.* ¶¶ 11-16, 18-20, 23-26, 42-44) legal conclusions (*see, e.g.*, *id.* ¶¶ 7-8, 10), and impermissible personal opinions and arguments about such matters as the true nature of "justice" (*id.* ¶¶ 27-31) and the appropriateness of "a federal injunction" (*id.* ¶ 35). Courts generally hold this kind of expert testimony improper. *See, e.g.*, *U.S. v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004) (noting expert testimony generally unhelpful when it consists of "what lawyers for the parties can argue in closing arguments"); *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (holding expert "may not testify to the legal implications of conduct"); *Zurich Am. Ins. Co. v. Hardin*, No. 1:16-CV-2312, 2018 WL 5270356, at *3 (N.D. Ga. Mar. 14, 2018) (noting "an expert must conduct an factual independent analysis when reviewing records" and "may not simply recite a witnesses' testimony about the facts . . . and refashion it as an expert opinion"). Second, Sweeney's opinions are not reliable because his declaration provides no indication about "how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *See Addison v. Arnett*, No. 2:13-CV-71, 2016 WL 1441803, at *4 (S.D. Ga. Apr. 22, 2016) (citation omitted); *see id.*

# ARGUMENT

## I.     Plaintiffs Are Likely to Succeed on the Merits.

### A.     Plaintiffs Are Likely to Succeed on Their Deliberate Indifference Claims.

COVID-19 presents an objectively serious risk to detainees.  *See Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020).  (Fefferman Decl. ¶¶ 9-10; Rottnek Decl. ¶¶ 25-27, 43-44.)  Defendants are aware of that risk but have failed to take reasonable steps to mitigate it.  As discussed above, Defendants regularly deny detainees access to testing, leave detainees known to be sick with COVID-19 symptoms in their cells, fail to supply masks to all detainees, and deprive detainees of adequate cleaning and hygiene supplies.  These failures unreasonably expose detainees to a serious risk of harm.

Defendants do not dispute that the risk of harm is serious[10] or that they are

---

("The lack of analysis in [expert's] report leads the Court to surmise that his conclusion that Defendants 'acted properly and exercised sound correctional judgment' is merely a personal opinion.").

[10] To the extent Defendants argue that COVID-19 does not pose "a substantial risk of serious harm" to the plaintiff class, they are incorrect.  *See Swain*, 961 F.3d at 1285 ("Here, the defendants seem to agree—wisely, we think—that the risk of COVID-19 satisfies this requirement."); *cf. Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993) (holding that "exposure of inmates to a serious, communicable disease" that poses a risk of future harm is a sufficiently serious deprivation to invoke constitutional protections).

aware of the obvious risk.[11]  They instead claim that they have addressed the known risk by adopting a laundry list of "extraordinary" measures.[12]  (Doc. 41 at 22.)  As discussed above, however, many of those measures are not in place at the Jail, as reflected in sworn statements of numerous current and former detainees.

The policies Defendants reference in their brief exist in word only and in some cases are easily disproven by a YouTube search.  (Ex. D.)  At a minimum, Defendants clearly "could have, but did not, take steps to minimize" the risk to detainees.  *LaMarca v. Turner*, 995 F.2d 1526, 1537 (11th Cir. 1993).  Even if Defendants took *some* responsive action, they disregarded and continue to disregard simple steps to prevent and mitigate the virus.[13]  *See Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1584 (11th Cir. 1995) (holding sheriff, despite taking some steps, could be deliberately indifferent for disregarding "'alternative means' or interim measures

---

[11] *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

[12] Despite Defendants' assertion that their actions were "prompt" (Doc. 41 at 1, 22), the attached declarations are notable for the absence of dates on which these measures allegedly went into place (Doc. 41-1).

[13] The differences between *Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020), and this case are striking.  In *Swain*, the jailers' efforts included purchasing air purifiers, installing industrial-grade sanitization equipment for disinfecting common areas, conducting twice-daily temperature checks of detainees, releasing nearly 900 detainees, providing sufficient hygiene products, and other measures.  *Id.* Defendants' efforts are nothing like those deemed sufficient in *Swain*.

for reducing the risk").[14]  For example, Defendants do not promptly test, quarantine, or provide medical attention to individuals who report COVID-19 symptoms. *See Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir. 1989) (holding "intentional refusal to provide [medical] care" is deliberate indifference).  Defendants even refuse to follow their own medical director's "highly suggested" recommendation that they test all new arrivals to the Jail.  (Ex. C.)  These and numerous other failures to act are objectively unreasonable and constitute deliberate indifference,[15] particularly in the context of Defendants' actions prior to this lawsuit. *LaMarca,* 995 F.2d at 1542

---

[14] Defendants erroneously argue that a "complete denial of [medical] treatment' is the only basis for establishing deliberate indifference.  (Doc. 41, at 22-23 & n.14.) As suggested above, however, jailers cannot disregard reasonable measures to reduce a risk of serious harm to detainees.  Accordingly, "a decision to take an easier but less efficacious course of [medical] treatment" can support a deliberate indifference claim.  *Dimanche v. Brown*, 783 F.3d 1204, 1215 (11th Cir. 2015) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

[15] *See, e.g.*, *Carranza v. Reams*, No. 20-CV-00977, 2020 WL 2320174, at *10 (D. Colo. May 11, 2020) (jail detainees had shown a substantial likelihood of success despite defendants having implemented several important and proactive steps to address the spread of COVID-19); *Criswell v. Boudreaux*, No. 120-CV-01048, 2020 WL 5235675, at *6 (E.D. Cal. Sept. 2, 2020) (same); *Gray v. Cty. of Riverside*, No. 5:13-CV-0444, 2020 WL 4243484, at *4 (C.D. Cal. Apr. 14, 2020) (same); *Banks v. Booth*, No. CV 20-849, 2020 WL 1914896, at *11 (D.D.C. Apr. 19, 2020) (same). Defendants' contrary authority generally involves substantial proactive measures not in place at the Jail, either on paper or in practice.  *See, e.g.*, *Sanchez v. Brown*, No. 3:20-CV-00832, 2020 WL 2615931, at *7 (N.D. Tex. May 22, 2020) (use of outside cleaners instead of trustees to professionally clean potentially infected areas); *Money v. Pritzker*, No. 20-CV-2093, 2020 WL 1820660, at *5 (N.D. Ill. Apr. 10, 2020) (substantial reduction of detainee population).

(holding an "institution's historical indifference" is relevant in assessing deliberate indifference).  Plaintiffs have presented substantial evidence that Defendants knew of and disregarded harmful jail conditions for months (Doc. 19-6; Doc. 19-11); that Defendants failed to broadly issue masks until at least three months into the pandemic (Doc. 19-1 at 32; J.H. Decl. ¶ 26; G.R. Decl. ¶ 5); that Defendants cannot be trusted to implement their own policies (*see* Ex. B, Declarations of Thirteen Detainees); and that most of the meager changes Defendants have made only occurred after the lawsuit was filed (D.H. ¶ 36; G.R. Decl. ¶ 5; J.L. Decl. ¶ 7).

Finally, even if (contrary to the weight of the evidence) Defendants had implemented the policy changes they allege, Plaintiffs would still be entitled to injunctive relief because a defendant's "voluntary cessation of challenged conduct does not ordinarily render a case moot."  *Knox v. Serv. Employees Int'l Union*, 567 U.S. 298, 307 (2012).  To establish mootness, Defendants would have the "heavy burden" of showing that conditions in the Jail would not revert to what they were before this case was filed.  *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 532 (11th Cir. 2013).  Here, Defendants have not demonstrated an unambiguous break from their old policies, nor have they shown that any policy changes resulted from substantial deliberation and have been followed consistently.  *See id.*  Thus, injunctive relief is warranted regardless of Defendants' alleged policy changes.

In sum, Plaintiffs are likely to succeed on the merits of their deliberate indifference claim.[16]

**B.      Plaintiffs Are Likely to Succeed on Their Habeas Corpus Claims.**

Defendants argue that habeas is unavailable in this case "for several reasons" raised in their motion to dismiss.[17]   (Doc. 41 at 28.)   Accordingly, Plaintiffs incorporate by reference the pertinent section of their response to the motion to dismiss.  (Doc. 37 at 40-43.)[18]

---

[16] In a footnote, Defendants contend that "the decisional law applicable to prison inmates applies equally to pretrial detainees." (Doc. 41 at 17 n.12.)  They are incorrect.  The Eleventh Circuit has declined to resolve whether, after *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), liability for the unconstitutional treatment of pretrial detainees continues to require a showing of subjective deliberate indifference.  *Dang ex rel. Dang v. Sheriff, Seminole Cty., Fla.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) ("We cannot and need not reach this question.").  The logic of *Kingsley*—that unreasonable results of intentional acts constitute punishment— applies equally to jail-conditions cases.

[17] Contrary to Defendants' claim that habeas corpus relief is not available, several courts have left open the availability of habeas corpus relief under the unique circumstances presented in this case.  *See, e.g.*, *A.S.M. v. Donahue*, No. 7:20-cv-62, 2020 WL 1847158, at *1 (M.D. Ga. Apr. 10, 2020); *Gayle v. Meade*, No. 20-CV-21553, 2020 WL 1949737, at *26 (S.D. Fla. Apr. 22, 2020).

[18] Defendants also argue that release is unavailable because Plaintiffs' rights are not being violated (Doc. 41 at 25-26), and that "federalism concerns" and the "public interest" weigh against release (*id.* at 26).  As discussed in this brief, Plaintiffs have established likely violations of their rights and releasing certain detainees will promote rather than harm the public interest.

### C.    Plaintiffs Are Likely to Succeed on Their ADA and RA Claims.

Contrary to Defendants' argument (Doc. 41 at 27), a disability discrimination claim under the ADA and/or the Rehabilitation Act can be based on either a conventional disparate treatment theory, or a theory that the defendant failed to make reasonable accommodations, or both.  *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008).  Here, Plaintiffs allege that Defendants failed to carry out their "affirmative duty to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified [person]." *Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *4 (11th Cir. Aug. 24, 2007).  This "affirmative duty" includes making reasonable modifications to ensure people with disabilities[19] have equal access to the services, programs, and activities of the jail, including safe housing, safe access to medical care, and safe adjudication of their criminal cases. 28 C.F.R. §§ 35.130(a), (b)(2,), (b)(7)(i); *see Fraihat* v. *U.S. Immigration & Customs Enf't*, 445 F. Supp. 3d 709, 748 (C.D. Cal. 2020) (disabled people in ICE detention entitled to reasonable accommodations in order to participate in the "programmatic 'benefit'" of the removal process).  Because it is an affirmative duty, Defendants'

---

[19] Disability Subclass representatives are all people with disabilities protected under the ADA and Rehabilitation Act.  Each has one or more conditions that "substantially impair" a "major life activity" or "major bodily function" as the ADA and Rehabilitation Act require. 28 C.F.R. § 35.108.

suggestion that they only need to provide accommodations when explicitly requested must be rejected. *See Nattiel v. Fla. Dep't of Corr.*, No. 1:15-CV-150, 2017 WL 5774143, at *1 (N.D. Fla. Nov. 28, 2017) (prison officials were aware of plaintiff's disabilities and therefore had a "duty to accommodate" even without a demand for an accommodation); *Pierce*, 128 F. Supp. 3d at 269 (finding "untenable" the argument that "prison officials have no legal obligation to provide accommodations for disabled inmates unless the inmate specifically requests such aid"). Thus, Plaintiffs are likely to succeed on their ADA and Rehabilitation Act claims.[20]

## II.   Plaintiffs Will Suffer Irreparable Injury Absent an Injunction.

The irreparable injury inquiry turns not on whether COVID-19 poses a danger, which "it undoubtedly does." *Swain*, 961 F.3d at 1292. Rather, the inquiry is whether Plaintiffs face a risk of irreparable harm absent an injunction. *Id.* at 1293.

---

[20] Plaintiffs will respond by September 30 to the Non-Final Report and Recommendation dismissing these claims. (Doc. 52.) The principal ground for the recommended dismissal is that Plaintiffs failed to show disparate treatment and that detainees with disabilities failed to request an accommodation. (Doc. 52 at 35-6.) These conclusions are inconsistent with settled law. *See, e.g., Schwarz*, 544 F.3d at 1212 n.6; *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) (explaining that a public entity is not insulated from liability under the ADA by treating disabled people exactly the same as non-disabled people because "uniformly-applied, disability-neutral policies . . . would utterly eviscerate [the] ADA requirement [of reasonable accommodations]"); *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1328 n 33. (N.D. Ga. 2017) (recognizing that a specific demand for an accommodation is unnecessary where the need for one is obvious).

Here, they undoubtedly do because Defendants' pandemic response has been, and remains, insufficient and unreasonable.

- Defendants regularly leave symptomatic people in overcrowded cells, where sick people infect others.  (*See* Part A.1. *supra*.)

- Defendants fail to provide tests to people who show COVID-19 symptoms.  (*See* Part A.2. *supra*.)

- Six months into the pandemic, Defendants *still* fail consistently to provide detainees with facemasks and have no functioning system to replace and clean them.  (*See* Part A.3.a. *supra*; L.P. Decl. ¶ 4; F.B. Decl. ¶ 4.)

- Defendants have failed to provide even minimally adequate cleaning supplies, such that detainees resort to using scraps of toilet paper, blankets, and their personal allotment of body soap to clean their cells.  (*See* Part A.3.b-c. *supra*; Singleton Decl. ¶¶ 3, 6; M.B. Decl. ¶ 10; R.L. Decl. ¶ 19.)

- Defendants have failed even to provide detainees with utensils for eating, such that detainees resort to the unsanitary practice of eating foods like rice, noodles, or eggs with their hands.  (A.J.W. Decl. ¶ 8; G.W. Decl. ¶ 10.)

- Defendants require detainees to congregate in close proximity during meal distribution, pill call, and video court.  (*See* Part A.4. *supra*.)  Social distancing protocols are still not enforced (*see id.*), and recent video evidence shows detained people crammed together in crowded hallways (Ex. D).[21]

---

[21] Though not directly relevant to the COVID-19 response, Defendants have failed to provide minimally adequate hygiene supplies, such that, for extended periods, detained people lack basic items like toothbrushes (A.J.W. Decl. ¶ 9) ("I was unable to brush my teeth for a week."), and feminine hygiene products (F.S. Decl. ¶ 15) (stating that she resorted to using a spare sheet as a sanitary napkin).

Defendants' insufficient response endangers all detainees, *cf. Swain*, 961 F.3d at 1293, but particularly those with health conditions that make them vulnerable to serious illness from COVID-19.[22]  Absent an injunction, there is an imminent risk that more people will become infected.  Some may suffer permanent injury or die.

If Defendants' real-life mitigation plan mirrored that described in Defendants' legal briefs, and if there were a basis for believing Defendants would consistently follow those policies going forward, an injunction might be unnecessary.  But detainees credibly report that those policies are not being followed, and Defendants' misrepresentations regarding the existence of an outbreak (Doc. 19-1 at 15) and misleading description of jail conditions undermine their claim that sufficient mitigation strategies are in place.

Defendants claim that there is no irreparable injury because the named Plaintiffs have not been infected.  (Doc. 41 at 33.)  Even if that were true (it is not),[23] Plaintiffs need only show that they face an "actual and imminent" risk of becoming infected absent an injunction.  *Swain*, 961 F.3d at 1292.  They have met this burden.[24]

---

[22] *See, e.g.,* Supp. Watkins Decl. ¶¶ 2-3 (stating that he is 61 and has diabetes); M.B. Decl. ¶¶ 2, 12 (stating she is 52 and received chemotherapy for breast cancer); J.H. Decl. ¶¶ 2, 6 (stating that he is 51 and has hypertension).

[23] Three of the named Plaintiffs experienced COVID-19-like symptoms but were not tested.  (Watkins Decl. ¶¶ 37-41; Singleton Decl. ¶ 10; Mitchell Decl. ¶¶ 13-14.)

[24] *Swain* does not compel a contrary result.  In *Swain*, a district court's irreparable-

### III.   The Balance of Harms Favors Plaintiffs.

COVID-19 "unquestionably poses a serious threat" to jail detainees.  *Swain*, 961 F.3d at 1293.  That risk is heightened for people in the Clayton County Jail.  Due to Defendants' unreasonable acts and omissions, Plaintiffs and the nearly 2,000 putative class members are at risk of contracting COVID-19 and experiencing preventable serious illness and death on a massive scale.  As a result, Defendants are violating Plaintiffs' federal rights, and "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."  *Brown v. Plata*, 563 U.S. 493, 511 (2011).

In contrast to the serious threat to detainees, an injunction would pose no undue burden on Defendants' legitimate interests.  The proposed injunction (Doc. 19-15) would leave Defendants with responsibility for formulating "reasonably specific and detailed written plans" in the first instance (*id.* ¶ 1).[25]  Similarly, the

---

harm analysis was flawed because the court "opted not to resolve" certain factual disputes regarding defendants' alleged protective measures.  *Swain*, 961 F.3d at 1293.  Here, there is substantial evidence in the record regarding the inadequacy of Defendants' COVID-19 response, much of it undisputed, whereas Defendants' submissions are unpersuasive and, in some instances, demonstrably false.

[25] *See Thomas v. Bryant*, 614 F.3d 1288, 1323 (11th Cir. 2010) (approving of seeking proposed remedial plans from prison officials before entering injunction); *LaMarca*, 995 F.2d at 1543 (approving of injunction terms "to ensure that [certain] specific policies were carried out [by prison staff]" as opposed to "the methods by which [prison officials] effectuated these policies").

proposed order would not necessarily result in release of detainees but would require only preliminary steps to "aid the Court's evaluation of whether release and/or enlargement is appropriate" (*id.* ¶¶ 6, 8-9) and a plan by Defendants to review (but not necessarily discharge) detainees eligible for discretionary release (*id.* ¶ 7).

Defendants argue that an injunction would interfere with the Sheriff's "flexibility" by "order[ing] the Sheriff to conform to standards on the day of entry" of the injunction.   (Doc. 41 at 36.)   As noted above, however, the proposed preliminary injunction allows Defendants to identify areas in which flexibility is needed.[26]   Thus, an injunction will not improperly restrain Defendants' flexibility but will merely keep it within constitutional bounds.  *Plata*, 653 U.S. at 511 ("If government fails to fulfill this obligation [to provide for prisoners' basic needs], the courts have a responsibility to remedy the resulting Eighth Amendment violation.").

## IV.   An Injunction Will Serve the Public Interest.

It is well established that "the public interest is served when constitutional rights are protected."  *Jones v. Governor*, 950 F.3d 795, 830 (11th Cir. 2020)

---

[26] Similarly, if an unforeseen problem arises after an injunction issues, the "settled rule" is that "district courts retain power to modify injunctions in light of changed circumstances."  *Dombrowski v. Pfister*, 380 U.S. 479, 492 (1965); *see Plata*, 563 U.S. at 542 (stating in prison-conditions case that district courts should "remain open to a showing or demonstration by either party that the injunction should be altered").

(quoting *Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019)). That rule applies with particular force here, as "the integrity of the criminal justice system depends on full compliance" with the proscription against cruel and unusual conditions of confinement. *Johnson v. California*, 543 U.S. 499, 511 (2005).

Defendants argue that a preliminary injunction would disserve the public interest because it would require "immediate release" of detainees, certain detainees may not "be able to protect themselves any better" outside of the Jail, and releasing detainees would allegedly pose a "risk of danger to the public" because they have "committed or allegedly committed a myriad of crimes."   (Doc. 41 at 37-38.) Plaintiffs' proposed injunction does not ask for "immediate release," but provides for release "where appropriate" and only if Defendants fail to "ensure that each detainee no longer faces an unreasonable risk of injury or death." (Doc. 19-15 ¶ 5.) In all events, releasing detainees will not harm the public interest.[27]  Defendants' suggestion that detainees may not be able to "provide for their food and medical care needs" or "protect themselves any better" from COVID-19 (Doc. 41 at 37) are

---

[27] *See, e.g.*, *Savino v. Souza*, No. 20-CV-10617, 2020 WL 2404923, at *1 (D. Mass May 12, 2020) ("[T]his injunction does not prohibit the government's (and the public's) [interest in] confining those who are dangerous or flight risks. Yet, to the extent it reduces the risk of an uncontainable outbreak in the facility, the injunction secures the safety of the detainees, the guards and other staff, their families, and ultimately the public at large.").

wholly speculative, and are factors that the Court could consider in determining whether to release a *particular* detainee.   Irrespective of whatever hardships detainees might face in the community, they would not be confined to a mismanaged "incubator[] for the coronavirus."  (Rottnek Decl. ¶ 15.)  *Coreas v. Bounds*, No. 20-CV-780, 2020 WL 1663133, at *6 (D. Md. Apr. 3, 2020) (noting "the absurdity of the claim that someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty").

With respect to public-safety concerns, the proposed order provides for identifying detainees deemed "unsuitable for release under any circumstances." (Doc. 19-15 ¶¶ 8-9.)  If the Court finds it necessary to order the release of certain detainees, it may consider public-safety concerns when making individualized release decisions.  Thus, a preliminary injunction would not harm the public interest.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

/s/ Jeremy Cutting

| | |
|---|---|
| Kosha S. Tucker | Sarah Geraghty |
| Ga. Bar No. 214335 | Ga. Bar No. 291393 |
| AMERICAN CIVIL LIBERTIES UNION | Jeremy Cutting |
| FOUNDATION OF GEORGIA | Ga. Bar No. 947729 |
| P.O. Box 77208 | Ryan Primerano |
| Atlanta, GA 30357 | Ga. Bar No. 404962 |

(678) 981-5295
ktucker@acluga.org

Stephen L. Pevar
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
765 Asylum Avenue
Hartford, Connecticut 06105
(860) 570-9830
spevar@aclu.org

David C. Fathi
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 Fifteenth Street, N.W., Seventh Floor
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org

SOUTHERN CENTER
FOR HUMAN RIGHTS
60 Walton Street, N.W.
Atlanta, GA 30303
(404) 688-1202
sgeraghty@schr.org

Brandon Buskey
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
(212) 284-7364
bbuskey@aclu.org

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that this document has been prepared in compliance with Local Rule 5.1C using 14-point Times New Roman font.

/s/ Jeremy Cutting

September 24, 2020

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing using the Court's CM/ECF system, which will send notification of filing to all counsel of record.

/s/ Jeremy Cutting

September 24, 2020