UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RHONDA JONES, et al.,

      Plaintiffs,

    v.

VICTOR HILL, in his official capacity
as Sheriff of Clayton County, Georgia,
et al.,

      Defendants.

CIVIL ACTION NO.
1:20-CV-02791-JPB

## ORDER

This matter is before the Court on Rhonda Jones, Michael Singleton and

Barry Watkins's (collectively, "Plaintiffs") Motion for Preliminary Injunction.

[Doc. 19].  This Court finds as follows:

## PROCEDURAL HISTORY

On July 1, 2020, Plaintiffs—medically vulnerable inmates held[1] at the

Clayton County Jail ("the Jail")—filed suit, on behalf of themselves and others

---

[1] Plaintiff Jones was released from custody after the instant motion was filed.  [Doc. 123-1, p. 2].  Although her individual claims appear to be moot, to date, neither party has moved to dismiss them.  Notwithstanding, even if her individual claims are subject to dismissal, "the termination of a class representative's claim does not moot the claims of the unnamed members of the class."  Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 52 (1991).

similarly situated, against Victor Hill, in his official capacity as Sheriff of Clayton County, Georgia; Roland Boehrer, in his official capacity as Chief Deputy; Terrance Gibson, in his official capacity as Jail Administrator; Kevin Thomas, in his official capacity as Jail Security Operations Section Commander; and Maurice Johnson, in his official capacity as Jail Administrative Operations Section Commander (collectively, "Defendants"). [Doc. 1].[2] Plaintiffs, who characterize this action as one to "enforce disease prevention measures and to protect people who are uniquely susceptible to the effects of COVID-19," brought the following claims: (1) unconstitutional punishment in violation of the Fourteenth Amendment Due Process Clause; (2) unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments; (3) violations of the Americans with Disabilities Act; (4) violations of the Rehabilitation Act; and (5) a Petition for a Writ of Habeas Corpus under 28 U.S.C. §§ 2241 and 2243. Id. Within their Class Action Complaint and Petition for Writ of Habeas Corpus, Plaintiffs

---

[2] On many of the documents relied upon and cited by this Court, two page numbers are present: the page number placed on the document by the preparer (at the bottom of the page) and the page number stamped on the document by the CM/ECF system (generally across the top of the page). All page numbers cited by the Court refer to the numbers imprinted by the CM/ECF system.

simultaneously requested preliminary injunctive relief.  Id. at 109.  On July 9,

2020, Plaintiffs' request was denied.[3]  [Doc. 8, p. 2].

Plaintiffs renewed their request for injunctive relief by filing the instant

Motion for Preliminary Injunction on July 27, 2020.  [Doc. 19].  In the motion,

Plaintiffs ask this Court to order Defendants to create and file a reasonably specific

written plan—developed in consultation with the Georgia Department of Public

Health and/or a qualified medical or public health expert in preventing and

mitigating the spread of infectious diseases—that addresses the following matters:

1. Educating detainees, staff members, contractors and/or vendors about
   COVID-19, including:  symptoms, the importance of social distancing
   and frequent hand washing, the proper use of personal protective
   equipment and other appropriate measures to prevent or mitigate the
   spread of the virus that causes COVID-19, with this education continuing
   on a regular and as-needed basis as more information becomes available
   about the virus;

_____

[3] This case was initially assigned to U.S. District Judge Eleanor K. Ross; she denied
Plaintiffs' first request for preliminary injunctive relief because the motion was not filed
separately as required by her standing order.  The case was reassigned to this Court on
July 28, 2020.  [Doc. 22].

2. Screening detainees, staff members, contractors, vendors and/or visitors to the Jail for symptoms of COVID-19 upon entry to the Jail;

3. Maintaining an adequate supply of COVID-19 tests and administering them to: (1) all individuals who are booked into the Jail; (2) a random, representative sample of all detainees and staff members at least once every fourteen days; and (3) all detainees, staff members, contractors and/or vendors suspected of being infected with the virus that causes COVID-19;

4. Responding promptly and effectively when detainees report experiencing symptoms consistent with COVID-19;

5. Detecting, monitoring, documenting and quarantining or isolating suspected or known cases of COVID-19 among detainees or staff members, including, but not limited to, taking reasonable steps to identify persons within the Jail who have been in contact with a person who has tested positive for or exhibited symptoms of COVID-19;

6. Ensuring that detainees known or suspected to have COVID-19 do not interact with detainees who are not known or suspected to have COVID-19;

7. Creating, posting and implementing schedules for thorough cleaning and sanitizing of cells, common areas and objects used by a person known or suspected to have COVID-19;

8. Facilitating at least six feet of distance between detainees and all other persons during all out-of-cell operations, including free time, recreation time, sick call, pill call, meal distribution and transport to video court and other group activities;

9. Reassigning detainees within the Jail as appropriate to maximize the number of detainees assigned a standard bed to sleep in and minimize the number of detainees required to sleep on the floor;

10. Maintaining and providing detainees with adequate facilities for frequent hand washing and adequate personal hygiene supplies;

11. Maintaining, using and providing detainees with adequate cleaning supplies for cleaning cells, common areas and fixtures in the Jail, including chemical solutions that are effective against the virus that causes COVID-19;

12. Creating, posting and adhering to schedules and reminding detainees why and how to clean using issued cleaning materials;

13. Maintaining and providing detainees with adequate supplies of personal protective equipment and similar items;

14. Creating, posting and adhering to schedules to clean objects that are frequently touched;

15. Providing adequate clothing and laundry service to detainees;

16. Maintaining and administering the seasonal influenza vaccine to all detainees and individuals booked into the Jail who agree to be vaccinated;

17. Providing adequate, additional protective measures for all detainees performing work assignments in the Jail;

18. Providing adequate, additional protective measures for all detainees whose age or medical conditions make them susceptible to serious illness or death if they contract COVID-19;

19. Ensuring that detainees have readily available access to means of reporting medical problems and unsafe conditions of confinement, including, but not limited to, access to grievance and sick call systems;

20. Documenting and monitoring the performance of all COVID-19 prevention and mitigation measures in the Jail; and

21. Educating detainees about COVID-19 quarantining and other protective

measures to take upon release to the community.

Id. at 2-6.

On July 27, 2020, Plaintiffs requested expedited discovery to obtain

evidence necessary to support their Motion for Preliminary Injunction.  [Doc. 21].

Upon Plaintiffs' request and over Defendants' objections, on August 14, 2020, this

Court decided to allow the parties to engage in discovery related to the pending

motion.  [Doc. 35].  On September 4, 2020, the parties asked the Court to resolve a

discovery dispute.  [Doc. 43].  The parties disagreed as to whether Defendants had

to produce medical requests and grievances submitted by inmates through a kiosk

and whether Plaintiffs' experts would be allowed to inspect the Jail.  Id.  On

September 11, 2020, after a hearing, this Court ordered Defendants to produce the

medical requests and grievances and ordered an inspection of the Jail to occur at a

time agreeable to the parties.  [Doc. 47].  Ultimately, based on the agreement of the

parties, the inspection was conducted on October 4, 2020.

While discovery related to Plaintiffs' Motion for Preliminary Injunction was

ongoing, Defendants filed their Motion to Dismiss.  [Doc. 23].  That motion was

referred to U.S. Magistrate Judge Christopher C. Bly, who recommended granting

the motion in part and denying it in part.  [Doc. 53].  Judge Bly issued his

recommendation on September 16, 2020, and it became ripe for this Court's review on October 21, 2020.  On November 19, 2020, after considering Plaintiffs' objections and Defendants' responses thereto, this Court adopted the Report and Recommendation and scheduled the preliminary injunction hearing to begin on December 8, 2020.  [Doc. 73 and November 19, 2020 docket entry].  As it stands now, only the deliberate indifference claim remains.

## BACKGROUND[4]

COVID-19 is a virus that spreads easily from person-to-person and causes illness that ranges from very mild (including some individuals with no reported symptoms) to severe, including illness resulting in death.  [Doc. 48-10, p. 1]. Significantly, older people and people of all ages with severe underlying health conditions—like heart disease, lung disease and diabetes, for example—have a higher risk of developing serious COVID-19 illness.  Id.  On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic. Id.  Rightly so, both parties acknowledge that COVID-19 presents a once-in-a-lifetime public health crisis.  [Doc. 125, p. 8].  Unfortunately, at least in Georgia

---

[4] These background facts are derived from the evidence included with the parties' briefings, the evidence presented during the initial two days of the hearing on December 8-9, 2020, the supplemental evidence submitted thereafter and the evidence tendered during the reconvened hearing on December 17, 2020.

and most other states within the United States, the pandemic is entering its worst phase since its inception as new positive cases continue to increase dramatically. [Doc. 77-6, p. 11]. The virus "poses particularly acute challenges for the administration of the country's jails and prisons. Because incarcerated inmates are necessarily confined in close quarters, a contagious virus represents a grave health risk to them—and graver still to those who have underlying conditions that render them medically vulnerable." Swain v. Junior, 961 F.3d 1276, 1280 (11th Cir. 2020).

In response to the COVID-19 pandemic, the Centers for Disease Control and Prevention ("CDC") formulated guidelines for healthcare and non-healthcare administrators of correctional and detention facilities.[5] [Doc. 41-3, p. 27]. The CDC originally issued its guidelines in March 2020, and they have been updated twice (in July and October 2020). [Doc. 77-6, p. 13]. At the outset of the guidelines, the CDC identifies and acknowledges various barriers detention facilities face in controlling the spread of COVID-19 or other communicable diseases. [Doc. 41-3, p. 27]. These barriers include, but are not limited to, living

---

[5] The Court references these guidelines not because they are determinative in answering the question of whether Plaintiffs presented sufficient evidence to likely show a constitutional violation—they are not, see Swain, 961 F.3d at 1288—but because both Plaintiffs and Defendants reference these guidelines throughout their arguments to this Court. [See, e.g., Docs. 77-6, p. 18 and 41-3, p. 4].

within a congregate living environment, high turnover of residents, the inability of

incarcerated persons to exercise disease prevention measures due to security

considerations, crowded living conditions and limited options for medical

isolation.  Id. at 27-28.  In light of these barriers, the CDC organized its guidelines

into three sections:  (1) operational preparedness; (2) prevention; and (3)

management.  Id. at 30-31.  Notably, the CDC recognized that the guidelines may

need to be adapted based on individual facilities' physical space, staffing,

population, operations and other resources and conditions.  Id. at 27.

Regarding operational preparedness, the CDC recommends, among other

things, that correctional institutions communicate with staff about COVID-19,

develop a policy or plan to address COVID-19, place educational signage

throughout the facility and maintain an adequate amount of supplies, like masks

and cleaning equipment.  Id. at 31-33.  Concerning the prevention of COVID-19,

the CDC advises cleaning frequently touched spaces several times per day,

encouraging cloth face coverings, conducting pre-intake symptom screening and

implementing social distancing strategies, such as staggering recreation times,

providing meals in cells, reducing the number of individuals in cells and staging

pill lines in housing units.  Id. at 34-39.  Finally, as to management, the CDC

suggests addressing symptoms of COVID-19 as soon as they are reported,

increasing testing and implementing various quarantine procedures for symptomatic individuals and those who have had close contact with someone infected with COVID-19.  Id. at 39-49.

The Jail employs 108 individuals and houses 1,800 inmates, which is below its rated inmate capacity of 2,000.  [Doc. 41-1, pp. 6-7].  Each of the Jail's eight housing units has six pods and each pod has sixteen cells, for a total of ninety-six cells per housing unit.  Id. at 4.  The pods are equipped with a community shower, telephones, televisions, an attorney visitation area, tables and chairs and a recreational activity area (commonly referred to as the dayroom).  Id.  To date, 161 inmates and staff have tested positive for COVID-19.  [Doc. 78-4, p. 3].  In May, June and July 2020, the average positivity rates for those tested was 24.35%.  [Doc. 41-4, p. 7].

In this case, the parties presented dramatically different accounts, which are detailed immediately below, regarding Defendants' response to the COVID-19 pandemic.  Defendants, who presented their evidence through their own testimony and declarations, an inmate, a CorrectHealth, LLC ("CorrectHealth")[6] employee and an expert, essentially maintain:  that inmates wear masks 100% of the time; that inmates maintain social distancing to the maximum extent possible; that

---

[6] CorrectHealth provides medical services at the Jail.  [Doc. 41-3, p. 2].

common areas are consistently cleaned with disinfectants multiple times per day; that inmates are tested immediately upon request or upon exhibiting symptoms; and that quarantining procedures are in place and followed.  On the other hand, Plaintiffs, presenting their evidence through their own declarations, testimony and declarations of other incarcerated inmates, a former CorrectHealth employee and experts, principally contend that inmates are not provided with masks or soap, do not have access to prompt medical care or COVID-19 testing and face retaliation if they complain about the lack of care.

**Defendants' Evidence**

Defendants presented evidence that beginning as early as March 2020, even before Clayton County, Georgia had any documented cases of COVID-19, the Jail began implementing various measures to prevent the spread of COVID-19 within the facility.  Many of these measures are described below.

One such measure includes educating inmates and staff.  According to Defendants, the staff is continually educated through e-mails and rollcall training. [Docs. 48-7, p. 1 and 125, p. 216].  As to inmates, their education begins during orientation when inmates watch a video about social distancing and are instructed to stay six feet apart, wash their hands and wear a mask.  [Docs. 41-2, p. 3 and 125, p. 172].  To aid in the education of both staff and inmates alike, educational signs

(which have evolved from flimsy paper to permanent stickers) have been placed throughout the Jail. [Docs. 41-2, pp. 6-7 and 125, pp. 180-81].

Another measure Defendants implemented is a screening process for all new inmates. Defendants contend that nurses employed by CorrectHealth now screen all new inmates entering the facility. [Docs. 41-2, p. 2 and 48-4, p. 1]. This screening includes a temperature check and questions regarding symptoms and possible exposure to COVID-19. [Doc. 41-3, p. 6]. If an inmate fails the screening process, the inmate is not placed in the general population. [Doc. 41-1, p. 19]. Instead, the inmate is sent to the medical infirmary to be monitored by medical staff and tested for COVID-19. [Doc. 41-3, p. 7]. In addition to screening inmates at intake, all employees have their temperature checked before entering the building. [Doc. 125, p. 192].

Defendants assert that mandatory mask wearing for all inmates, staff and visitors is another measure that they have taken in response to COVID-19. According to Defendants, masks have been required for all those inside the Jail since April 2020. [Doc. 41-1, p. 10]. Although masks were not readily available to inmates at the beginning of the pandemic, Defendants contend that all inmates are now given two facemasks (one cloth and one disposable) when they enter the facility and are issued replacement masks upon request. [Doc. 41-2, p. 8]. The Jail

now has 15,000 masks in its inventory.  [Doc. 41-1, p. 14].

Defendants further argue that they have implemented measures to encourage social distancing.  These measures include changes to the recreation schedule to reduce the number of inmates present in the dayroom at any given time, changes to meal distribution whereby inmates now eat meals in their cells and changes to pill call such that inmates no longer stand in a line to receive their pills.  [Docs. 41-2, pp. 10-11 and 41-1, p. 14].  Defendants also presented evidence that they blocked access to certain telephones, showers, toilets and sinks to create more space between inmates.  [Doc. 77-6, p. 25].  Additionally, Defendants contend that they reduced the Jail's inmate population to increase space between the remaining inmates.  In February 2020, before the pandemic was declared, the average daily population at the Jail was 2,178.  [Doc. 78-4, p. 1].  By October 2020, the average daily population at the Jail was reduced to 1,811—a 15.5% reduction.  Id. Defendants argue that they accomplished this reduction through the following:  (1) informing other agencies that the facility would not accept new inmates for minor cases or minor arrests; (2) targeting the release of inmates who are fifty-five years and older and inmates who have medical conditions; and (3) routinely releasing inmates that are scheduled for release any time during a given week on Monday of that week to expedite a reduction in the inmate population.  [Docs. 125, p. 162 and

41-1, pp. 27-28].

Defendants argue that testing for COVID-19 and quarantining those infected or suspected of being infected with COVID-19 are other measures they have taken in response to the pandemic.  To date, Defendants have tested 774 inmates and staff members.  [Doc. 78-4, p. 3].  Defendants claim that COVID-19 tests are never denied to inmates who request a test, exhibit signs or symptoms consistent with COVID-19 or who have had recent contact with someone with COVID-19.  [Doc. 41-3, p. 9].  According to Defendants, under their protocols, if an inmate is in the infirmary due to suspected or confirmed COVID-19, that inmate will stay in the infirmary for at least fourteen days.  [Doc. 41-1, p. 20].  After the fourteen days, if the inmate receives a negative COVID-19 test, then that inmate can return to the general population.  Id.  If the inmate is awaiting test results, however, the inmate is moved to a step-down quarantine unit to be further monitored and evaluated.  Id. Inmates are not transferred to the general population from the step-down unit until they are asymptomatic and receive a negative test.  Id.

As to the cleaning and sanitation measures taken in response to COVID-19, Defendants assert that they are using the same protocols they used during the MRSA, SARS and bird flu outbreaks.  [Doc. 125, p. 184].  According to Defendants, these protocols require inmate workers to clean common areas and

other high-touch areas at least twice a day and after recreation time ends for a group of inmates.  [Doc. 41-2, p. 9].  These high-touch areas, which are cleaned with a disinfectant known as OPTIM-1, include tables and chairs in the dayroom, showers, visitation areas, telephones, kiosks, door handles, rails and windows.  Id. Defendants also contend that during every shift, inmate workers spray the toilets and sinks located in inmates' cells with OPTIM-1.  [Doc. 125, pp. 185-86].

Defendants also argue that they have purchased supplies to aid their response to the COVID-19 pandemic.  Specifically, the Jail purchased air purifiers for the common areas of the intake and medical units.  Id. at 181.  The Jail also purchased handheld thermometers so that temperature checks could be performed on incoming inmates and staff.  Id. at 192.  The Jail even purchased a metal detector that has a thermal scanning function.  Id.

**Plaintiffs' Evidence**

Plaintiffs do not dispute that Defendants have taken some measures to combat the spread of COVID-19 within the Jail.  Plaintiffs, however, contend that because of, at least in part, Defendants' lack of a written COVID-19 policy, Defendants have failed to consistently implement the measures they know they need to take (or say they are already taking) to reduce the risk of COVID-19. Plaintiffs presented much of their evidence through inmate declarations, some of

which were anonymous, describing conditions in the Jail.

Plaintiffs assert that despite the mask mandate at the Jail, inmates are not consistently provided masks or replacement masks.  Plaintiffs provided evidence that in the first four months of the pandemic (March through June of this year), detainees were not given masks and instead had to make their own from clothing, towels or rags.  [Doc. 77-6, p. 49].  Even now, months into the pandemic, Plaintiffs claim that inmates are still not regularly given masks.  For instance, Jamie Mills testified that during her entire incarceration in the Jail (from October 2, 2020, through October 28, 2020) she was without a mask because Jail personnel took her mask during the intake process and refused to give her a replacement.  [Doc. 77-5, p. 9].

Plaintiffs further contend that Defendants are not doing enough to enable social distancing.  Plaintiffs' chief complaint is the inability to social distance while confined to small cells with two other people in them.  Plaintiffs presented evidence that many detainees are housed three-to-a-cell in cells designed for only two people.  [Doc. 77-6, p. 18].  For example, Plaintiff Watkins is housed with two other inmates.  [Doc. 19-5, p. 19].  Similarly, Plaintiff Jones, who is no longer incarcerated, was housed in a cell with three detainees and slept on the floor.  Id. at 5.  In addition to crowded cells, Plaintiffs argue that inmates are not reminded to

social distance when outside their cells and are often forced into lines and other spaces where social distancing is not enforced or is impossible.

Plaintiffs assert that Defendants also need to do more regarding cleaning, sanitation and hygiene. Even though the CDC recommends an intensified cleaning protocol, inmates say that common areas and high-touch areas are not cleaned before and after each use. Id. at 30. They also state that they are not given supplies necessary to adequately clean their own cells, thus requiring them to clean their cells with dirty water and left-over toilet paper. [Doc. 77-6, p. 36]. Review of the grievances submitted by inmates to the Jail demonstrates that inmates routinely complain about the lack of cleaning in the common areas. Id. at 32. Plaintiffs also presented pictures showing a mildewed shower and a clogged HVAC vent. Id. at 34. In addition to the lack of cleaning, Plaintiffs further argue that they have insufficient hygiene supplies. To support this assertion, Plaintiffs presented evidence that inmates are only issued four ounces of liquid soap per week—an insufficient weekly amount in their opinion. Id. at 41. Plaintiffs also claim that they do not have access to communal soap. The inmates explained that bottles of orange soap were placed in the common area restrooms before the inspection but were removed before any of the inmates could use the soap. Id. at 42-43.

Plaintiffs contend that inmates cannot easily submit medical requests or grievances.  In the Jail, inmates are required to submit medical requests and other grievances, even those related to COVID-19, via a kiosk.  Id. at 58.  In the declarations, inmates routinely describe either an inability to access the complaint system or difficulty accessing it.  Id. at 59.  As an example, Trey Absher, an inmate, explained that the kiosks located in his housing unit were broken, making it difficult to submit requests.  [Doc. 125, p. 109].  Another inmate, Jaquan Williams, explained that he was unable to submit a medical request regarding COVID-19 because the Jail limits the number of requests an inmate can have pending.  Id. at 86.  Relatedly, Plaintiffs contend that even when inmates submit requests through the kiosk system, the Jail fails to promptly respond to the requests.  For instance, one inmate explained that he submitted a sick call request regarding COVID-19 symptoms and medical staff did not see him for ten days.  [Doc. 77-6, p. 66].

Plaintiffs additionally argue that testing does not occur in the way Defendants claim and that Defendants need to promptly test inmates who request tests, have symptoms or have been in close proximity to known cases of COVID-19.  In support of this argument, Plaintiffs presented evidence that ninety-eight different detainees either reported COVID-19 symptoms or requested a COVID-19

test from July 1, 2020, to August 31, 2020.  [Doc. 105-1, p. 1].  Of the ninety-eight, only four received a test within fourteen days.  Id.  Katie Baker-Leake, a former CorrectHealth employee, stated that she often saw sick call requests from inmates who were requesting COVID-19 tests for the second time because the first request had been ignored.  [Doc. 78-10, p. 5].

Plaintiffs also argue that despite Defendants' quarantine and isolation protocol, Defendants are not actually isolating detainees with COVID-19 or symptoms of COVID-19, which allows the virus to spread throughout the facility. Multiple declarations indicated that sick inmates are not promptly removed or never removed from their cell.  Id. at 17.  One inmate described being placed into a cell with a man who had symptoms of COVID-19 (difficulty breathing, cold sweats and diarrhea) and who was awaiting COVID-19 test results.  [Doc. 77-6, p. 63].  Another inmate explained that she experienced coronavirus symptoms and it took one week for medical to respond to her request.  Id. at 65.  This inmate explained that even though she had symptoms, she was never isolated or tested for COVID-19.  Id.  According to Plaintiffs' expert, "[i]ndividuals with any detected sign or symptom not explained by another clinically diagnosed condition should be removed from the rest of the population, tested, and only returned to the rest of the population upon receiving a negative test result."  [Doc. 19-2, p. 16].

In the instances where inmates are quarantined or isolated, Plaintiffs contend that the quarantine process is not in accordance with CDC guidelines.  For example, one inmate, who was not symptomatic, described being placed in quarantine because his cellmate had COVID-19 symptoms.  [Doc. 77-6, p. 68]. Although this inmate did not have any COVID-19 symptoms, he claimed that he was placed into quarantine with inmates who did have symptoms.  Id.

Lastly, Plaintiffs argue that inmates who report problems relating to the Jail's response to COVID-19 often face various forms of retaliation, thus closing necessary channels of communication.  Id. at 71.  For instance, one inmate described receiving nutraloaf—an amalgamated food product used for punishment—the day following the inspection because some inmates within his dorm banged on their cell doors during the inspection.  [Doc. 77-5, pp. 19-20]. That same inmate also described a lockdown on November 11, 2020.  Id. at 21.  As another example, Mr. Absher claimed that he was removed from his position as an inmate worker for speaking with a lawyer from the Southern Center for Human Rights regarding the conditions at the Jail.  Id. at 4.

## ANALYSIS

A plaintiff seeking preliminary injunctive relief must show the following:

(1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction

issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

Sofarelli v. Pinellas Cnty., 931 F.2d 718, 723-24 (11th Cir. 1991) (citation omitted).  "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the 'burden of persuasion' as to each of the four prerequisites."  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted).  Granting a preliminary injunction is the exception rather than the rule.  Id.

I.   Substantial Likelihood of Success on the Merits

A plaintiff seeking preliminary injunctive relief must show a substantial likelihood that he will ultimately prevail on the merits of his claim.  Sofarelli, 931 F.2d at 723.  This factor is generally considered the most important of the four factors.  Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986).

In this case, Plaintiffs contend that Defendants have been "deliberately indifferent" to the serious risk that COVID-19 poses to inmates confined at the Jail.  As a general rule, both the Eighth and Fourteenth Amendments are violated when a jailer is "deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury."  Swain, 961 F.3d at 1285.  To establish a deliberate indifference claim, a plaintiff must make both an objective and a subjective

showing.  Farmer v. Brennan, 511 U.S. 825 (1994).  The objective component requires a plaintiff to show a "substantial risk of serious harm" while the subjective component requires a plaintiff to demonstrate "the defendants' deliberate indifference" to that risk.  Swain, 961 F.3d at 1285.  Deliberate indifference to the risk of harm, which is the subjective component of this Court's inquiry, is shown through three sub-showings:  "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  Id. At the outset of the Court's analysis, it is important to note that the deliberate indifference standard is "far more onerous than normal tort-based standards of conduct sounding in negligence."  Id. at 1288.  Importantly, a plaintiff must show more than malpractice or simple negligence.  Id. at 1285.  In fact, a plaintiff must show something akin to "subjective recklessness as used in the criminal law."  Id. at 1285-86.  "Indeed, even where 'prison officials . . . actually knew of a substantial risk to inmate health or safety,' they may nonetheless 'be found free from liability if they responded reasonably to the risk . . . .'"  Id. at 1286.

As demonstrated in this Court's Background section, the declarations and testimony provided by the inmates describing their experiences in the Jail contrast sharply with the declarations and testimony provided by Defendants which identify a number of measures taken to protect detainees from exposure to COVID-19.  For

the reasons explained below, the Court finds that Plaintiffs are likely to show both the objective component (substantial risk of serious harm) necessary to establish a deliberate indifference claim and that Defendants had subjective knowledge of that harm.  At this stage of the proceedings, however, especially given the conflicting evidence,[7] this Court is not persuaded Plaintiffs have made a sufficient showing that Defendants disregarded the risk of serious harm by conduct more than mere negligence.  Without this showing, Plaintiffs cannot establish a substantial likelihood of success on the merits.

      1.  <u>Objective Component</u>

This Court begins by analyzing the objective component of the claim.  The objective component requires a plaintiff to demonstrate a substantial risk of serious harm—"i.e., 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' and, in either instance, 'one that, if left unattended, poses a substantial risk of serious harm.'"  <u>Hoffer v. Sec'y, Fla. Dep't of Corr.</u>, 973 F.3d 1263, 1270 (11th Cir. 2020).

---

[7] The grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts.  <u>Cumulus Media, Inc. v. Clear Channel Comms., Inc.</u>, 304 F.3d 1167, 1171 (11th Cir. 2002) (recognizing that preliminary injunctions are, by their nature, products of an expedited process often based upon an undeveloped and incomplete evidentiary record).

Here, it is undisputed that COVID-19 is a highly contagious virus that can cause serious illness, even death.  Both parties acknowledge that to date, the Jail has already documented 161 confirmed cases of COVID-19.  Moreover, "[s]ince the beginning of the COVID-19 pandemic, outbreaks in jails and prisons have killed over 1,400 people."  [Doc. 77-6, p. 13].  Ultimately, based on this evidence, the Court finds that Plaintiffs are likely to easily satisfy the objective prong, despite Defendants' arguments to the contrary.

    2.  <u>Subjective Component</u>

Turning to the subjective component of the claim and the first of the three required sub-showings—whether Defendants had subjective knowledge of a risk of serious harm—Plaintiffs are likely to prevail here too.  In analyzing this first sub-part, a court "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 738 (2002).  Here, the risk of harm is obvious, as 161 inmates and staff have already tested positive.  Moreover, Defendants have implemented numerous measures to mitigate the risk of COVID-19 spreading throughout the Jail, which, at the very least, is an implicit acknowledgment of a serious risk of harm.  <u>See</u> <u>Gayle v. Meade</u>, No. 20-21554-Civ-COOKE/GOODMAN, 2020 WL 3041326, at *18 (S.D. Fla. June 6, 2020) (holding that it is "hard to imagine" that the defendants were unaware of the risk of

25

serious harm involved in contracting COVID-19 in a jail and determining that the defendants at least "impliedly" acknowledged the risk by creating a set of guidelines and recommendations specifically addressing the pandemic).

As to the remaining sub-showings, whether Defendants disregarded the risk by conduct that is more than mere negligence, "the fundamental question . . . is whether [Defendants] exhibited 'a sufficiently culpable state of mind.'" Swain, 961 F.3d at 1287.  In evaluating that question, this Court must focus "not on isolated failures . . . but rather on [Defendants'] entire course of conduct." Id. at 1287-88.  "It bears repeating that deliberate indifference is *not* a constitutionalized version of common-law negligence." Id. at 1288.

This Court begins its analysis by noting the measures taken by the Jail that are not meaningfully in dispute based on the current evidence before the Court. These measures include screening procedures for new inmates and temperature checks for all employees, reducing the inmate population, purchasing thermometers and air purifiers, implementing social distancing measures such as changing the recreation schedule and meal time procedures and increasing space between showers, toilets and phones and designating isolation and quarantine spaces.  The Jail has also educated its staff, albeit not through a written policy, regarding COVID-19 and placed signs throughout the facility reminding

individuals to maintain social distance, wash their hands and wear a mask.

Next, this Court addresses the measures taken by the Jail that are in dispute. The Court is not convinced, based on the present record, that Plaintiffs have demonstrated that inmates are not provided masks.  The evidence presented thus far shows that masks have been required in the facility since April 2020.  Even though inmates were initially required to create makeshift masks, credible evidence showed that by early summer, inmates were issued two masks upon arrival.  The Jail also has 15,000 masks at its disposal.  Although one of the inmates testified that she was never issued a mask and did not have a mask the entire time she was incarcerated, this Court questions the veracity of that testimony because Defendants presented a picture of the same inmate wearing a mask while incarcerated.  [Doc. 96-2, p. 1].  Moreover, two defense witnesses, both inmates, admitted to wearing and receiving masks.  [Doc. 125, pp. 93, 115].

Similarly, Plaintiffs have not yet shown significant lapses in cleaning protocols.  Credible evidence was presented that each dorm is provided with disinfectant cleaning products and inmate workers are required to disinfect the high-touch areas multiple times per day pursuant to a cleaning schedule.  In fact, Mr. Absher, one of Plaintiffs' witnesses, admitted that inmate workers are required to clean.  Id. at 116.  Importantly, in most of the pictures reviewed by this Court,

the Jail appeared reasonably clean. As to hygiene supplies, Plaintiffs largely focused on the orange soap bottles that were placed in the common area restrooms before the inspection and disappeared following the inspection. Regardless of what happened with the orange soap,[8] evidence showed that inmates are given four ounces of liquid soap or bar soap every week. Defendants credibly explained that inmates are not charged for soap and are given more soap if they request it.

This Court is also not convinced based on the present record that inmates face retaliation for complaining about conditions at the Jail. To be sure, Plaintiffs have shown that inmates were punished following the inspection and forced to eat nutraloaf. While Plaintiffs contend that the punishment was undeserved and that inmates were simply trying to speak to the inspectors, the record shows that inmates were banging on their cell doors during the inspection. [Doc. 77-5, p. 25]. Additionally, while Plaintiffs have also shown that inmates are sometimes placed on lockdown, Plaintiffs have not shown that the lockdowns are causally related to complaints about the Jail. For instance, in one inmate declaration, the inmate

---

[8] The Court recognizes that Plaintiffs claim that the orange soap bottles were mere props for the experts' inspection. However, Chief Deputy Boehrer explained, credibly in this Court's opinion, that the bottles were placed in the restrooms in preparation for an unrelated inspection to be conducted by the Sheriff the following week, [Doc. 125, p. 197], and that inmates historically stole such loose items, id. at 180, thus likely explaining their disappearance.

explained that his dorm was locked down because two or three inmates were outside of their cells when they were not supposed to be. Id. at 22. Finally, as to Mr. Absher, who claimed that he was removed from his position as an inmate worker for speaking to a lawyer about the conditions of the Jail, Chief Deputy Boehrer provided credible testimony that he removed Mr. Absher from his position as an inmate worker after he discovered, during a routine review of the files of all inmate workers, that Mr. Absher did not qualify for the position because of the seriousness of his pending charges (felony charges involving firearms and drugs). [Doc. 125, pp. 199-200].

Although Defendants have implemented numerous measures as explained above, based on the record as it stands now, serious questions exist about portions of Defendants' COVID-19 response. Most concerning to this Court is Defendants' response to those who report symptoms or request testing.[9] Here, Plaintiffs presented enough evidence to demonstrate that inmates who report

---

[9] The Court notes that Plaintiffs' evidence did not convincingly show that inmates are consistently unable to report medical problems or other grievances through the kiosk. For instance, although Mr. Absher testified that the kiosk in his housing unit was broken, thus hindering his ability to make requests, the evidence showed that during the time when the kiosk was broken, Mr. Absher made numerous requests by using a kiosk in a neighboring unit. [Doc. 125, pp. 118-20]. Moreover, Chief Deputy Boehrer credibly explained that inmates do not always need to use the kiosk and can ask their housing officer if they need anything. Id. at 179.

symptoms are not always promptly removed from their cell or tested for COVID-19.  By not identifying or separating those with COVID-19 from the general population, COVID-19 could spread through the Jail.[10]

 After considering Defendants' entire course of conduct,[11] however, the

---

[10] Also concerning to this Court is the testimony of Ms. Mills and Mr. Absher.  Ms. Mills testified that soon after arriving at the Jail, she was placed on suicide watch, stripped of her mask and clothing and placed in a restraint chair.  [Doc. 77-5, p. 8].  She explained that she broke her hip while in custody and was not given medical attention for an entire week.  Id.  As to Mr. Absher, he provided a declaration and testimony concerning his experience as an inmate worker in the infirmary.  [Docs. 77-5, p.1 and 125, p. 100].  Mr. Absher explained that in June of this year, he witnessed S.S., who had COVID-19, die while in medical isolation at the Jail.  [Doc. 77-5, p. 2].  Mr. Absher testified that he never witnessed S.S. receive any care from medical staff even though S.S. told staff that he could not move.  Id.  He also explained that S.S.'s isolation cell was filled with trash and smelled awful.  Id.  Although the testimony of both Ms. Mills and Mr. Absher were given some weight in the Court's ultimate decision, they were not given great weight for the following reasons.  First, as to Ms. Mills, questions exist about the credibility of her testimony.  She testified that she was restrained in a chair naked and was never given a mask, but Defendants produced a picture of Ms. Mills in the chair while wearing a cloth covering and a mask.  [Doc. 96-2, p. 1].  Also, as even Plaintiffs' counsel conceded, Ms. Mills's medical condition (her hip) did not involve COVID-19.  [Doc. 126, pp. 5-6].  Next, as to Mr. Absher's testimony, this Court questions his credibility as well.  See supra p. 29 and note 9.  And the records presented after the hearing revealed that S.S. did receive medical and mental health care during his time in custody.  [Doc. 101-1].  (It is also noteworthy, especially since the pending motion seeks an injunction requiring Defendants "to take steps to protect Plaintiffs and putative class members from being infected with the virus that causes COVID-19," [Doc. 19, p. 1], that S.S.'s medical records show that he contracted COVID-19 *before* being processed into the jail and that upon his arrival to the Jail, he was quarantined and isolated in a reverse air-flow cell.  [Doc. 101-3, p. 1].)  While there are open questions regarding the quality of care provided to S.S., they cannot dictate the decision on an injunction motion where, as here, the primary issue Plaintiffs raise is the prevention of infections, not the treatment of those infected.
[11] Swain, 961 F.3d at 1287-88.

Court finds that Plaintiffs have not provided enough evidence to demonstrate that it is likely that Defendants' COVID-19 response is so deficient that it rises to the level of deliberate indifference.  Here, this Court cannot ignore the credible evidence before it that masks have been required in the facility since April 2020, and every inmate is given two masks.  Moreover, all staff undergo temperature checks prior to the start of their shifts and all incoming inmates are screened before being placed in the general population.  The evidence showed that each dorm is provided with disinfectant cleaning products and inmate workers are required to disinfect the high-touch areas multiple times per day.  Inmates are given soap and have running water in their cells to enable them to properly wash their hands.  Importantly, the inmate population has been reduced and meal time and recreation time have all been adjusted to allow for easier social distancing.  Social distancing has also been encouraged by creating space between chairs, phones, toilets and showers.  Signage also reminds the inmates to separate.  Finally, although imperfect, Defendants have designated separate spaces for isolation and quarantine.  These are only some, but not all, of the preventative measures that the Jail has implemented.  In light of these measures, Plaintiffs have not met their burden to show a substantial likelihood of success as to their deliberate indifference claim.

While the evidence presently before the Court indicates that the Jail, as to its COVID-19 policies and procedures, could be doing more to protect vulnerable inmates, especially in the area of testing and responding promptly to medical requests, federal judges are not wardens.  "The Constitution charges federal judges with deciding cases and controversies, not with running state prisons." Lewis v. Casey, 518 U.S. 343, 363 (1996) (Thomas, J., concurring).  The narrow question before this Court is whether Plaintiffs have shown that Defendants have likely violated the Constitution.  And, under governing precedent, that burden is extremely high.  See Swain, 961 F.3d at 1287.  Given the high threshold necessary to show deliberate indifference and the proactive measures implemented by the Jail, however imperfect the implementation of those measures may be, Plaintiffs fail to demonstrate a substantial likelihood of success on the merits.  This decision is not meant to suggest that the evidence, especially after it is more fully developed, could not be found to be sufficient to establish a constitutional violation.  Rather, this Court finds only that based on the present record, and under Plaintiffs' burden, the evidence before the Court is not adequate to merit injunctive relief.

II.   Other Prerequisites

As explained in detail above, Plaintiffs fail to show a substantial likelihood

of success on the merits as to their deliberate indifference claim.  Therefore, this Court will not address whether Plaintiffs will be irreparably harmed should an injunction not issue or whether the balance of equities[12] favors injunctive relief. See Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994) (recognizing that when plaintiffs fail to establish a substantial likelihood of success on the merits, the other prerequisites need not be addressed).  See also Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011) (holding that if the plaintiff is unable to show a substantial likelihood of success on the merits, the court need not consider the other requirements); Stearns-Miller v. Inch, No. 20-22309-CV-SCOLA, 2020 WL 5633839, at *6 (S.D. Fla. Aug. 24, 2020) (declining to address the other requirements after determining that the plaintiffs could not demonstrate a substantial likelihood of success on the merits as to a deliberate indifference claim involving COVID-19 at a detention facility).

## CONCLUSION

This Court recognizes that the potential spread of COVID-19 in our country's jails and prisons, including Clayton County's, is an urgent problem—

---

[12] In a case like this, where the government is the party opposing the preliminary injunction, the final two preliminary injunction factors (harm to the opposing party and the public interest) merge.  Swain v. Junior, 958 F.3d 1081, 1091 (11th Cir. 2020) ("[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest.").

one with potentially grave consequences.  Here, however, Plaintiffs have failed to show a substantial likelihood of success on the merits of their constitutional claim and, as such, have failed to demonstrate that they are entitled to a preliminary injunction as a matter of law.  Ultimately, after thoroughly reviewing the record and the evidence, Plaintiffs' Motion for Preliminary Injunction [Doc. 19] is **DENIED**.

      **SO ORDERED** this 24th day of December, 2020.

_____

**J. P. BOULEE**
United States District Judge