# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

RHONDA JONES *et al.*,

        Plaintiffs,

v.

VICTOR HILL *et al.*,

        Defendants.

CIVIL ACTION

NO. 1:20-CV-2791-JPB-CCB

## PLAINTIFFS' MOTION FOR ORDER
## REGARDING CLASS COMMUNICATIONS

Plaintiffs move the Court for an order under Rule 23(d)(1) of the Federal Rules of Civil Procedure and Local Rule 23.1(C) to restore class counsel's ability to communicate effectively with class members by mail.

Shortly after the Court certified this case as a class action and class counsel began communicating with a large number of class members by mail, Defendants abruptly changed their longstanding policy on detainees' access to writing implements, declared pens contraband, and confiscated all class members' pens. This unprecedented policy serves no legitimate purpose, effectively eliminates class members' ability to communicate confidentially with their counsel by mail, and substantially burdens class counsel's ability to "fairly and adequately represent

the interests" of the class.  Fed. R. Civ. P. 23(g)(4).  The ban also violates the

constitutional rights of class counsel and the class members and supports an

inference of unlawful retaliation for protected speech.  The Court should exercise

its authority under Rule 23(d) of the Federal Rules of Civil Procedure to enter an

order ensuring that class members are able to communicate with class counsel by

mail.  *See Peoples v. Wainwright*, 325 F. Supp. 402, 403 (M.D. Fla. 1971) (Tjoflat,

J.) (recognizing that "attorney-client communication by mail" is "a proper matter"

for an order under Rule 23(d), and barring prison officials from censoring class

members' legal mail).

## FACTUAL BACKGROUND

### A.     Plaintiffs' Class Action Lawsuit and Class Counsel's Efforts to Communicate with Detained Class Members

Plaintiffs represent a certified class challenging Defendants' violation of

Plaintiffs' constitutional rights through their deficient response to the COVID-19

pandemic in operating the Clayton County Jail.  (Doc. 1.)  The Court certified a

class consisting of all people who are now or who will be incarcerated in the

Clayton County Jail and appointed undersigned counsel to represent the class.

(Doc. 130.)  The case is currently in the discovery period.  (Doc. 146.)

Class counsel rely on their incarcerated clients to inform them of

circumstances relevant to the merits of the case.  (Exhibit A, Declaration of Jeremy

Cutting ¶ 6.)  Until recently, class counsel could confidentially communicate with class members through legal mail or individual legal visits.  (*Id.* ¶¶ 4–6.)  COVID-19 has already substantially restricted counsel's access to the class members at the jail.  (*Id.* ¶ 5.)  When conducted virtually, individual legal visits last only 30 minutes and cost $11.97.  (*Id.*)  Only an attorney can initiate a legal visit, not a class member.  (*Id.*)  Class counsel lacks the personnel or capacity to conduct individual legal visits with each of the roughly 2,000 constantly changing class members in the jail.  (Cutting Decl. ¶ 5.)  Instead, they stay apprised of facts concerning the merits of the case by receiving legal mail from class members.  (*Id.* ¶ 6.)  Receiving written materials through the mail is the most effective and least expensive means for class counsel to communicate with the class members.  (*Id.*)  Additionally, mail provides the only confidential channel through which class members may contact their attorneys.  (*Id.* ¶ 7.)

**B.**      **Defendants' Prohibition on Detainee Use of Pens**

In February 2021, class counsel sent a confidential letter to each of the approximately 2,000 class members in the jail, informing them of the lawsuit and inviting their input in the form of a mailed response.  (Cutting Decl. ¶ 8.)  It was counsel's first mailing to the class and the letters were sent in envelopes clearly marked as legal mail from class counsel.  (*Id.*)  As the attached declarations show,

in early March, shortly after class members began receiving the letters from counsel, Defendants' staff enacted restrictions on pens that prevent class members from responding to class counsel or otherwise communicating by mail.  (Exhibit B, Detainee Declarations, R.K. Decl. ¶¶ 3–4; M.J. Decl. ¶¶ 3–4; S.A. Decl. ¶¶ 3–4; J.W. 2d. Decl. ¶¶ 4–5.)

According to witnesses in different housing units across the jail, jail staff entered each dorm, announced that detainees were no longer allowed to possess pens, and confiscated all pens in detainees' possession through searches of the detainees and their cells.  (R.G. Decl. ¶ 4; R.K. Decl. ¶ 4; J.W. 2d. Decl. ¶ 5; S.A. Decl. ¶ 4.)  Pens were also removed from the list of available commissary items.  (R.K. Decl. ¶ 4; M.J. Decl. ¶ 5; A.H. Decl. ¶ 4.)  Detained class members report this was the first time they had ever seen staff confiscate or prohibit pens.  (S.A. Decl. ¶ 7 ("I have been in the jail for almost 18 months . . . and this is the first time I have seen any pens be confiscated."); A.H. Decl. ¶ 7 ("I have been in the jail for more than 21 months . . . and I have always had free access to pens until just after the arrival of SCHR's mailing in late February."); D.S. Decl. ¶ 5 (more than two years).)

The pens confiscated from class members were not ordinary pens.  They were flexible and designed to collapse under pressure to make them safe for use in

secure settings.[1]  (R.K. Decl. ¶ 5 ("The jail pens are thin, wobbly, plastic ink tubes about 4 inches long, with a small writing tip at the end. The pens are so flexible that you have to hold them at the very tip in order to write with them."); M.J. Decl. ¶ 4 ("My pens, like all pens offered by the jail commissary, were very flexible and would bend under the slightest pressure."); J.W. 2d. Decl. ¶ 7 ("They were so bendable that they were difficult to write with.  It is my understanding that this unusual type of pen, which I had never seen before I was incarcerated, is a pen designed to be safe in a jail setting.").)  Officers generally did not provide a reason for the new prohibition on pens.  (M.J. ¶ 6; J.W. 2d. Decl. ¶ 5.)  However, officers told some class members that the pens were confiscated for "safety," and "because they could be used for weapons."  (D.S. Decl. ¶ 5; R.K. Decl. ¶ 5.)

Class counsel raised the issue of class members' access to pens with Defendants' counsel, asking for assurances that their clients were not interfering with class counsel's ability to communicate with their clients.[2]  Defendants'

---

[1] *See, e.g.*, Anchortex, *No-Shank NSP Super Flex Pens (case)*, https://www.anchortex.com/products/no-shank-nsp-super-flex-pens-case?variant=37960657436860 (example of pens that are "extremely flexible," "which helps promote greater security") (last visited Apr. 12, 2021).

[2] Plaintiffs' Counsel sent a letter to Defendants' Counsel on April 7, 2021.  Exhibit C-1, Ltr. from Ryan Primerano to Jack Hancock, Apr. 7, 2021.  On April 27, having received no response from Defendants, Plaintiffs' counsel sent a follow-up

counsel confirmed that the jail no longer permits detainees to possess pens due to reported concerns regarding "the use of pens as weapons," and said Defendants assert class members are "able to obtain a pen from jail personnel" as needed.[3]

When detained class members ask officers to borrow a pen, they do not receive one. (R.K. ¶ 6 ("I have asked multiple officers 10 to 15 times for a pen. They have never let me use one."); *id.* ¶ 8 ("To my knowledge, nobody in my dorm has obtained a pen since the "shakedowns" and the announcement that pens were contraband almost two months ago.); S.A. Decl. ¶ 6 ("I have asked officers to borrow a pen on at least 10 occasions. But I have never been given a pen, even for temporary use during my out of cell time."); R.G. Decl. ¶ 5 ("Yesterday, I asked an officer for a pen to fill out a medical form because our kiosk wasn't working, but he didn't answer my request. I never received a pen."); J.W. 2d. Decl. ¶ 6 ("Officers have responded to my [seven] requests with: "not right now," "don't have time," and "don't have any pens on me.").)

Without access to pens, detained class members have now been unable to communicate by mail with class counsel for over two months. (S.A. Decl. ¶ 6

letter seeking to resolve the issue without involvement of the Court. Exhibit C-2, Ltr. from Ryan Primerano to Jack Hancock, Apr. 27, 2021.

[3] Exhibit D, Email from Jack Hancock, Apr. 27, 2021.

("Because of this new prohibition on pens, I have not been able to communicate with my lawyers by mail."); R.K. Decl. ¶ 9 ("I would like to respond to my attorneys' mail but, without access to a pen or other writing implement, I have no way to write a response."); J.W. 2d. Decl. ¶ 6 ("I have been unable to respond to the legal mailing sent to me by my lawyers at SCHR or any other legal mail from my criminal attorney."); A.H. Decl. ¶ 6; M.J. Decl. ¶ 8; R.G. Decl. ¶ 6.)

## LEGAL STANDARD

"[A] district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). That broad authority is reflected in Rule 23(d) of the Federal Rules of Civil Procedure, which empowers district courts handling class actions to enter appropriate orders furthering "the fair and efficient conduct of the action." Advisory Committee Notes to Rule 23; *see also In re Sch. Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988) ("Rule 23 specifically empowers district courts to issue orders to prevent abuse of the class action process."). Rule 23(d) specifically provides for orders that, among other things, "determine the course of proceedings," "impose conditions on the representative parties," and "deal with similar procedural matters." Fed. R. Civ. P. 23(d)(1); *see also* N.D. Ga. L.R. 23.1(C) (providing that

"[t]he administration of justice often requires that limited restrictions be placed on counsel and parties in cases in which class certification is sought or has been granted.").[4] When such an order is "appropriate" is entrusted to a court's discretion. *Gulf Oil Co.*, 452 U.S. at 100; *see, e.g.*, *Peoples v. Wainwright*, 325 F. Supp. 402, 403 (M.D. Fla. 1971) (Tjoflat, J.) (applying Rule 23(d) to prison mail policy that "as a practical matter . . . foreclosed effective attorney-client communication," and ruling that "attorney-client communication by mail" was "a proper matter for such administrative regulation").

## ARGUMENT

The Court should enter an order under Rule 23(d) ensuring that class members and class counsel have "effective attorney-client communication in this case" by legal mail. *Peoples v. Wainwright*, 325 F. Supp. 402, 403 (M.D. Fla. 1971) (Tjoflat, J.). Defendants' restriction on pens substantially limits class counsel's ability to communicate with class members concerning the merits of the case, undermining counsel's ability to fairly and adequately protect the class. *See id.* In addition, Defendants' policy violates class counsel's First Amendment right to speak with, associate with, and advocate for their clients, and class members'

---

[4] District courts also possess inherent authority to supervise the conduct of parties to protect the rights of litigants and the orderly administration of justice. *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31(1962).

First Amendment right to communicate with their attorneys by mail. Finally,

Defendants' actions appear to constitute unlawful retaliation against the class

members and class counsel in response to their constitutionally protected

participation in a lawsuit against Defendants. For each of these reasons, an order is

necessary to restore detained class members' access to pens.

## I.     Defendants' Ban on Pens Substantially Burdens Class Counsel's Ability to "Fairly and Adequately" Represent the Class.

Class counsel has an affirmative duty to "fairly and adequately protect the

interests of the class." Fed. R. Civ. P. 23(g)(4). Compliance with this duty

depends on counsel's ability to gather complete and accurate information about the

merits of the case, which in turn requires open and confidential communications

with class members. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) (district

court abused its discretion by issuing an order that "made it more difficult for

respondents, as the class representatives, to obtain information about the merits of

the case from the persons they sought to represent"). Indeed, the "oldest of the

common-law privileges," attorney-client privilege, "recognizes that sound legal

advice or advocacy serves public ends and that such advice or advocacy depends

upon the lawyer's being fully informed by the client." *Upjohn Co. v. United

States*, 449 U.S. 383, 389 (1981); *see also Trammel v. United States*, 445 U.S. 40,

51 (1980) ("The lawyer-client privilege rests on the need for the advocate and

counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.").

When the client is incarcerated, the attorney-client relationship relies in great part on mail communication. The Eleventh Circuit has emphasized that uninhibited mail communications between attorneys and incarcerated clients form a cornerstone of fair proceedings:

> The basic prisoner interest is an uninhibited communication with attorneys…. [P]risoners have a vital need to communicate effectively with [their attorneys]. This is to insure ultimately that the judicial proceedings brought against or initiated by prisoners are conducted fairly. Since the prisoner's means of communicating with these parties are restricted sharply by the fact of incarceration, the essential role of postal communication cannot be ignored.

*Lemon v. Dugger*, 931 F.2d 1465, 1467 (11th Cir. 1991) (quoting *Taylor v. Sterrett*, 532 F.2d 462, 475 (5th Cir. 1976)). Thus, an obstacle which prevents incarcerated plaintiffs from using the mail to keep their counsel fully informed threatens not only "the professional mission" of the representation, *Trammel*, 445 U.S. at 51, but "the public ends" which it serves, *Upjohn*, 449 U.S. at 389; *see Peoples v. Wainwright*, 325 F. Supp. 402, 403 (M.D. Fla. 1971) (Tjoflat, J.) (addressing prison policy that "foreclosed effective attorney-client communication" in a class action, and concluding that "[a] decision on

constitutional grounds [was] not necessary" because the court had authority under Rule 23(d) to prohibit prison officials from interfering with class members' legal mail).

Here, Defendants' confiscation of pens from class members significantly interferes with class counsel's ability to discharge their duty to represent the class "fairly and adequately."[5] Fed. R. Civ. P. 23(g)(4). Class counsel rely on privileged mail from class members to learn information relevant to the merits of the case. (Cutting Decl. ¶ 6.) Yet under Defendants' sweeping restriction on pens, detained class members can no longer write to their attorneys. (S.A. Decl. ¶ 6; R.K. Decl. ¶ 9; J.W. 2d. Decl. ¶ 6; A.H. Decl. ¶ 6; M.J. Decl. ¶ 8; R.G. Decl. ¶ 6; D.S. Decl. ¶ 7.) The ban on pens makes it significantly more difficult for class counsel "to obtain information about the merits of the case from the persons they sought to represent," *Gulf Oil Co.*, 452 U.S. at 100, and creates an impermissible

---

[5] Defendants' actions are not the first time they have undermined the principles of Rule 23. In December, Defendant Hill issued a press release falsely claiming that the ongoing lawsuit had been "thrown out of court in it's [sic] entirety by a federal judge." Sheriff Victor Hill, *Covid19 Lawsuit Filed Against The Clayton County Jail Thrown Out Of Court In It's Entirety!*, Dec. 29, 2020, https://nixle.us/alert/8446226/. Communications that misrepresent the status or effect of the pending action violate the principles of Rule 23 and may warrant a curative order. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 n. 12 (1981); *see also, e.g.*, *Ralph Oldsmobile, Inc. v. Gen. Motors Corp.*, No. 99-CV-4567, 2001 WL 1035132, at *7 (S.D.N.Y. Sept. 7, 2001) (misleading communications warranted Rule 23(d) order for defendants to send class members curative notice).

risk that the full merits of the case will not be presented to the Court.  The pen

restriction "reduces the effectiveness of the [] class action" for no legitimate

reason.  *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir.

1985) (defendants' attempts to reduce the size of the class by encouraging possible

claimants to opt out "constituted an intolerable affront to the authority of the

district court to police class member contacts").  Defendants' actions needlessly

obstruct the attorney-client relationship and are inimical to the purposes of Rule

23, justifying an order under Rule 23(d).

## II.    Defendants' Ban on Pens Violates the First Amendment Rights of Both Class Counsel and the Class Members.

Defendants' restriction on class members' access to pens also infringes on

several independent constitutional guarantees.  First, by effectively prohibiting

class member mail, the pen ban violates class counsel's rights to speak and

associate with their clients to further their respective organizations' missions

through litigation.  Second, the pen ban violates detained class members' right to

communicate with their attorneys by mail.

### A.    The Ban Violates Class Counsel's First Amendment Right to Associate with Their Clients to Advance Litigation.

Advocacy organizations have a First and Fourteenth Amendment right to

speak with, advise, and represent their clients, including incarcerated clients, for

the purpose of engaging in litigation as a form of political expression. *NAACP v. Button*, 371 U.S. 415, 430 (1963) (organization's right "to engage in association for the advancement of beliefs and ideas" was protected by the First and Fourteenth Amendments); *In re Primus*, 436 U.S. 412, 431 (1978) (holding that non-profit litigation is protected by the First and Fourteenth Amendments because it is "a vehicle for effective political expression and association, as well as a means of communicating useful information to the public"); *Little v. City of North Miami*, 805 F.2d 962, 967–68 (11th Cir. 1986) ("By representing [non-profit organization], himself and others in state litigation, appellant was engaging in a 'form of political expression' entitled to First and Fourteenth Amendment protection." (quoting *Primus*, 436 U.S. at 428)); *see also United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585–86 (1971); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28, 38 (2010); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001)). A restriction on that right implicates profound First Amendment interests and can only be justified by a compelling state interest. *Primus*, 436 U.S. at 432.

Class counsel are representatives of non-profit advocacy organizations specializing in public-interest and civil-rights litigation.[6] *Primus*, 436 U.S. at 427.

---

[6] *See* Southern Center for Human Rights, www.schr.org ("The Southern Center for Human Rights is working for equality, dignity, and justice for people impacted by

By vindicating the legal rights of their clients in litigation, the organizations further their mission of "secur[ing] constitutionally guaranteed rights." *Button*, 371 U.S. at 442–43; *see also Primus*, 436 U.S. at 427–28 (recognizing that the ACLU's litigation practice "has defined the scope of constitutional protection in areas such as political dissent, juvenile rights, prisoners' rights, military law, amnesty, and privacy"). Thus, class counsel have a First Amendment right to "engage in association for the advancement of beliefs and ideas" by communicating with their clients. *Primus*, 436 U.S at 423–24 (quoting *Button*, 371 U.S. at 430).

Defendants' pen ban prevents class members from writing and sending legal mail and infringes on class counsel's freedom to engage in protected speech critical to this litigation. (S.A. Decl. ¶ 6; R.K. Decl. ¶ 9; J.W. 2d. Decl. ¶ 6; A.H. Decl. ¶ 6; M.J. Decl. ¶ 8; R.G. Decl. ¶ 6; D.S. ¶ 7.) The ban thus has "a distinct potential for dampening the kind of 'cooperative activity that would make advocacy of litigation meaningful.'" *Primus*, 436 U.S. at 433 (quoting *Button*, 371

_____

the criminal legal system in the Deep South.") (last visited Apr. 12, 2021); American Civil Liberties Union of Georgia, *About Us*, www.acluga.org ("The ACLU of Georgia envisions a state that guarantees all persons the civil liberties and rights contained in the United States and Georgia Constitutions and Bill of Rights.") (last visited Apr. 12, 2021); American Civil Liberties Union, *Prisoners' Rights*, www.aclu.org ("The National Prison Project is dedicated to ensuring that our nation's prisons, jails, and detention centers comply with the Constitution, domestic law, and human rights principles.") (last visited Apr. 12, 2021).

U.S. at 438).  To survive First Amendment scrutiny, Defendants' ban on pens must be sufficiently tailored.

An advocacy organization's ability to effectively communicate with their clients may be regulated "only with narrow specificity." *Primus*, 436 U.S. at 424 (quoting *Button*, 371 U.S. at 433).  "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Button*, 371 U.S. at 438.  In *In re Primus*, the Supreme Court held that a state restriction on attorney solicitation applied to the ACLU must "withstand the 'exacting scrutiny applicable to limitations to core First Amendment rights.'" 436 U.S. at 432 (quoting *Buckley v. Valeo*, 424 U.S. 1, 44–45 (1976)).  This strict scrutiny standard requires Defendants to demonstrate that the challenged regulation advances a "compelling" state interest and is "closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* (quoting *Buckley*, 424 U.S. at 25); *see also Button*, 371 U.S. at 433, 444.

Defendant's blanket restriction cannot withstand strict scrutiny.  Defendants' stated reason for the ban is to address the possibility that a "very flexible" pen in a "small plastic tube[]" (J.W. 2d. Decl. ¶ 7) could be used as a weapon.  However, Defendants must make more than a vague invocation of jail safety to show that a prohibition on pens furthers a compelling state interest—they must present specific

evidence demonstrating that the prohibition furthers the interest. Even assuming

Defendants can show that keeping "thin, wobbly, plastic ink tubes" (R.K. Decl. ¶

5) out of detainees' hands furthers a compelling interest, an indefinite and jail-wide

ban on pens is not closely drawn to achieve it. Defendants' restriction forbids the

possession and use of pens by every detainee in the jail even though most pose no

particular threat to jail safety. Therefore, the restriction is fatally overbroad. *See*

*Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it

targets and eliminates no more than the exact source of the 'evil' it seeks to

remedy.") (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S.

789, 808–810 (1984)).

Nor is the restriction the least restrictive means to achieve the purported

goal. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015) (refusing to punish

the state "for leaving open more, rather than fewer, avenues of expression").

Defendants can satisfy any legitimate interest in safety without invading class

counsel's First Amendment guarantees by seizing flexible plastic pens. Jail

protocols already exist to restrict individual detainees' access to certain items

based on individualized security concerns and would offer a less restrictive means

to further the same interest.[7]  While Defendants may find the new blanket

prohibition to be convenient, "the First Amendment does not permit the State to

sacrifice speech for efficiency."  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138

S. Ct. 2361, 2376 (2018) (citing *Riley v. Nat'l Fed'n of the Blind of N. Carolina,*

*Inc.*, 487 U.S. 781, 795 (1988)).  Therefore, the restriction on class counsel's

ability to communicate with its clients to engage in expressive conduct is not

narrowly tailored and cannot be upheld.[8]

### B.    The Ban on Pens Violates Class Members' Right to Communicate with Their Attorneys by Mail.

"Mail is one medium of free speech, and the right to send and receive mail

exists under the First Amendment."  *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (11th

---

[7] *See* Exhibit E, SOP 4.12 (stating when detainees may lose "razor privileges").

[8] Defendants' pens ban was not adopted for a content-neutral purpose because the circumstances surrounding it make clear that it targets this litigation.  *See* Part III, *infra.*  However, the ban would be invalid even if it were content neutral.  A content-neutral restriction on speech must be "no greater than is essential to the furtherance of that interest" it allegedly serves.  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968).)  A restriction may not "burden substantially more speech than is necessary to further the government's legitimate interests."  *Ward v. Rock Against Racism,* 491 U.S. 781, 799 (1989).  Here, the jail-wide scope of Defendants' indefinite restriction plainly "burden[s] substantially more speech than is necessary," *id.*, and cannot be upheld.  *See Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310 (11th Cir. 2003) (stating that "[a] grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional").

Cir. 2008). It is further well established that a person in jail "has a First Amendment free speech right to communicate with his attorneys by mail." *Id.* at 1334 n. 34 (finding a constitutional violation where prison officials engaged in a pattern and practice of opening, but not reading, a plaintiff's clearly marked attorney mail outside his presence); *Bacon v. Edwards*, No. 419-CV-093, 2019 WL 3290777, at *1 (S.D. Ga. Jul. 22, 2019) (incarcerated plaintiff stated a First Amendment claim under *Al-Amin* based on a jail policy stating that "all outgoing mail will be postcards only"); *see also Procunier v. Martinez*, 416 U.S. 396, 408–09 (1974) (holding detainees have a First Amendment interest in sending mail to non-detained people), overruled in part on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989). Indeed, for incarcerated people, sending and receiving mail "is almost as much a part of free speech as the right to use our tongues." *Taylor v. Sterrett*, 532 F.2d 462, 480 (5th Cir. 1976) (citing *United States v. Burleson*, 255 U.S. 407, 437 (1921) (Holmes, J. dissenting)). Accordingly, a restriction that "sufficiently chills, inhibits, or interferes with [an incarcerated person's] ability to speak, protest, and complain openly to his attorney . . . infringe[s] his right to free speech." *Al-Amin*, 511 F.3d at 1334.

Restrictions on detainees' constitutional rights, including free-exercise rights, are valid only insofar as they are "reasonably related to legitimate

penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). In *Turner v. Safley*, the Supreme Court identified four factors that inform the analysis of whether a reasonable relationship exists: (1) whether there is a rational connection between the policy and the interest put forward to justify it; (2) whether there are alternative means of exercising the right in question; (3) the impact that accommodation of the constitutional right will have on officers, other detainees, or the allocation of jail resources; and (4) whether the regulation or policy is an "exaggerated response" to jail concerns. *Id.* at 89–90. "[T]he existence of obvious, easy alternatives" to a jail regulation that infringes constitutional rights "may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to [jail] concerns." *Id.* Though more permissive than strict scrutiny, "the *Turner* standard . . . is not toothless." *Pesci v. Budz*, 730 F.3d 1291, 1299 (11th Cir. 2013).

Considered in light of the *Turner* factors, the restriction at issue here is arbitrary and unnecessarily impinges on First Amendment rights. *See Turner*, 482 U.S. at 89–90 ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."). First, the logical connection between the ban and security concerns is dubious and, more likely than not, pretextual. The pens at issue are

flexible, jail-safe models distributed in jails and prisons specifically because of their safe design.  Undersigned counsel are unaware of any similar ban on pens being adopted in contemporary jails or prisons, and the fact that Defendants have allowed pens for years before suddenly changing course in March suggests that the ban serves no legitimate interest.  (S.A. Decl. ¶ 7; A.H. Decl. ¶ 7; D.S. Decl. ¶ 5.)  The other *Turner* factors similarly weigh against a blanket ban on pens.  Since class members cannot obtain pens from officers (R.K. ¶ 6; S.A. Decl. ¶ 6; R.G. Decl. ¶ 5; J.W. 2d. Decl. ¶ 6), they have no alternative means to exercise their right to send mail, a result that is inconsistent with Defendants' own written policies.[9] Class members also have no alternative to the mail as a means of confidentially contacting their attorneys.  (R.K. Decl. ¶ 9; J.W. 2d. Decl. ¶ 6; A.H. Decl. ¶ 6; M.J. Decl. ¶ 8; R.G. Decl. ¶ 6.)  On the other hand, "obvious, easy alternatives" exist that would harmonize the detainees' rights with any arguable security interest in restricting access to flimsy plastic pens, such as individualized pen restrictions for certain detainees; those alternatives would not have an appreciable impact on jail

---

[9] The jail's mail policy provides that "[t]he Clayton County Detention Facility shall allow and encourage inmates to communicate with persons outside the jail by sending and receiving mail.  This facility will ensure that mail is processed in a timely manner and will not be withheld except where such restrictions are necessary to maintain the order and security of the facility."  Exhibit F, SOP No. 5.01; *see also id.*, SOP No. 5.01(2)(C) ("There are no limitations on the amount of legal mail that can be sent or received by an inmate in this facility.").

staff or resources, as demonstrated by Defendants' lengthy history of allowing pens in the jail.  Finally, even if the pen ban addressed legitimate safety concerns (it does not), enacting a jail-wide ban to address isolated incidents clearly represents an "exaggerated response."

In sum, there is no logical fit between the sweeping prohibition on jail-safe pens and Defendants' legitimate interests.  Defendants' de facto ban on class member mail "sufficiently chills, inhibits, or interferes with [class members'] ability to speak, protest, and complain openly to [their] attorney[s]," violating class members' First Amendment right to free speech.[10]  *Al-Amin*, 511 F.3d at 1334.

---

[10] The restriction likely also infringes on class members' separate right of access to the courts. *See Procunier v. Martinez*, 416 U.S. 396, 419 (1974) ("Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid."), overruled in part on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Taylor v. Carmack*, No. 1:08-CV-3262, 2010 WL 11519431, at *1 (N.D. Ga. July 14, 2010) ("Indigent inmates must be provided with paper and pens to draft legal documents, with notarial services to authenticate the documents, and with stamps to mail them.") (citing *Bounds v. Smith*, 430 U.S. 817, 824–25 (1977)).  However, the Eleventh Circuit has stated that "protection of an inmate's freedom to engage in protected communications is a constitutional end in itself. *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008) (quoting *Jones v. Brown*, 461 F.3d 353, 359-60 (3d Cir. 2006)).

**III. Defendants' Ban on Pens Retaliates Against Class Counsel and Class Members for Constitutionally Protected Conduct in Violation of the First and Fourteenth Amendments.**

First Amendment rights receive "stringent protection" due to "the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983). Undersigned counsel and their respective organizations have a First Amendment right to communicate with, associate with, and advocate for their clients in litigation against Defendants. *In re Primus*, 436 U.S. 412, 423–24 (1978); *see also Little v. City of North Miami*, 805 F.2d 962, 967–68 (11th Cir. 1986). Detained class members also have First Amendment rights to communicate with their attorneys by mail and to participate in ongoing litigation against Defendants. *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (11th Cir. 2008); *Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008). The First Amendment prohibits "retaliatory sanctions designed to punish the legitimate exercise of [these] First Amendment rights." *Little*, 805 F.2d at 968. Yet Defendants' ban on pens appears to do just that.

Unlawful retaliation can take a variety of forms.[11] "To state a retaliation

---

[11] *See, e.g.*, *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005) (holding harassment by local officers in retaliation for supporting a referendum against

claim, the commonly accepted formulation requires that a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

All three elements are present here. Compelling circumstantial evidence suggests Defendants confiscated all pens from detained class members and declared pens contraband in retaliation for the Southern Center's and the ACLU's ongoing litigation and the class members' participation in that litigation.[12] The

---

sheriff could support First Amendment claim); *Hoever v. Carraway*, 815 F. App'x 465, 469–70 (11th Cir. 2020) (holding threats to prisoner in retaliation for filing grievances supported jury finding of First Amendment violation); *Bridges v. Russell*, 757 F.2d 1155, 1156 (11th Cir. 1985) (holding First Amendment claim could proceed where prisoner alleged prison transfer in retaliation for filing grievances); *Hooks v. Kelley*, 463 F.2d 1210, 1210–11 (5th Cir. 1972) (holding First Amendment claim could proceed where prisoner alleged transfer from minimum to medium security prison in retaliation for using courts to challenge prison conditions); *Andrade v. Hauck*, 452 F.2d 1071, 1072 (5th Cir. 1971) (holding First Amendment claim could proceed where prisoner alleged deprivation of commissary privileges in retaliation for corresponding with judge).

[12] Plaintiffs raised similar retaliation concerns with Defendant Hill's counsel last year after his office unlawfully terminated several attorneys' visitation privileges without cause. Plaintiffs raised retaliation concerns again at the preliminary injunction hearing, where detainee-witness Trey Absher testified about losing his worker status after meeting with class counsel (Doc. 125 at 108), and through sworn declarations stating that staff use punitive measures including placing

improper purpose of Defendants' actions is manifest in the lack of a factual precedent, the timing of the actions, and the flimsy justification provided for the ban. Before this restriction, class members, some of whom had been at the jail for over a year, had never experienced a restriction on their access to pens. (A.H. Decl. ¶ 7 ("I have been in the jail for more than 21 months . . . and I have always had free access to pens until just after the arrival of SCHR's mailing in late February."); S.A. Decl. ¶ 7 (almost 18 months).) Yet shortly after class members received clearly marked legal mail from SCHR, Defendants' staff confiscated all pens from the class members and declared pens to be contraband. (R.K. Decl. ¶¶ 3–4; M.J. Decl. ¶¶ 3–4; S.A. Decl. ¶¶ 3–4; J.W. 2d. Decl. ¶¶ 4–5.)[13] Moreover, Defendants' purported "safety" justification is inconsistent with the minimal threat posed by flexible jail-safe pens, suggesting it is merely a pretext for shutting down mail communications. (R.K. Decl. ¶ 5 ("I have never seen a pen used as a weapon and I'd be shocked if I did. . . . The jail pens are thin, wobbly, plastic ink tubes . . . . so flexible that you have to hold them at the very tip in order to write with

---

people on nutraloaf diets, cell "raids," extended lockdown, and disciplinary segregation to retaliate against detainees who speak with Plaintiffs' counsel or criticize the jail's living conditions (Doc. 78-7, Sparkman Decl. at 72–73).

[13] *See Williams v. Brown*, 347 F. App'x 429, 435 (11th Cir. 2009) (officer's temporal reaction to a grievance and circumstantial evidence was sufficient to state a claim).

them."); J.W. 2d. Decl. ¶ 7 ("It is my understanding that this unusual type of pen, which I had never seen before I was incarcerated, is a pen designed to be safe in a jail setting."); D.S. Decl. ¶ 5 ("I have been incarcerated at the jail for more than two years, and before that moment I had never seen or heard of any safety concerns related to these pens.").)

By effectively blocking detained class member's ability to engage in communication by mail, Defendants' ban on pens has adversely affected class counsel's ability to associate with their clients (Cutting Decl. ¶ 9) and eliminated detained class members' ability to send mail to their attorneys (S.A. Decl. ¶ 6; R.K. Decl. ¶ 9; J.W. 2d. Decl. ¶ 6; A.H. Decl. ¶ 6; M.J. Decl. ¶ 8; R.G. Decl. ¶ 6; D.S. Decl. ¶ 7). Defendants' actions therefore violate the First and Fourteenth Amendments.

## CONCLUSION

The Court should issue an order under Rule 23(d)(1) and Local Rule 23.1(C) restoring class members' access to pens and class counsel's access to their clients.

Respectfully submitted,

/s/ Jeremy Cutting

Andres M. Lopez-Delgado
Ga. Bar No. 552876
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA
P.O. Box 77208
Atlanta, GA 30357
(678) 981-5295
adelgado@acluga.org

Stephen L. Pevar
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
765 Asylum Avenue
Hartford, Connecticut 06105
(860) 570-9830
spevar@aclu.org

David C. Fathi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 Fifteenth Street, N.W., Seventh Floor
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org

* Not admitted in DC; practice limited to
  federal courts

L. Joseph Loveland
Ga. Bar No. 459350
Jeremy Cutting
Ga. Bar No. 947729
Ryan Primerano
Ga. Bar No. 404962
SOUTHERN CENTER
FOR HUMAN RIGHTS
60 Walton Street, N.W.
Atlanta, GA 30303
(404) 688-1202
ccutting@schr.org

Brandon Buskey
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
(212) 284-7364
bbuskey@aclu.org

*Counsel for Plaintiffs*

May 13, 2021

# CERTIFICATE OF COMPLIANCE

I certify that this document has been prepared in compliance with Local Rule 5.1C using 14-point Times New Roman font.

/s/ Jeremy Cutting

May 13, 2021

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing using the Court's CM/ECF system, which will send notification of filing to all counsel of record.

/s/ Jeremy Cutting

May 13, 2021