IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| RHONDA JONES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | FILE NO. 1:20-CV-02791-JPB |
| | ) | |
| VICTOR HILL, in his official capacity as | ) | |
| Sheriff of Clayton County, Georgia, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR ORDER REGARDING CLASS COMMUNICATIONS**

Defendants hereby respond in opposition to plaintiffs' Motion for Order Regarding Class Communications (Doc. 151).  For the reasons stated below, plaintiffs' motion should be denied.

## I.     INTRODUCTION AND STATEMENT OF FACTS

Plaintiffs have filed a motion pursuant to Rule 23(d)(1) and Local Rule 23.1(C) requesting that the Court order defendants to allow every single inmate[1] to possess a pen.  (Doc. 151.)  Plaintiffs' extraordinary motion and the relief sought therein has no basis under the Federal or local rules.  This motion is nothing more than plaintiffs' ongoing efforts to second-guess the decision-making at the Clayton County Jail

---

[1] For purposes of this response, the terms "inmates" and "detainees" are used synonymously herein.

("CCJ") and have the Court intervene and control the policy-decisions made at the local government level.  Plaintiffs have no legal basis to support such an undertaking and their motion should be denied.

**A.      Pens Are Available To All Inmates At The CCJ And Are Provided Upon Request**

The current policy at the CCJ is that as of March 9, 2021, inmates at the CCJ can no longer keep pens in their personal possession; ***however, pens are made available <u>and</u> all inmates have access to pens upon request***.  (Declaration of Major Levon Allen ("Allen Decl.") attached hereto as <u>Exhibit 1</u>, ¶¶ 7, 9, 13.)  Inmates can make their request for a pen to a correctional officer verbally or can submit a request in writing through the Kiosk.  (<u>Id.</u>, ¶ 14) Correctional officers should not refuse an inmate's request to use a pen.  (<u>Id.</u>)  Upon request, the requesting inmate is taken to the day room where he or she is permitted to utilize the pen.  (<u>Id.</u>)   This process has been briefed to every correctional officer at the CCJ.  (<u>Id.</u>)

**B.      The Record Evidence Establishes That Inmates Have Access To Pens**

Existing evidence in the record filed by Michael Lovelace clearly refutes plaintiffs' contention that inmates do not have access to pens or a means to communicate by mail.  (Doc. 143.)   After the confiscation and ban on personal possession of pens, Inmate Lovelace prepared *with a pen* an envelope to this Court and drafted a pleading and mailed same to this Court on or around March 24, 2021.  (<u>Id.</u>)  Additionally, after plaintiffs filed the instant motion, Lovelace prepared *with a*

*pen* a motion for discovery and submitted same to the Court. (Doc. 156.) Lovelace's

filings are unsolicited evidence that inmates at the CCJ have access to pens and mail.

The following handwritten mail dated April 15, 2021 and handwritten

grievance dated May 8, 2021 attached to Allen's Declaration as <u>Exhibits E and F</u>,

both prepared *with a pen*, further discredits plaintiffs' contention that inmates don't

have access to pens:




## C. The Decision To Ban Personal Possession Of Pens Is Part Of A Safety Initiative To "Shank Proof" The CCJ

Plaintiffs speculate that the decision to confiscate and ban personal possession

of pens at the CCJ had something to do with this pending action or communications

with class counsel. (Doc. 151.) However, as set forth in Major Allen's declaration,

this decision had ***nothing*** to do with this case but was part of a safety initiative to

"shank proof," "hang proof," and "escape proof" the CCJ in order to make it a safer

place for all inmates and staff. (Exhibit 1, ¶¶ 3, 11-12.)  The initiative was begun by Major Allen shortly after he became Jail Administrator in January 2021. As part of the plan to shank proof the CCJ, Major Allen spearheaded an internal review of items accessible by inmates that could be used to cause harm to others.  (Id., ¶ 4.)  Major Allen identified that inmates at the CCJ were altering or manipulating pens to create weapons and/or shanks.  (Id., ¶ 6.) Additionally, inmates were using pens to create ink for tattoos, write gang paraphernalia, graffiti, vandalize, and/or damage the walls and other areas of CCJ.  (Id., ¶ 7.) Several other items at the CCJ were also considered and removed and/or replaced, such as mop bucket ringers, broom handles, dry-erase boards, electrical outlet covers, and paper towel dispensers. (Id., ¶ 5.)  For the health, safety, and welfare of everyone at the CCJ, and because of the potential danger, all pens were confiscated from inmates and the CCJ implemented a jail-wide ban on inmate possession of pens and now provide pens to inmates for use upon request. (Id., ¶¶ 6, 13, 14.)

During a shake down of Housing Unit 6 on March 11, several altered pens were found in the possession of inmates.  (Id., ¶ 10, Jail Miscellaneous Incident Report Dated March 11, 2021 attached to Allen Decl. as Exhibit B, and E-mail dated March 11, 2021 attached to Allen Decl. as Exhibit C.) Some of the pens were wrapped with adhesive substances and/or multiple layers of what appeared to be paper to re-enforce the pens.  (Id.)  Moreover, the tips were shaved down and

sharpened.  (<u>Id.</u>)  These altered pens presented a serious hazard to everyone at the CCJ and could cause serious bodily injury.  (<u>Id.</u> and photographs attached to Allen Decl. as <u>Exhibit D</u>.)

The following photographs were taken from the shake down on March 11, 2021 evidencing the alteration of pens into weapons and the vandalism:



Rather than institute an individualized ban on a case-by-case basis, the CCJ banned all inmate possession of pens because pens were widely available among inmates, easily transferrable, and can easily be exchanged.  (<u>Id.</u>, ¶ 8.) Removing pens from possession on an individualized basis would not completely eliminate the institutional and safety threat caused by the possession of pens.  (<u>Id.</u>)

**D.     The Decision To Ban Personal Possession Of Pens Was Not Retaliatory And Had Nothing To Do With The Pending COVID-19 Lawsuit**

The decision to ban and/or confiscate pens was not retaliatory in any way and had nothing to do with the above-referenced lawsuit or any communications between class counsel and any members of the class or inmates.  (Id., ¶ 11.)  The decision to ban and/or confiscate pens was not made to interfere with the ability of inmates to communicate with class counsel or anyone with American Civil Liberties Union or Southern Center For Human Rights.  (Id.)  This decision was not made to limit or eliminate any inmate's ability to write their counsel or the courts.  (Id.) Finally, the decision to ban and/or confiscate pens was not made in response to any letters or communications by class counsel to anyone at the CCJ.  (Id., ¶ 12.)  Indeed, at the time Major Allen made the decision to confiscate and ban personal possession of pens on March 9, 2021, he was ***unaware*** of the February 2021 mass mailing or any letters sent by class counsel to anyone at the CCJ.  (Id.)

**E.     Inmates Have The Capability To Communicate With Counsel By Mail, Text Messaging, E-Mail, Video-Visitation, and In-Person**

Inmates at the CCJ have at least five (5) different methods of communicating with counsel.  Inmates have the capability to communicate in writing and by mail.  (Id., ¶ 16.)  Inmates can send electronic communications via e-mail or text messaging by utilizing the Kiosk.  (Id.)  Indeed, very recently, inmate Lovelace sent unsolicited e-mails directly to counsel for defendants:



**MICHAEL PATRICK LOVELACE**
To: asabzevari@fmglaw.com

**LOVELACE/SETTEL OUT OF COURT**

SIR...I HAVE A LAWSUIT AGAINST VICTOR HILL INTHAT I STAND TO GAIN THE WIN IN MY BEHALF!!
I PROPOSE A AGREEMENT TO SETTEL OUT OF COURT!! PLEASE SCHEDUAL THE NEXT VAILABLE
VIDEO VISIT...IF NOT INTRESTED...I STILL STAND TO WIN!!! SEE YOU SOON....LOVELACE/JONES

May 15, 2021 - 05:11 pm

(See Kiosk Emails dated May 14 and 17, 2021 attached to Allen Decl. as Exhibit G.)
Inmates and counsel can also communicate confidentially via video-visitation
meetings as well as in-person visitation.  (Id., ¶ 16.)

## II.   ARGUMENT AND CITATION TO AUTHORITY

### A.   Plaintiffs Fail To Cite Any Authority For The Court To Overturn A Local Government Policy Decision To Ban Personal Possession Of Pens

Plaintiffs disapprove of the manner by which the CCJ provides pens to
inmates and requests that the Court intervene and "enter an order under Rule 23(d)"
to permit personal possession of pens.  However, plaintiffs have cited no law to
support such an undertaking.  Neither Rule 23(d)(1) nor Local Rule 23.1(C) provides
authority for a district court to enter an order changing the manner by which pens
are made available at the CCJ, even in a class action.  None of the cases cited by
plaintiffs, moreover, supports such relief.

Plaintiffs cite to a 1971 district court case from Florida <u>four</u> times.  (Doc. 151, pp. 2 and 8, 10) (citing <u>Peoples v. Wainwright</u>, 325 F. Supp. 402, 402 (M.D. Fla. 1971).) Notwithstanding the fact that <u>Peoples</u> is not binding, it is completely inapposite.  <u>Peoples</u> involved allegations that mail between inmates and their legal counsel was systematically being opened, read, and censored and that this foreclosed attorney-client communication.  However, there is no such censorship process at the CCJ.  Plaintiffs have not submitted a single declaration to show that they do not have access to the mail system at the CCJ or that their legal mail is being opened, read, or censored.  To the contrary, the record evidence establishes that inmates have access to pens and are able to communicate via mail.  (Docs. 143 and 156; <u>Exhibits E and F</u> attached to Allen Decl.) Moreover, unlike forty years ago in <u>Peoples</u>, inmates can also now communicate effectively and efficiently with counsel via text messaging, e-mail, and video-visitation.  (Allen Decl., ¶ 16 and <u>Exhibit G</u> thereto.)  Therefore, plaintiffs cite no authority to support their request for relief, and this Court should decline plaintiffs' invitation to interfere with local policy decisions, especially when those decisions have been made for legitimate institutional safety reasons.

**B.**     <u>**Class Counsel's Ability to Fairly And Adequately Represent The Class Has Not Been Burdened By Any Policy Decisions At The CCJ**</u>

Plaintiffs creatively contend that the current pen policy at the CCJ somehow impinges on Rule 23(g)(4), which sets forth that class counsel "fairly and adequately represent the interests of the class."  (Doc. 151, p. 9.)  However, plaintiffs' reliance

on Rule 23(g) is fundamentally flawed. "This requirement [is] aimed at ensuring the rights of absent class members are vigorously protected" and to ensure against situations "where class counsel represents parties whose interests are fundamentally conflicted." W. Morgan-East Lawrence Water & Sewer Auth. v. 3M Co., 737 F. App'x 457, 464 (11th Cir. 2018). Rule 23(g)(4) involves the overarching principal of the adequacy of class counsel and plaintiffs cite no law that the rule relates to methods of communication with clients. See, e.g., Sanchez-Knutson v. Ford Motor Co., 310 F.R.D. 529, 542 (S.D. Fla. 2015) ("Pursuant to Rule 23(g)(4), class counsel must fairly and adequately represent the interests of the class. Here, the Court has reviewed the submissions by Jordan M. Lewis, Esq., and the law firm Kelley Uustal, PLC, and determines that the proposed class counsel is adequate under Rule 23(g)(1) and (4)."). Moreover, this Court has already appointed plaintiffs' counsel as class counsel. (Doc. 130.) See Baez v. LTD Fin. Servs., L.P., No. 6:15-cv-1043-Orl-40TBS, 2016 U.S. Dist. LEXIS 74788, at *19 (M.D. Fla. June 8, 2016) (The court is required to appoint counsel who will "fairly and adequately represent the interests of the class.").

Plaintiffs next cite to Lemon v. Dugger, 931 F.2d 1465, 1466 (11th Cir. 1991) and contend that "uninhibited mail communications between attorneys and incarcerated clients is a corner stone of fair proceedings." (Doc. 141, p. 10.) Lemon, however, is inapposite as to the pen policy at the CCJ. In Lemon, an inmate filed a

civil rights complaint under Section 1983 alleging that a prison official had opened and read his legal mail and that other prison officials condoned this practice.  The Eleventh Circuit held that "[i]t is a violation of an inmate's constitutional rights for the prison officials to read legal mail." Lemon, 931 F.2d at 1466.  Lemon, however, has no bearing in this case.  There is no evidence that any inmate mail between counsel is being opened or read or that there is any such practice. Although for safety, inmates at CCJ can no longer possess pens in their cells and now have to request a pen, this procedure bears no resemblance to the alleged procedure in Lemon where the inmate's mail was actually being inhibited because the mail was being intercepted, opened, and read.

Plaintiffs also contend that under the CCJ's pen policy, "detained class members can no longer write their attorneys." (Doc. 151, p. 11.)  Plaintiffs rely on seven declarations (typed presumably by class counsel) from seven unidentified inmates at the CCJ. (Doc. 151-2.)  Oddly, none of these seven declarants identify themselves by name to allow the defense to ascertain the validity of their contentions. (Id.)  Moreover, each declaration is signed electronically by express permission (again presumably by class counsel).  Clearly there is some method by which the declarant detainees *are communicating* with counsel. (Id.) Nevertheless, none of the declarants can identify any correctional officer by name who they have requested a pen from and who has denied them a pen. (Id.)  Nor do any of the

declarants actually contend that they do not have access to mail at the CCJ or that any of their legal mail has been opened or read. (Id.) These hand-picked statements of seven inmates from a jail that houses well over 1,000 inmates is inherently not a reliable representation of the capability of inmates at the CCJ to write their attorneys.

Plaintiffs completely ignore the clear evidence filed in the record showing that inmates *do* have access to pens and mail. (Docs. 143 and 156.) Inmate Lovelace, using a pen, prepared an envelope, drafted multiple pleadings while incarnated at the CCJ, and sent same to this Court all *after* the confiscation and ban on personal possession of pens was instituted at the CCJ. (Docs. 143 and 156. Exhibits E and F attached to Allen Decl.) Moreover, plaintiffs do not refute the fact that inmates can write to their attorneys via text messaging and e-mail. (Allen Decl., ¶ 16 and Exhibit G attached thereto.)

In sum, even if Rule 23(g)(4) has any bearing whatsoever on communications between class counsel and class members, or any bearing on the Court's authority to implement policy at the CCJ, CCJ's pen policy sets forth that pens are provided to inmates upon request and plaintiffs cite no law to show that the inmates are entitled to something more. Inmates at the CCJ have access to pens upon request and are capable of writing to class counsel if they desire. It is also undisputed that class counsel has multiple other methods of communicating with inmates at the CCJ at their disposal. Class counsel can also communicate in writing effectively by text

messaging and e-mail.  Class counsel can also communicate with inmates live via video-visitation or in-person.   Therefore, the ban on personal possession does not burden, let alone "substantially burden" class counsel's ability to "fairly and adequately" represent the class.

**C.   The Policy To Ban Personal Possession Of Pens And To Make Pens Available Upon Request Does Not Violate The First Amendment**

Plaintiffs contend that the CCJ's policy on pen access "infringes" on the First Amendment because, as plaintiffs contend, this policy effectively "prohibits" "class members from writing and sending legal mail." (Doc. 151, pp. 12-21.)  Importantly, there is no First Amendment claim in this lawsuit.  Nor are plaintiffs seeking to amend their complaint to add any such claim.  Moreover, there is no claim for prospective injunctive relief asserted in this case with respect to pen usage, either. It is not clear, then, the purpose behind plaintiffs' contentions regarding the First Amendment.  Anyone who seriously contends that the pen policy somehow has infringed on their constitutional rights is free to file a grievance, go through and exhaust the administrative process, and file a lawsuit seeking relief.  Defendants submit that the Court need not and should not reach the issue of whether the pen policy has violated anyone's constitutional rights, as that issue or claim is not properly before the Court.  In an abundance of caution, defendants address plaintiffs' contentions and show that there has been no infringement on the First Amendment.

### 1.     No Violation Of Class Counsel's First Amendment Rights

Plaintiffs' counsel actually contend that the CCJ's pen policy somehow violates their First Amendment rights.  (Doc. 151, pp. 12-17.)  However, none of the cases cited by plaintiffs support their contention.  (Id.) Sure, class counsel are representatives of non-profit advocacy organizations, but there is no evidence that the CCJ's pen policy is a "regulation" aimed at any advocacy organizations, or a ban on plaintiffs' counsel's ability to communicate with their clients, or even a ban on speech.  Plaintiffs cite repeatedly to the Supreme Court's 1978 opinion In re Primus, 436 U.S. 412, 424 (1978).  However, In re Primus involved a state's restriction with respect to the time, place, and manner of solicitation of clients by members of its bar.  Plaintiffs' counsel's contentions do not involve solicitation of prospective clients or litigants, and the "exacting scrutiny" applied to state action in In re Primus simply has no applicability here.  The Court has already, in fact, certified a class of all current and future persons at the CCJ and has appointed plaintiffs' counsel as class counsel.  (Doc. 130.) Moreover, plaintiffs' counsel can communicate with their clients by mail, text messaging, e-mail, video-visitation, and/or in-person.  (Allen Decl., ¶ 16.)  Thus, neither the holding nor the circumstances in In re Primus have anything to do with plaintiffs' counsel's criticism of CCJ's pen policy.

-13-

Even if defendants are required to show the Court a "compelling state interest" that is "closely drawn" in order to support the CCJ's pen policy, as plaintiffs' counsel contends, CCJ's pen policy would withstand such scrutiny and is the least restrictive means to combat the safety hazard that individual possession of pens presents. Plaintiffs' counsel contends that defendants make a "vague invocation of jail safety" and contend that the ban on pens should have been restricted to only those inmates that have used the pens improperly. (Doc. 151, pp. 15-16.)  Respectively, plaintiffs' counsel do not work in jail administration and have submitted no sworn statements showing that they know anything about institutional safety.

The CCJ's pen policy was part of an overarching safety initiative to "shank proof," "hang proof," and "escape proof" the CCJ. (Allen Decl., ¶¶ 3, 11-12.)  As part of this effort, all pens were confiscated from inmates and the CCJ implemented a jail-wide ban on inmate possession of pens and now provide pens to inmates for use upon request.  (Id., ¶¶ 6, 13, 14.)  Several altered pens were found in the possession of inmates.  (Id., ¶ 10.) Pens had been sharpened and wrapped with adhesive substances and/or multiple layers of what appeared to be paper to re-enforce the pens and make them sturdy.  (Id.)  These altered pens presented a serious hazard to everyone at the CCJ and could cause serious bodily injury.  (Id.) Pens were also being used to vandalize the CCJ.  (Id., ¶ 7.)  Rather than institute an individualized ban on a case-by-case basis, the CCJ banned all inmate possession of

pens because pens were widely available among inmates, easily transferrable, and can easily be exchanged. (Id., ¶ 8.) According to jail personnel, removing pens from possession on an individualized basis would not completely eliminate the institutional and safety threat caused by the possession of pens. (Id.) Therefore, the CCJ's pen policy is narrowly tailored to combat a serious safety risk, is not a restriction on class counsel's ability to communicate with their clients, and certainly does not violate any of their First Amendment Rights.

### 2.   No Violation Of Class Members' First Amendment Rights

Plaintiffs also contend that the CCJ pen policy somehow violates the class members' First Amendment rights. (Doc. 151, pp. 17-21.) "Mail is one medium of free speech, and the right to send and receive mail exists under the First Amendment." Al-Amin v. Smith, 511 F.3d 1317, 1333 (11th Cir. 2008). "[An inmate] has a First Amendment free speech right [to send and receive legal mail] separate and apart from his constitutional right of access to the courts." Al-Amin, 511 F.3d at 1333.

Here, however, the First Amendment is not implicated because there is no claim in this case that any defendant, let alone anyone at the CCJ, has interfered with any class member's legal mail – incoming or outgoing. For this reason alone, every single case cited by plaintiffs is distinguishable. (Doc. 151, pp. 17-19.) None of the seven hand-picked declarations filed by plaintiffs support any claim that any prison

official interfered with legal mail, either.  And there is ample evidence in the record to show that inmates do have access to pens and mail.  (Docs. 143 and 156.  <u>Exhibits E and F</u> attached to Allen Decl.) Plaintiffs' criticisms do not involve interference with mail. Plaintiffs are attempting to bootstrap their dissatisfaction with CCJ's pen policy to the First Amendment jurisprudence concerning the right to send and receive mail.  However, none of the cases cited by plaintiffs can support such a claim. And none of the cases cited by plaintiffs hold that the pen policy at issue or any similar policy violates the First Amendment.

Plaintiffs cite to <u>Turner v. Safley</u>, 482 U.S. 78 (1987) and ask that the Court analyze their dissatisfaction with CCJ's pen policy under the four <u>Turner</u> factors. (Doc. 151, pp. 19-21.)  As discussed above, however, there is no claim or evidence that any First Amendment right to mail has been violated by anyone at the CCJ, so there is no need to analyze the <u>Turner</u> factors.  Even if the Court is inclined to consider the <u>Turner</u> test, the CCJ's pen policy would satisfy this standard.

To determine if a jail's content-neutral regulation is "reasonably related to legitimate penological interests," courts examine the four critical factors outlined by the Supreme Court in <u>Turner</u>: (1) whether there is a legitimate and neutral connection between the regulation and the asserted governmental interest and the policy; (2) whether there are alternative means of exercising the constitutional right; (3) any effect accommodating the right would have on guards and inmates; and (4)

the absence or existence of ready alternatives.  Thornburgh v. Abbott, 490 U.S. 401,

414(1989); Turner, 482 U.S. at 89.  "This is not a 'least restrictive alternative' test:

prison officials do not have to set up and then shoot down every conceivable

alternative method of accommodating the claimant's constitutional complaint."

Turner, 482 U.S. at 90-91.  Moreover, a court does not have to agree with prison

officials' proffered interest for a policy to pass constitutional scrutiny. "The inquiry

under Turner is not whether the policy actually serves a penological interest, but

rather whether it was rational for jail officials to believe that it would." Covell v.

Arpaio, 662 F. Supp. 2d 1146, 1152-53 (D. Ariz. 2009).

        Importantly, the Supreme Court stated in Turner that "courts are ill equipped

to deal with the increasingly urgent problems of prison administration," and

"[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict

scrutiny analysis would seriously hamper their ability to anticipate security problems

and to adopt innovative solutions to the intractable problems of prison

administration."   Turner, 482 U.S. at 84, 89.  The Court must therefore afford

considerable deference to "the determinations of prison administrators who, in the

interest of security, regulate the relations between prisoners and the outside world."

Thornburgh v. Abbott, 490 U.S. 401, 408 (1989).  This reasonableness inquiry

recognizes that courts do not sit as super-wardens, and ensures that prison officials,

rather than judges, will "make the difficult judgments concerning institutional

operations." Turner, 482 U.S. at 89. The distribution of burdens between the parties also reflects the difficulties of prison management from the bench: the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." Overton v. Bazzetta, 539 U.S. 126, 132 (2003); Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 128, 97 (1977) (stating that "the burden was not on [the prison] to show affirmatively" that the creation of an inmate union "would constitute a present danger to security and order").

Here, plaintiffs fail to show that the CCJ pen policy does not pass constitutional scrutiny under Turner. (Doc. 151, pp. 19-21.) As in the preceding section, plaintiffs contend that the security concerns are "dubious" and they criticize the blanket ban. (Id., pp. 19-21.) However, as defendants stated above, there is a logical connection between the CCJ's pen policy and the asserted goal of institutional safety. The CCJ's pen policy was part of an overarching safety initiative to "shank proof" the CCJ. (Allen Decl., ¶¶ 3, 11-12.) Several altered pens were found in the possession of inmates. The once flexible pens had been shaven at the tip and wrapped with multiple layers of what appeared to be paper to re-enforce the pens and make them sturdy. (Id., ¶ 10.) CCJ determined that these altered pens presented a serious hazard to everyone at the CCJ and could cause serious bodily injury. (Id.) As for the blanket ban, the CCJ determined that this was necessary because pens were widely available among inmates, easily transferrable, and can

easily be exchanged.  (Id., ¶ 8.) Under plaintiffs' theory, CCJ staff could only restrict possession of pens upon removing one from an inmate or jail staff after they had been stabbed with it, and then only if they can identify the inmate responsible for the stabbing.

Although inmates are no longer permitted to possess pens, pens are available to all inmates upon request.  (Id., ¶¶ 7, 9, 13, 14.)  In addition to being able to communicate with class counsel through mail, inmates also have alternative means of communicating through text messaging, e-mail, video-visitation, and/or through in-person visitation.  (Id., ¶ 16.)  Therefore, even if the Court considered the constitutional challenge, CCJ's pen policy would easily satisfy scrutiny under Turner.  At most, plaintiffs are complaining of being "inconvenienced" in having to request a pen, but this is insufficient to establish a violation of the First Amendment. Bennett v. Hendrix, 423 F.3d 1247, 1252 (11th Cir. 2005) ("At the same time, we recognize that government officials should not be liable when the plaintiff is unreasonably weak-willed or suffers only a 'de minimis inconvenience to her exercise of First Amendment rights.'").

## D.   The Policy To Ban Personal Possession Of Pens And Make Pens Available Upon Request Is Not Retaliatory

Plaintiffs contend that the CCJ pen policy is a "retaliatory sanction[] designed to punish the legitimate exercise of First Amendment Rights."  (Doc. 151, pp. 22-23.)  However, there is no First or Fourteenth Amendment retaliation claim in this

COVID-19 lawsuit.  Nor are plaintiffs seeking to amend their complaint to add any such claim.  As with plaintiffs' First Amendment contentions discussed in the preceding section,  defendants submit that the Court need not and should not reach the issues of whether the confiscation of pens or the CCJ's pen policy has violated anyone's constitutional rights as that issue is not properly before the Court. Nevertheless, defendants show that plaintiffs fall well short of establishing any claim of retaliation and would not succeed on same even it had been asserted.

The First Amendment forbids retaliating against an inmate for exercising his free speech rights. Harper v. Admin. Lieutenant, No. 20-11222, 2021 U.S. App. LEXIS 15389, at *7 (11th Cir. May 24, 2021).  To state a First Amendment retaliation claim, the inmate must allege that: "(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008). As to the third element, "[t]he causal connection inquiry asks whether the defendants were subjectively motivated to discipline."  Smith, 532 F.3d at 1278. "The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." Thomas v. Evans, 880 F.2d 1235, 1242 (11th Cir. 1989).

Here, there is no evidence whatsoever that the confiscation of pens or CCJ's policy with respect to pens was in retaliation to "the Southern Center's and the ACLU's ongoing litigation and the class members' participation in that litigation." (Doc. 151, pp. 23-24.)  Plaintiffs rely on nothing other than speculation and their own belief that CCJ's justification is "flimsy."  (Id.)  However, as set forth in Major Allen's declaration, this decision had ***nothing*** to do with this case but was part of a safety initiative to "shank proof," "hang proof," and "escape proof" the CCJ in order to make it a safer place for all inmates and staff. (Allen Decl., ¶¶ 3, 11-12.)  As part of the plan to shank proof the CCJ, Major Allen spearheaded an internal review of items accessible by inmates that could be used to cause harm to others.  (Id., ¶ 4.) Major Allen identified that inmates at the CCJ were altering or manipulating pens to create weapons and/or shanks.  (Id., ¶ 6.) For the health, safety, and welfare of everyone at the CCJ, and because of the potential danger, all pens were confiscated from inmates and the CCJ implemented a jail-wide ban on inmate possession of pens and now provide pens to inmates for use upon request.  (Id., ¶¶ 6, 13, 14.)

As Major Allen attests, the decision to ban and/or confiscate pens was not retaliatory in any way and had nothing to do with the above-referenced lawsuit or any communications between class counsel and any members of the class or inmates. (Id., ¶ 11.)  The decision to ban and/or confiscate pens was not made to interfere with the ability of inmates to communicate with class counsel or anyone with

American Civil Liberties Union or Southern Center For Human Rights.  (Id.)  This decision was not made to limit or eliminate any inmate's ability to write their counsel or the courts.  (Id.) Finally, the decision to ban and/or confiscate pens was not made in response to any letters or communications by class counsel to anyone at the CCJ, either.  (Id., ¶ 12.)  Indeed, at the time Major Allen made the decision to confiscate and ban personal possession of pens on March 9, 2021, he was ***unaware*** of the February 2021 mass mailing or any letters sent by class counsel to anyone at the CCJ.  (Id.)

Even if plaintiffs can show that the CCJ pen policy was somehow retaliatory, which they have failed to do, plaintiffs' retaliation claim would still fail because plaintiffs cannot meet the objective prong to support such a claim.  Plaintiffs cannot show that the "allegedly retaliatory conduct would likely deter a person of ordinary firmness" from requesting a pen and/or sending mail and/or exercising their First Amendment rights.  None of the declarant inmates state that the CCJ pen policy or any other action at the CCJ has deterred them from requesting a pen or sending mail.  (Doc. 151-2.)  In fact, inmate Lovelace as well as other inmates have sent handwritten mail and have submitted handwritten grievances after the CCJ pen policy went into effect.  (Docs. 143 and 156.  Exhibits E and F attached to Allen Decl.)  Clearly, inmates have not been deterred from exercising their First

Amendment rights despite the confiscation of pens and the CCJ pen policy prohibiting personal possession.[2]

Plaintiffs present no evidence that the confiscation of pens or the CCJ pen policy was retaliatory. Defendants have submitted evidence establishing just the opposite. Nor have plaintiffs presented evidence from any inmate that contends that he or she has been, or feels that they would be, retaliated against for requesting a pen, let alone sending mail or sending mail to counsel. There is no evidence that anyone at the CCJ has threatened to take adverse action if anyone wrote or spoke to class counsel. Therefore, plaintiffs' retaliation claim, even if considered by the Court, lacks merit.

---

[2] Cf. Halpin v. Crist, 405 F. App'x 403, 407 (11th Cir. 2010) (allegation of fear of retaliation can be "undermined by the record of multiple unrelated grievances he filed, both before and after the alleged incident giving rise to the fear of reprisal."); Henderson v. Langenbrunner, No. 2:09-cv-149-FtM-36DNF, 2010 U.S. Dist. LEXIS 32558, at *23 (M.D. Fla. Apr. 2, 2010) ("Plaintiff was not deterred from seeking redress by the alleged act of retaliation since he immediately filed another grievance against Lngenbrunner regarding the mail incident."); Rodriguez v. McNeil, No. 3:08CV391-MCR/AK, 2009 U.S. Dist. LEXIS 128775, at *5 (N.D. Fla. Apr. 27, 2009) ("Plaintiff has attached numerous grievances to his first and second amended complaints, which are unrelated to the retaliation claims, but which were filed after the alleged threats occurred and prove at least that he was not afraid to use the grievance process even after these threats."); Burgest v. United States, No. 06-60178-CIV, 2008 U.S. Dist. LEXIS 18710, at *4 (S.D. Fla. Mar. 11, 2008) (finding that "allegations of intimidation and coercion by prison officials are flatly contradicted by the evidence showing that he submitted two subsequent grievances").

### III.   <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that the Court deny plaintiffs' Motion for Order Regarding Class Communications.   The decision to confiscate and ban personal possession of pens at the CCJ had nothing to do with this pending action, but was part of a safety initiative to "shank proof" the CCJ in order to make it a safer place for all inmates and staff.   Pens are ***still available*** at the CCJ and all inmates have access to pens upon request. Handwritten filings by Lovelace complete undercuts plaintiffs' contentions otherwise.   If any class member wants to communicate with counsel by mail, moreover, they have the unfettered capability to do so and the CCJ does not interfere with legal mail.   Additionally, class members can also communicate with counsel effectively and efficiently via text messaging, e-mail, video-visitation, and in-person visitation.   Plaintiffs' counsel's ongoing efforts to second-guess jail administration at the CCJ should be rejected.

**FREEMAN MATHIS & GARY, LLP**

*/s/ A. Ali Sabzevari*
Jack R. Hancock
Georgia Bar No. 322450
jhancock@fmglaw.com
A. Ali Sabzevari
Georgia Bar No. 941527
asabzevari@fmglaw.com

*Attorneys for Defendants*

661 Forest Parkway, Suite E
Forest Park, GA  30297

(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to Local Rule 7.1(D), that the foregoing has been prepared in accordance with Local Rule 5.1(C) (Times New Roman font, 14 point).

This 27th day of May, 2021.

FREEMAN MATHIS & GARY, LLP

*/s/ A. Ali Sabzevari*
A. Ali Sabzevari
Georgia Bar No. 941527
asabzevari@fmglaw.com

*Attorney for Defendants*

661 Forest Parkway, Suite E
Forest Park, GA  30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER REGARDING CLASS COMMUNICATIONS** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to all counsel of record who are CM/ECF system participants.

This 27th day of May, 2021.

/s/ A. Ali Sabzevari
A. Ali Sabzevari
Georgia Bar No. 941527
asabzevari@fmglaw.com

*Attorney for Defendants*

FREEMAN MATHIS & GARY, LLP
661 Forest Parkway, Suite E
Forest Park, GA  30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)