# EXHIBIT A

## Declaration of
## Emmitt L. Sparkman

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RHONDA JONES *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>VICTOR HILL *et al.*,<br><br>Defendants. | CIVIL ACTION<br><br>NO. 1:20-CV-2791-JPB-CCB |

**DECLARATION OF EMMITT L. SPARKMAN**

I, Emmitt L. Sparkman, being competent to make this declaration and having personal knowledge of the matters stated herein, declare under penalty of perjury that the following is true and correct:

1. I am over 21 years of age. The statements contained in this declaration are based on my personal knowledge, or on information that experts in the field of corrections would reasonably rely on in forming an opinion. To the best of my knowledge, all opinions are true, and I am aware that they will be used in a court of law.

2. I am a corrections consultant and subject matter expert with over forty-six years of experience working in adult and juvenile institutional and community corrections.

1

3. I have extensive experience in the operation of correctional facilities, in the development of offender classification policies and procedures, and in the oversight of agency offender classification systems.

4. My experience in prison and corrections administrative positions includes responsibility for managing the custody, control, and treatment of incarcerated people housed in long-term segregation and on death row.

5. I have held line and supervisory positions at correctional facilities in the states of Texas, Kentucky, and Mississippi. These positions include: correctional officer, probation officer, education consultant, correctional captain, correctional major, intake-detention superintendent, director of education, director of security, warden, superintendent, and deputy commissioner.

6. My experience includes working in both the public and private corrections sectors. I served as a warden of two private pre-release centers in Texas (1990s), a 936-bed state medium-security prison in Kentucky (1992-1996), and a 1,000-bed private medium-security prison in Mississippi (1996-2001).

7. In June 2001, I was named the Superintendent of the Mississippi State Penitentiary, a prison complex with 18 prisons that included a 1,000-bed supermax prison (Unit 32), housing death row and the highest risk prisoners in the custody of the Mississippi Department of Corrections. I served in that position from June

2001 until December 2002.

8. I was appointed the Deputy Commissioner of Institutions for the Mississippi Department of Corrections in November 2002 and served in that position until May 2013. As Deputy Commissioner for Institutions, I was responsible for three state prison complexes, five private prisons, and fifteen regional prisons. I also had responsibility for the classification, records, employee training, treatment, facilities/engineering, and agriculture departments of the Agency.

9. I have been a consultant to the states of Illinois, Maryland, Colorado, Oklahoma, New Mexico, and South Carolina, assisting them to develop strategies to reduce the use of long-term segregation and improve conditions of confinement in segregation units. I participated in an evaluation of the use of administrative segregation by the Federal Bureau of Prisons in 2014.

10. I serve as an implementation panel member responsible for monitoring the settlement agreement between the South Carolina Department of Corrections and the plaintiffs in *T.R., et al. v. South Carolina Department of Corrections, et al.*, C/A No. 2005-CP-40-2925, in the Court of Common Pleas for the Fifth Judicial Circuit, regarding conditions of confinement for mentally ill prisoners.

11. I serve as a subject matter expert for the Court Monitors in *Nunez v. City of New York, et al.*, No. 11-cv-5845 (LTS) (JCF) (S.D.N.Y.) and *United States of America v. Territory of the Virgin Islands, et al.*, No. 1:86-cv-265 (D.V.I.).

12. I was certified as an American Correctional Association auditor in 1995. I have conducted numerous accreditation audits for the Federal Bureau of Prisons and state correction systems and have served both as an audit team member and as an audit chairperson.

13. I was asked by Plaintiffs' counsel to offer my opinion on whether the decision to ban Clayton County Jail detainees from possessing pens is consistent with prevailing norms in the field of corrections. In my opinion, the ban is unreasonable and inconsistent with accepted practices in managing correctional facilities.

14. I have reviewed Plaintiffs' Motion for an Order Regarding Class Communications (Doc. 151), the exhibits attached to that motion (Doc. 151-1 to 151-6), Defendants' Response in Opposition to Plaintiffs' Motion for Order Regarding Class Communications (Doc. 157), and the exhibits attached to Defendants' response (Doc. 157-1). In addition, I previously reviewed records concerning the Clayton County Jail and conducted an on-site inspection of the facility on October 4, 2020.

15. In mid-February 2021, Plaintiffs' counsel sent legal mail to all of the approximately 2,000 detainees in the Clayton County Jail. (Doc. 151-1 at 3-4.) On March 9, 2021, the Jail Administrator, Major Levon Allen, ordered the Clayton County Jail's "command staff" to implement a "ban on inmate possession of pens" and to "confiscate pens from the cells" of detainees. (Doc. 157-1 at 3.) Pens were also removed from the jail's commissary so that detainees could not purchase them. (Doc. 151-2 at 8.)

16. The ban on pens is a new policy. (*See, e.g.*, Doc. 151-2 at 2 (detainee R.K. stating that the ban "came as a surprise" because he "had access to pens for as long as [he had] been at the jail"); *id.* at 9; *id.* at 11.) The pens used in the jail are flexible and collapse under pressure. (*Id.* at 12.)

17. According to his declaration, Major Allen decided to confiscate all pens from detainees and implement a jail-wide ban on detainee possession of pens because detainees could use pens to create weapons, write on jail surfaces, and give themselves tattoos. (Doc. 157-1 at 3.) Major Allen states that detainees can request pens temporarily from officers, and that officers "should not" refuse the request. (*Id.* at 5.) I did not see any evidence that Major Allen has adopted a written standard operating procedure governing detainees' use of pens. According to detainees, it appears that officers have refused to provide pens when detainees

5

request them. (Doc. 151-2 at 3-4, 6, 9 6, 9, 11, 15, 18.)

18. In my opinion, a complete ban on inmate possession of pens is not a reasonable policy, even if officers provided pens upon request as stated in Major Allen's declaration.

19. Reasonable prison and jail administrators know that prisoners and jail detainees depend on traditional paper mail to exercise their constitutional rights to access the courts and communicate with their lawyers. Prisoners and jail detainees are also understood to have a right to confidentiality in their communications with attorneys by mail. For this reason, every correctional and jail facility I know of, other than the Clayton County Jail currently, allows prisoners and detainees generally to possess pens or pencils in their cells. There are often limitations on what kind of pens or pencils a prisoner or detainee may possess, or where they must keep them. But I am aware of no other facility that has implemented a blanket ban of the kind recently adopted in the Clayton County Jail.

20. The flexible pens described in detainee's declarations are designed to be safe for prison and jail settings. They are specifically designed to have minimal effectiveness as weapons and are widely used in jails and prisons to promote security. Some jails and prisons issue very short pencils that similarly have little use as weapons.

21. Even in high security restrictive housing units that hold the most violent or difficult prisoners, every facility I have worked in has allowed prisoners generally to possess flexible pens or short pencils, with no detrimental impact on security or orderly operations. The only time those pens or pencils would be confiscated from prisoners would be at the direction of mental health professionals on a temporary basis if the prisoner presented a threat to others or himself or herself. The pens or pencils would be confiscated along with all of a prisoner's other property, not because pens and pencils posed a particular risk. As soon as mental health professionals approved it, a prisoner whose property had been confiscated would have the property, including writing utensils, returned.

22. In my experience, flexible pens do not present a sufficiently serious security risk to justify a blanket ban on prisoners or detainees possessing them. They are no more useful as weapons than many other items commonly distributed to detainees such as eating utensils, safety razors, and toothbrushes.

23. A blanket ban on possession of pens is not a reasonable way to prevent prisoners and detainees from writing on jail surfaces or using ink for tattoos. There are reasonable alternatives to a ban. For example, periodically inspecting cells for writing and detainees themselves for fresh tattoos, and using disciplinary sanctions to deter misuse of pens, would accomplish the same result.

According to the Clayton County Sheriff's Office standard operating procedure on razor blades, it appears that the jail has taken that approach to razors, allowing detainees to be issued a razor before court appearances, but permitting individualized disciplinary sanctions and increased supervision if detainees misuse their issued razors. (Doc. 151-5.)

24. The policy described in Major Allen's declaration is inadequate for the further reason that it fails to ensure that detainees will be able to maintain confidentiality of their communications when they use the pens for legal communications. The declaration states that detainees are brought to the housing unit's day room to use a pen provided by a correctional officer, presumably while a correctional officer is present and potentially able to observe what the detainee is writing.

25. For these reasons, my opinion is that the Clayton County Jail's blanket ban on detainees' possession of pens is unreasonable and not justified by security, health, or safety concerns.

I swear under penalty of perjury that the information given herein is true and correct.

Sworn by me this 10th day of June, 2021.

/s/ Emmitt L. Sparkman